CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
LESNICK PRINCE & PAPPAS LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:  (213) 493-6496
Facsimile:   (213) 493-6596

Attorney for Petitioning Creditors BPMD
Texas Partners, LP, Lejos Investments, LLC,
Ricky Lyons, Gordon Smith, and Robert
Chaikin

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:23-bk-11489-SC |
| | Chapter 7 |
| TRUE PHARMASTRIP, INC., a Canadian corporation, | **MOTION OF PETITIONING CREDITORS TO APPOINT AN INTERIM TRUSTEE** |
| Debtor. | Hearing Information: <br> Date: To Be Set By Court <br> Time: To Be Set By Court <br> Held Remotely Using ZoomGov |

# **TABLE OF CONTENTS**

**I.     INTRODUCTION** ...................................................................................................**1**

**II.    FACTUAL BACKGROUND**..............................................................................**2**

**III.   ARGUMENT** .....................................................................................................**9**

       A.    The Bankruptcy Code Provides for the Appointment of an Interim Trustee to
             Preserve the Assets of the Estate ...................................................................9

       B.    The Court Should Appoint an Interim Trustee in This Case ...........................9

**IV.    CONCLUSION**...............................................................................................**12**

# **TABLE OF AUTHORITIES**

CASES

*In re James Plaza Joint Venture*
    62 B.R. 959 (Bankr. S.D. Tex. 1986)............................................................................ 10

*In re: Professional Accountants Referral Services, Inc.*
    142 B.R. 424 (Bankr. D. Colo. 1992)........................................................................... 10

STATUTES

11 U.S.C. § 1104(a)(1) ...................................................................................................... 10

11 U.S.C. § 303(g)......................................................................................................... 9, 10

1    Petitioning Creditors BPMD Texas Partners, LP, Lejos Investments, LLC,

2    Ricky Lyons, Gordon Smith, and Robert Chaikin (collectively "Petitioners") hereby request

3    that the Court appoint an interim trustee (the "Motion").[1]  As Petitioners will show, the

4    appointment of an interim trustee is necessary to protect the bankruptcy estate of alleged

5    debtor True Pharmastrip, Inc. ("TPI" or "Debtor") and to prevent its chief executive officer

6    Jacques Poujade, as well as its legal counsel Spertus, Landes & Josephs, LLP, from

7    dissipating TPI's assets.

8    **I.    INTRODUCTION**

9        Petitioners are entities and individuals who loaned TPI a total of $475,000 in

10   2019 (the "Loans").  Under the terms of the loan agreements between TPI and

11   Petitioners, TPI was obligated to repay the Loans in 2021, but it failed to do so.

12   Petitioners made a formal demand for repayment upon TPI in 2021,[2] but TPI ignored

13   them.

14       Petitioners commenced this bankruptcy case by filing an involuntary petition

15   for relief under Chapter 7 of the United States Bankruptcy Code on July 24, 2023.  The

16   Court issued a summons on July 26, and Petitioners obtained it from the Court that same

17   day.

18       TPI has stated that it sold substantially all its assets to a company known as

19   Falcon International, Inc. in or around October 2022.  Petitioning Creditors are aware,

20   however, that there is one potential source of recovery for TPI's creditors – funds

21   interpleaded in an action currently pending in Los Angeles County Superior Court, where

22   a receiver previously interpleaded $1.2 million of funds (the "Interpleader Action").  TPI is

23   an active litigant in the Interpleader Action and claims the first $948,589.60 of those funds

24

25

26

[1] The Petitioning Creditors are concurrently making an *ex parte* application for an order
27  shortening time on the Motion.
[2] The Loan agreements did not require Petitioners to make a demand for repayment; they
28  did so anyway.

1  belong to it.  TPI's legal counsel has also filed a "Notice of Lien" in the Interpleader

2  Action, claiming an unspecified amount of the money is owed to him.

3        Should TPI recover the $1.2 million or some lesser amount in the

4  Interpleader Action, its CEO Jacques Poujade is a direct threat to immediately dissipate

5  those funds.  In 2019, Poujade violated a preliminary injunction and asset freeze issued

6  by a California federal district court, and was found to be in contempt of court, by

7  permitting his business associate Jason Cardiff to access $1.2 million of TPI funds in

8  violation of the asset freeze.  The federal district court minced no words when it found

9  Poujade in contempt, calling him a liar and accusing him of perpetrating a fraud on the

10  Court.  The Spertus, Landes & Josephs firm, which currently represents TPI in the

11  Interpleader Action, represented Poujade in those contempt proceedings.

12        Since that time, in a separate matter, Poujade pled guilty to one count of

13  Securities Fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.  The

14  Spertus, Landes & Josephs firm represents Poujade in his personal criminal case even

15  though it has nothing to do with TPI or the FTC action.  It may be that Poujade is trying to

16  use funds that belong to TPI's creditors to pay for his legal fees in his personal criminal

17  case.

18        The Court should appoint an interim trustee to prevent Poujade and the

19  Spertus, Landes and & Josephs law firm from absconding with funds that rightfully belong

20  to TPI's creditors.

21  II.    **FACTUAL BACKGROUND**

22        In May 2019, an investment banker named John Lemak contacted Marc

23  Graubart, the managing partner of Petitioner BPMD Texas Partners, LP, about an

24  investment opportunity in a company (Debtor TPI) that purportedly manufactured and sold

25  dissolvable strips containing THC, the active ingredient in cannabis.  *See* Declaration of

26  Marc Graubart (hereinafter "Graubart Dec."), ¶3.  Graubart knew Lemak because Lemak

27

28

1  had previously worked with Graubart's father.  *Id.*  Lemak told Graubart, "You have to do

2  this deal," and "it's going public."  *Id.*

3  Graubart then spoke with Jason Cardiff, who held himself out as the owner

4  of TPI.  *See* Graubart Dec., ¶4.  In connection with his efforts to secure Graubart's

5  investment capital, Cardiff told Graubart he had turned down a $500 million offer from

6  Philip Morris to purchase the company.  *Id.*  At no point did Cardiff ever mention the name

7  Jacques Poujade.  *Id.*

8  Based on these representations, Graubart decided to invest.  *See* Graubart

9  Dec., ¶5.  To that end, he also offered the opportunity to other investor friends of his.  *Id.*

10  All told, Graubart (through an entity called BPMD Texas Partners, LP) invested $200,000,

11  and the other investors invested the following sums:

12  Robert Chaikin:            $50,000

13  Gordon Smith:             $50,000

14  Ricky Lyons:              $25,000

15  *See* Graubart Dec., ¶6; Declaration of Robert Chaikin ("Chaikin Dec."), ¶3;

16  Declaration of Gordon Smith ("Smith Dec."), ¶3; Declaration of Ricky Lyons ("Lyons

17  Dec."), ¶3.

18  Another investor, Petitioning Creditor Lejos Investments, LLC, learned about

19  the investment opportunity by discussing it with John Lemak, and invested $150,000.

20  Declaration of Jeff Farr ("Farr Dec."), ¶3.

21  With one exception, the Loan Agreements were entered into in July 2019,

22  with repayment scheduled to occur by July 2021.  *See* Graubart Dec., ¶6; Chaikin Dec.,

23  ¶3; Farr Dec., ¶3; Smith Dec., ¶3; Lyons Dec., ¶3.  Although Petitioners were given the

24  right to convert the repayment obligations into shares of TPI, all of them declined to

25  exercise that option.  *See* Graubart Dec., ¶6; Chaikin Dec., ¶3; Farr Dec., ¶3; Smith Dec.,

26  ¶3; Lyons Dec., ¶3.

27

28

3

1    When Lemark and Cardiff solicited funds from Graubart and the other

2    investors in July 2019, they concealed critical information that, had it been known by

3    Petitioners, would have deterred Petitioners from ever investing in the first place – namely

4    that Cardiff was a defendant in an action filed by the Federal Trade Commission ("FTC")

5    in the central district of California.  *See* Graubart Dec., ¶7; Chaikin Dec., ¶4; Farr Dec.,

6    ¶4; Smith Dec., ¶4; Lyons Dec., ¶4.

7    Nearly one year earlier, on October 10, 2018, the Federal Trade

8    Commission filed a complaint (the "FTC Complaint") for a permanent injunction and other

9    equitable relief against Jason Cardiff individually, as well as Redwood Scientific

10   Technologies, Inc. ("Redwood Scientific"), a company for which Cardiff served as a

11   shareholder, officer, and director.  *See* Petitioners' Request for Judicial Notice ("RJN")

12   No. 1.  The FTC Complaint also revolved around the production and marketing of

13   dissolvable strips, the same product TPI purportedly manufactures.  Specifically, the FTC

14   alleged:

15   6.    Individual Defendants Jason Cardiff, Eunjung Cardiff,
16   and Danielle Cadiz have for years operated a fraudulent multi-
     pronged scheme that has bilked consumers out of millions of
17   dollars through baseless advertising claims for products that
     purport to alleviate serious health conditions, while also
18   enrolling consumers in unwanted autoship programs that
     have resulted in millions of dollars of unauthorized charges.
19

20   7.    Defendants' evolving business operation injures
     consumers in multiple ways.  First, Defendants' marketing of
21   their dissolvable strips relies on false or unsubstantiated
     claims for TBX-FREE (stop smoking aid), Eupepsia Thin
22   (appetite suppressant), and Prolongz (men's sexual
     performance), including claims that those products were
23   proven to work.  Defendants also make false claims that their
     film strips are made in the United States and are sold with
24   money-back guarantees.  Then, Defendants enroll consumers
     – without prior notice and authorization and, in some cases,
25   notwithstanding consumers' or Defendants' clear statements
     to the contrary – in autoship continuity plans that bill
26   consumers monthly for unwanted products.  Defendants also
     make it difficult for consumers to cancel those plans and get
27   their money back.  More recently, Defendants have turned to

28

4

1    abusive telemarking practices by delivering prerecorded
2    marketing messages to millions of consumers.    Finally,
     Defendants recently launched a multi-level marketing scheme
3    for which they make false or unsubstantiated earnings claims.

4         *See* Petitioners' RJN No. 1, ¶¶6, 7.

5         After filing the Complaint, the FTC immediately moved for and obtained a

6    preliminary injunction against Cardiff and his wife, with the Court finding "in numerous

7    instances" they had "misrepresented the effectiveness of their dissolvable film strip

8    products for smoking cessation, weight loss, and improved male sexual performance,

9    thereby misleading vulnerable consumers."  *See* Petitioners RJN No. 2, "Findings of

10   Fact," Recital B.  As part of the order granting the FTC's motion for preliminary injunction

11   (the "PI Order"), the Court ordered the Cardiffs' assets frozen, which prohibited them from

12   "transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing,

13   dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or

14   security interest or other interest in, any Assets . . . . owned or controlled, directly or

15   indirectly, by any Defendant, including, but not limited to, those for which any Defendant

16   is a signatory on the account."  *See* Petitioners' RJN No. 2, p. 14.

17        The PI Order also confirmed the continued appointment of a receiver (the

18   "Receiver") to hold and control the assets of the Cardiffs.[3]  *See* Petitioners' RJN No. 2, p.

19   22-23, Section XVI(B)(empowering the Receiver to take "exclusive custody, control, and

20   possession of all Assets and Documents of, or in the possession, custody or under the

21   control of, any Receivership Entity and all Assets of Defendant Jason Cardiff and Eunjung

22   Cardiff covered by Part XV of this Order, wherever situated").

23        In June 2019 – right around the time Cardiff began soliciting investment

24   funds from Petitioners – the FTC returned to Court, filing a motion seeking to hold Cardiff,

25   his wife, and Jacques Poujade in contempt for violating the terms of the PI Order and

26   _____

27   [3] Section XVI(E) on pages 24-25 of the PI Order contains a list of the extravagant items of
     jewelry and other personal items the Cardiffs purchased with the millions they stole from
28   consumers.

5

1  unlawfully transferring funds to Cardiff.  Following three days of court testimony from July

2  29-31, 2019, and several filings thereafter, the Court entered an order on October 29,

3  2019.  [RJN No. 3, Order, Dkt. No. 238.]  In its order, the Court "found that Jason Cardiff,

4  Eunjung Cardiff, and Jacques Poujade were in contempt of the Court's Temporary

5  Restraining Order (Dkt. 29) and Preliminary Injunction (Dkt. 59)."  *Id.*

6          The Court further ordered counsel for Poujade -- the Spertus, Landes &

7  Josephs firm which now represented TPI in the Interpleader Action -- to transfer

8  $1,560,000 Canadian dollars ($1,205,984.80 United States dollars) to the Receiver for the

9  purpose of maintaining those funds pending further order of the Court.  *Id.*  The transfer of

10 those funds "resolves the contempt proceedings as to the money at issue."  *Id.*

11         In connection with the Order, the district court judge stated that "I've never

12 presided over a matter where the fraud committed by the defendants was so clear, the

13 deception so extreme.  I'm astounded."  *See* Petitioners' RJN No. 4, 389:3-6.  Speaking

14 directly to Poujade – TPI's CEO –the district court stated:

15
16         "Mr. Poujade, I find that you are totally unbelievable.  You lied
           to this Court.  You perpetrated fraud on this Court.  You did
           that in conjunction with the Cardiffs.  You created a paper trail
17         perpetrating the fraud on the Court.    It's unbelievable
           considering the positions that you hold as a financial officer.
18         But I guess money is everything and greed is everything.  And
           in the pursuit of your greed, you have advanced the interest
19         of the Cardiffs to the detriment of the public, government
           agencies, the receiver, and the Court."
20
21         *See* Petitioners' RJN No. 4, 390:17 – 391: 2.

22         Indeed, the district court recommended that the FTC pursue criminal

23 charges against both:

24
           "It would seem to me because of the egregious nature of this
25         case, that the government should consider or should have
           considered pursuing a criminal contempt.  I am convinced that
26         if this matter were brought before a jury, the jury would return
           a verdict of conviction as to all defendants in this case.  I would
27         - - I would suggest that the FTC seriously consult with the
           office of the U.S. Attorney and bring this matter to the attention
28

                                                6

of the federal authorities, criminal section of the U.S. Attorney.
This is outrageous, unbelievable."

*See* Petitioners' RJN No. 4, 391:9-19.

As noted, Petitioners had no idea any of these events were transpiring when Cardiff solicited them for investment funds in the summer of 2019. *See* Graubart Dec., ¶8; Chaikin Dec., ¶5; Farr Dec., ¶5; Smith Dec., ¶5; Lyons Dec., ¶5.

A month before repayment of the loans was due in 2021, Graubart asked TPI to review the company's financial statements. *See* Graubart Dec., ¶9. He was rebuffed. *Id.* At that point, he and the other Petitioners had formed serious reservations about TPI and its leadership, and they simply wanted to be repaid on their loans. *See* Graubart Dec., ¶9; Chaikin Dec., ¶6; Farr Dec., ¶6; Smith Dec., ¶6; Lyons Dec., ¶6. The time for repayment came and went, and TPI defaulted on its obligations. *See* Graubart Dec., ¶10; Chaikin Dec., ¶;7 Farr Dec., ¶7; Smith Dec., ¶7; Lyons Dec., ¶7.

Although the loan agreements did not require them to demand repayment, Petitioners did so anyway, but to no avail. *See* Graubart Dec., ¶10; Chaikin Dec., ¶7; Farr Dec., ¶7; Smith Dec., ¶7; Lyons Dec., ¶7. TPI simply ignored them. *See* Graubart Dec., ¶10; Chaikin Dec., ¶7; Farr Dec., ¶7; Smith Dec., ¶7; Lyons Dec., ¶7. Not only did TPI fail to repay Petitioners, TPI has utterly failed to even communicate any intention of *ever* repaying them. *See* Graubart Dec., ¶10; Chaikin Dec., ¶7; Farr Dec., ¶7; Smith Dec., ¶7; Lyons Dec., ¶7.

Ultimately, in the FTC action, over the objections of TPI (who insisted the funds must be returned to it), the district court ordered the $1.2 million Poujade gave to the receiver to purge the contempt of court decree against him to be interpleaded in a state court action. *See* Petitioners' RJN No. 5.

The receiver followed the order of the district court and filed the Interpleader Action in February 2022. *See* Petitioners' RJN No. 6. Petitioners were named as "Defendants," or in other words parties who had a potential interest in the $1.2 million. *Id.* TPI filed a cross-complaint against all other parties, asserting its sole right to the money.

7

1  *See* Petitioners' RJN No. 7.  Petitioners filed a cross-complaint for declaratory relief, and

2  TPI is now seeking to dismiss Petitioners' cross-complaint, once again intentionally

3  disregarding its repayment obligations to Petitioners.  *See* Declaration of Jack L.

4  Henningsen ("Henningsen Dec."), ¶3.  In the meantime, the Spertus, Landes & Josephs

5  law firm has filed a notice of lien with the Court, claiming it is owed some unspecified

6  amount of the $1.2 million being held by the receiver in the Interpleader Action.  *See*

7  Petitioners' RJN No. 8.

8         After the Interpleader Action was filed in February 2022, in October 2022

9  TPI notified all the debenture holders (including Petitioners) that it intended to sell its

10  assets to a company called Falcon International, Inc. ("Falcon"), and they could trade in

11  their debt for shares of Falcon.  *See* Graubart Dec., ¶11; Chaikin Dec., ¶8; Farr Dec., ¶8;

12  Smith Dec., ¶8; Lyons Dec., ¶8.  Petitioners declined that "opportunity."  *See* Graubart

13  Dec., ¶11; Chaikin Dec., ¶8; Farr Dec., ¶8; Smith Dec., ¶8; Lyons Dec., ¶8.

14         It is Petitioners' understanding that TPI completed the asset sale to Falcon,

15  and TPI is no longer conducting business.  *See* Graubart Dec., ¶11; Chaikin Dec., ¶8;

16  Farr Dec., ¶8; Smith Dec., ¶8; Lyons Dec., ¶8.  The only asset Petitioners are aware of

17  that could satisfy the debt TPI owes them is the $1.2 million being held by the receiver in

18  the Interpleader Action.  *See* Graubart Dec., ¶11; Chaikin Dec., ¶8; Farr Dec., ¶8; Smith

19  Dec., ¶8; Lyons Dec., ¶8.

20         In June 2023, TPI filed a motion for summary judgment in the Interpleader

21  Action, contending it is entitled to the first $948,589.60 of the $1.2 million.  *See*

22  Henningsen Dec., ¶3.  Oddly, TPI's motion does not request that the funds be paid to TPI;

23  instead, it requests that the funds be paid **directly to the Spertus, Landes & Josephs**

24  **law firm**.  *See* Petitioners' RJN No. 9, p. 2, lines 27-28 (asking the Court to "order the

25  Clerk to release the funds forthwith to the Spertus, Landes & Josephs, LLP – Attorney

26  Client Trust Account").

27

28

8

1    In an action unrelated to either TPI or the FTC action, Poujade has now pled guilty

2    to one count of Securities Fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §

3    240.10b-5 (the "Securities Fraud Case").  *See* Petitioners' RJN No. 10.  Not

4    coincidentally, the Spertus, Landes & Josephs law firm represents Poujade in the

5    Securities Fraud Case.  *Id.* at p. 25 (attorney Samuel Josephs is a name partner of the

6    Spertus, Landes & Josephs law firm).  It is possible that Poujade, TPI's CEO, is trying to

7    divert TPI's funds to the Spertus, Landes & Josephs law firm to pay for his defense in his

8    personal criminal case.

9    **III.    ARGUMENT**

10        **A.    The Bankruptcy Code Provides for the Appointment of
                   an Interim Trustee to Preserve the Assets of the Estate**

11

12        The Bankruptcy Code anticipates that, in some involuntary bankruptcy

cases, it will be necessary to bring in a trustee immediately to protect assets of the estate.

13

For this reason, the Code specifically gives the Court the power to appoint an interim

14

trustee:

15

16        At any time after the commencement of an involuntary case
          under chapter 7 of this title but before an order for relief in the
17        case, the court, on request of a party in interest, after notice
          to the debtor and a hearing, and if necessary to preserve the
18        property of the estate or to prevent loss to the estate, may
          order the United States trustee to appoint an interim trustee
19        under section 701 of this title to take possession of the
          property of the estate and to operate any business of the
20        debtor.

21        *See* 11 U.S.C. Section 303(g).

22

23        **B.    The Court Should Appoint an Interim Trustee in This
                   Case**

24        The language of the statute is clear and sets forth a simple test.  The Court

25    has the discretion to appoint a trustee if it believes doing so is necessary to preserve the

26    property of the estate or prevent loss to the estate.

27

28

9

1    There are very few reported decisions interpreting Section 303(g).  In *In re*

2  *James Plaza Joint Venture,* 62 B.R. 959 (Bankr. S.D. Tex. 1986), the court appointed an

3  interim trustee to prevent the dissipation of the Debtor's sole asset – a bank account

4  containing approximately $150,000.  This is like the instant case, where it appears the

5  $1.2 million being held by the receiver in the Interpleader Action is TPI's only remaining

6  asset.

7    In *In re: Professional Accountants Referral Services, Inc.*, 142 B.R. 424

8  (Bankr. D. Colo. 1992), the Court held that appointment of an interim trustee on an

9  emergency basis was proper where there has been "dishonesty . . . or gross

10  mismanagement of the affairs of the debtor by current management . . ." (quoting 11

11  U.S.C. Section 1104(a)(1).)

12    Here, there is compelling evidence TPI's CEO Poujade is dishonest and

13  cannot be trusted to manage TPI's affairs in bankruptcy.

14    For starters, when TPI was seeking investments funds from Petitioners,

15  neither Poujade nor Jason Cardiff ever disclosed the fact that the FTC had filed an action

16  against Cardiff and his companies, and the FTC then subsequently obtained a permanent

17  injunction and an asset freeze against Cardiff.

18    As the orders of the federal district court show, Poujade then actively

19  assisted Cardiff in violating the terms of the asset freeze, enabling Cardiff to access $1.2

20  million in TPI funds to pay for his lavish personal expenses.  The federal district court

21  concluded Poujade was a liar, had perpetrated fraud on the Court, and suggested the

22  government should file criminal contempt charges against him.  In short, Poujade cannot

23  be trusted.

24    As if his fraudulent actions from four years ago were not enough, within the

25  past month Poujade has pled guilty to securities fraud charges filed by the United States

26  Attorneys' Office.

27

28

10

1    Not only is Poujade untrustworthy, but TPI has shown no ability or

2    willingness whatsoever to repay Petitioners.  Beyond the $1.2 million being held by the

3    receiver in the Interpleader Action, it is doubtful whether TPI has any other assets to

4    satisfy the obligations it owes to Petitioners.

5    Not only should the Court prevent Poujade and TPI from dissipating assets,

6    but the appointment of an interim trustee is necessary to prevent TPI's legal counsel from

7    improperly seizing the $1.2 million in funds (or some portion thereof) to the detriment of

8    TPI's creditors.  In July 2019, TPI's counsel James Spertus was the same counsel

9    defending Jacques Poujade against the contempt of court charges.  In open court and in

10    filings, Spertus maintained that as of October 2018, Jason Cardiff had nothing to do with

11    TPI and individuals who invested money with TPI after that time "did not even know the

12    name Jason Cardiff."  That was, of course, completely untrue.  As noted herein, it was

13    *Jason Cardiff* who met with Petitioner Marc Graubart in May 2019 – nearly seven months

14    *after* Cardiff had purportedly dissociated himself from TPI – and persuaded Graubart to

15    loan TPI money.  *See* Graubart Dec., ¶4.

16    It was after Spertus represented Poujade in open court testimony from July

17    29-31, 2019 that the Court made its findings of fact, determining Poujade was a liar, had

18    no credibility, had perpetrated a fraud on the Court, and had violated the PI and the asset

19    freeze by permitting Cardiff to transfer $1.2 million from a TPI bank account to TPI's

20    lawyer.  From there, the money went to a company controlled by Poujade's brother, who

21    then made the funds available to Cardiff so he could pay his personal expenses.  *See*

22    Petitioners' RJN No. 11, p. 3.

23    After the Court held Poujade in contempt of court, Spertus filed a motion on

24    behalf of TPI to intervene in the case, which the Court denied, and he filed an appeal to

25    the 9th Circuit, which was also unsuccessful.  *See* Petitioners' RJN No. 5, p. 6.  He also

26    filed a motion with the district court seeking release of the funds, which the Court denied.

27    *Id.*

28

11

1    In short, Spertus represented Poujade as he presented untruthful testimony

2    to, in the words of the court itself, "perpetrate a fraud." After Poujade was found to be in

3    contempt of court, Spertus spent substantial attorneys' fees litigating several

4    unsuccessful motions, including an unsuccessful appeal to the 9th Circuit.  Now, in the

5    Interpleader Action, Spertus is representing TPI as it takes steps to defeat Petitioners'

6    right to repayment of the Loans, while simultaneously claiming a lien on an unspecified

7    amount of the funds.

8    To make matters worse, Spertus has asked the Court to order the $1.2

9    million in funds (or at least the first $948,589.60) to be paid to his law firm directly.  This

10    suggests that TPI is attempting to divert $948,589.60 of TPI funds to the Spertus, Landes

11    & Josephs firm to pay Poujade's legal fees in a criminal action filed against him

12    personally.

13    **IV.    CONCLUSION**

14    TPI, Poujade, and the Spertus, Landes & Josephs law firm cannot be

15    trusted to preserve the TPI funds in the Interpleader Action for the benefit of TPI's

16    creditors, and the Court should appoint an interim trustee for the benefit of Petitioners and

17    any other TPI creditors.

18    DATED:  July 28, 2023                    LESNICK PRINCE & PAPPAS, LLP

19

20                                        By:  /s/ Christopher E. Prince

21                                              Christopher E. Prince
                                              Attorney for Petitioning Creditors BPMD
22                                              Texas Partners, LP, Lejos Investments,
                                              LLC, Ricky Lyons, Gordon Smith, and
23                                              Robert Chaikin

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled (*specify*): **MOTION OF PETITIONING CREDITORS TO
APPOINT AN INTERIM TRUSTEE** will be served or was served **(a)** on the judge in chambers in the form and manner
required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
07/28/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Christopher D Crowell**    ccrowell@hrhlaw.com
- **Christopher E Prince**    cprince@lesnickprince.com,
  jmack@lesnickprince.com;cprince@ecf.courtdrive.com;jnavarro@lesnickprince.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 07/28/2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case
or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first
class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge
will be completed no later than 24 hours after the document is filed.

Debtor
True Pharmastrip, Inc.
Attn: Jacques Paujade, in his capacity as an officer of the Debtor
16 Canyonwood
Irvine, CA 92620

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 07/28/2023, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

**VIA OVERNIGHT MAIL:**
Hon. Scott C. Clarkson
United States Bankruptcy Court
411 W. Fourth St., Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 07/28/2023 | Janet A. Mack | /s/ Janet A. Mack |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**