**LITIGATION AND BUSINESS LAW GROUP, INC.**
Michael W. Kinney, Esq. (106781)
73-745 El Paseo Drive, Suite 12B
Palm Desert, California 92260
Telephone:  760.341.1100
Email:      mkinney@lblglaw.com

Attorneys Specially Appearing for
True Pharmastrip Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

|  |  |
|---|---|
| IN RE TRUE PHARMASTRIP INC., A Canadian Corporation | ) Case No. 8:23-bk-11489-SC<br>)<br>)<br>)<br>) **DECLARATION OF ERWIN SUI IN**<br>) **SUPPORT OF TRUE PHARMASTRIP,**<br>) **INC'S  OPPOSITION TO PETITIONING**<br>) **CREDITORS MOTION FOR**<br>) **APPOINTMENT OF AN INTERIM**<br>) **TRUSTEE**<br>)<br>)<br>) **Date:   August 24, 2023**<br>) **Time:  8:30 a.m.**<br>) **Ctrm.**<br>)<br>)<br>)<br>)<br>)<br>) |

I, Erwin Sui, declare and state as follows:

1.  I am attorney at law duly licensed to practice in Canada. I know each of the following facts to be true of my own personal knowledge or have gained such knowledge from the books and records maintained under my supervision and control.

2.    I am the attorney for True Pharmastrip, Inc. ("TPI") formerly known as Clover Cannastrip Thin Film Technologies Corp.

3.    At or about the time that I started representing TPI in the latter part of September 2018, I became aware of a corporate restructuring of the company. I learned that one of the original shareholders, Jason Cardiff ("JCardiff") had tendered his shares for cancelation and that he and his wife Eunjung Cardiff ("ECardiff") had resigned or would shortly resign as directors. JCardiff or ECardiff were never officers of TPI.

4.    TPI was incorporated under the B.C. *Business Corporations Act* on July 31, 2018. The original incorporator was JCardiff, who subscribed for 100 Class A Common Shares of TPI for nominal consideration. TPI was incorporated as a holding company.

5.    On July 31, 2018, Ange Gardien LLC., subscribed for 100 Class A Common Shares for nominal consideration.

6.    TPI's registered office is 1383 West 8th Avenue, Vancouver, B.C. The initial directors of the Company were JCardiff, Jacques Poujade and Eujung Cardiff ("ECardiff").   TPI does not now nor has it ever maintained an office in California. TPI is not qualified to do business in California or any other state in the United States.

7.    JCardiff tendered his shares for cancellation back to the Company. The shares were cancelled and this cancelation was entered into the stock register of the company. The shares were cancelled on August 29, 2018. The cancelation of the shares of JCardiff were recorded in the official registry of the Company maintained by a separate law firm Benchmark Law Corporation. I notified Benchmark of the transaction. Neither JCardiff nor ECardiff are shareholders of TPI nor were they after August 29, 2018.

8.    As an attorney I am subject to rules of professional conduct. Rule 2.1-1 of the British Columbia Code of Professional Conduct states that, "A lawyer owes a duty to the state, to maintain its integrity and its law. A lawyer should not aid, counsel or assist any person to act in any way contrary to the law." Further Section 427 0f the B.C. Business Corporations Act provides that, "a person who makes or assists in making a statement that is included in a record that is required or permitted to be made by or for the purposes of this Act or the regulations commits an offence if the statement (a)is, at the time and in the light of the circumstances under which it is made, false or misleading in respect of any material

fact, or (b)omits any material fact, the omission of which makes the statement false or misleading." I would not submit any untrue statements for inclusion in the corporate records of TPI.

9.      JCardiff and ECardiff resigned as directors of TPI. They resigned prior to October 8, 2018 but it was not formally documented in a resolution at that time and the resignation of each was made effective on October 8, 2018.  Notice of the resignations was filed with the B.C Corporate Registry on November 16, 2018. I verified that the information on the notice of resignation was true and correct before processing it for filing. Although Jason Cardiff no longer had anything to do with TPI by September 2018, he inadvertently remained a signatory on TPI's checking account after his resignation from TPI.

10.      In September 2018, TPI received its first capital infusion.  After the funds from these transactions were received by TPI's then Canadian law firm, the firm wired $500,000 CAD to TPI's account on September 10, 2018.  On September 13, 2018, after certain fees and commissions were deducted from the FSD Pharma, $1,340,000 CAD more was wired into TPI's account.

11.      On September 19, 2018, TPI incorporated a wholly-owned subsidiary called Pharmastrip Corp. under the *Canada Business Corporations Act*.   The sole director and sole officer of Pharmastrip Corp. is Richard Poujade.   Pharmastrip Corp's address is 1199 Grenoble Crescent, Ottawa, ON K1C 2C5 Canada.  It has never had a California address.

12.      On October 16, 2018 the Company closed a $0.01 seed round with Haywood Securities Inc. for 2,500,000 Class A Common Shares.  On October 16, 2018, $1,200,00 Canadian, was wired to my trust account from TPI's account related to the closing and the subscription agreement with FSD Pharma which invested $1,500,000 CAD in TPI, a transaction that had been negotiated in late August/early September, 2018. On October 18, 2018 an additional $360,000 CAD was wired to my trust account relating to the Company closing on additional subscription agreements.

13.      On November 5, 2018, TPI closed on the various subscriptions it had received to that point and issued securities in the names of the subscribers.

14.      On or about April 4, 2019 TPI acquired Industrial Court L7 LLC. ("L7"). The acquisition was accomplished for the purpose of securing licenses to manufacture and sell cannabis infused products.

15.    During June and July 2019, TPI raised $8,600,000 USD in additional funds through convertible debentures. The debentures were entered into with 59 individuals or entities ("Debenture Holders"). Pursuant to the debentures exclusive jurisdiction of all disputes was in British Columbia. A true and correct copy of one such debenture and the subscription agreement is attached hereto as Exhibit 1.

16.    When the debentures were negotiated, JCardiff was neither an officer, director, shareholder, agent or representative of TPI.

17.    TPI at the date hereof has 233 common shareholders and 58 preferred shareholders.

18.    In 2022 reached an agreement with Falcon International ("Falcon") to sell L7 to Falcon. I assisted TPI with drafting of the documents. As part of the transaction, TPI reached a settlement agreement and release with 52 of the 59 Debenture Holders. The Petitioning Creditors are the only Debenture Holders who did not participate. As part of the settlement the Debenture Holders each received preferred stock in TPI and common stock in Falcon.

19.    As of the time of TPI's deposit with the Receiver of $1,560,000 CAN, TPI's board of directors consisted of five individuals: Jacques Poujade, former U.S. Congressman Dana Rohrabacher, Ralph Olson, Kamlesh Shah, and Anton Drescher.

20.    TPI has never received notice of the pending Motion for Appointment of a Trustee at its address in Canada. I never received telephonic notice or mail notice. Each of the debentures provided that notice be provided to TPI at its registered office at 1383 West 8th Avenue, Vancouver, B.C.

21.    I have had multiple communications with one of the Petitioning Creditors, Marc Graubart. He knows that I am counsel for TPI in Canada. I never received an email from Petitioning Creditors or their counsel giving me notice of the Motion.

22.    Jacques Poujade submitted his resignation as an officer and director of TPI on July 13, 2023 which was accepted by TPI. I have submitted the document for filing with the B.C Corporate Registry. Jacques Poujade is neither an officer, director, employee, agent or representative of TPI.

23.    TPI has not received a Summons or the Petition.

**I declare under penalty of perjury under the laws of British Columbia that the foregoing is true and correct.**

**Executed this 9th day of August, 2023 at Vancouver, B.C.**

_____

Erwin Sui

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE ISSUER THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY, ONLY (A) TO THE ISSUER, (B) OUTSIDE THE UNITED STATES PURSUANT TO RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE LOCAL LAWS AND REGULATONS, (C) PURSUANT TO THE EXEMPTIONS FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF AVAILABLE, AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) PURSUANT TO ANOTHER APPLICABLE EXEMPTION UNDER THE U.S. SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, AFTER, IN THE CASE OF TRANSFERS PURSUANT TO CLAUSE (C) OR (D), PROVIDING TO THE COMPANY A LEGAL OPINION OR OTHER EVIDENCE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE ISSUER, TO THE EFFECT THAT SUCH TRANSFER DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT. DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE GOOD DELIVERY IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA.

# TRUE PHARMASTRIP INC.

## 8.0% UNSECURED SENIOR CONVERTIBLE REDEEMABLE DEBENTURE

**2019 CB#057**

| | |
|---|---|
| Date: | July 31, 2019 |
| Principal Amount: | US $50,000 (the "**Principal Amount**") |
| Maturity Date: | July 30, 2021 |
| Lender: | Gordon Smith (the "**Lender**") |
| Lender's Address: | 1325 Howard Ave, Suite 338, Burlingame, CA 94101 |

Pursuant to the Subscription Agreement accepted by True Pharmastrip Inc. (the "**Company**") on July 31st, 2019 between the Company and Gordon Smith (the "**Subscription Agreement**"), the Company hereby issues this 8.0% Unsecured Senior Convertible Redeemable Debenture in the principal aggregate amount of US $50,000 (the "**Debenture**") to the Lender.

1.      **TERMS OF REPAYMENT**

The Company, a corporation incorporated under the laws of the Province of British Columbia, for value received hereby acknowledges itself indebted for the above mentioned principal sum and promises to pay to or to the order of the Lender as follows:

i)      interest at a rate of 8.0% per annum, calculated in United States dollars, payable semi-annually in arrears on June 30 and December 31 of each year, commencing December 31, 2019;

ii)     interest shall be paid in the form of common shares ("Shares") of the Company at an issue price of CAN$1.00 per Share; and

iii)    principal payable in full on the Maturity Date.

- 2 -

Payment of both the Principal Amount and accrued interest thereon shall be made at the Lender's address, set out above, or at such other place in British Columbia as the Lender may designate in writing to the Company.

The Company waives presentment for payment, demand, or notice of non-payment of this Debenture in collection, and consents to all extensions of time, renewals, waivers or modifications that may be granted by the holder with respect to the payment or any other provision of this Debenture.

**See Section 3 below, "Exchange Rate" regarding currency conversions.**

2.    **CONVERSION**

(a)    **Conversion Privilege and Conversion Price**

Upon and subject to the provisions and conditions of this section, the holder of this Debenture shall have the right, at his option, to convert, at any time and from time to time up to the close of business on the Maturity Date (the "**Expiry Time**"), up to the entire Principal Amount of this Debenture, into Shares of the Company, at a conversion price of CDN$1.00 per Share (the "**Conversion Price**"). No fractional Shares will be issued.

**See Section 3 below, "Exchange Rate" regarding currency conversions.**

The number of Shares issuable to the holder of this Debenture hereunder shall be equal to the aggregate Principal Amount being converted divided by the Conversion Price. Such right of conversion shall extend only to the maximum number of Shares into which the aggregate principal amount of this Debenture surrendered for conversion may be converted into Shares at the time of such conversion. No fractional Shares will be issued.

(b)    **Registration; Book-Entry**

The Company shall maintain a register (the "**Register**") for the recordation of the names and addresses of the holders of each Debenture and the Principal amount of the Debentures (and stated interest thereon) held by such holders (the "**Registered Debentures**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holders of the Debentures shall treat each Person whose name is recorded in the Register as the owner of a Debenture for all purposes, including, without limitation, the right to receive payments of Principal and Interest, if any, hereunder, notwithstanding notice to the contrary. A Registered Debenture may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Upon its receipt of a request to assign or sell all or part of any Registered Debentures by the Lender, the Company shall record the information contained therein in the Register and issue one or more new Registered Debentures in the same aggregate Principal amount as the Principal amount of the surrendered Registered Debenture to the designated assignee or transferee pursuant to **Section 6**. Notwithstanding anything to the contrary in this Section 2(b), the Lender may assign any Debenture or any portion thereof to an Affiliate (as such term is defined in the *Business Corporations Act* (British Columbia)) of such Lender without delivering a request to assign or sell such Debenture to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); provided, that (x)

- 3 -

the Company may continue to deal solely with such assigning or selling Lender unless and until such Lender has delivered a request to assign or sell such Debenture or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Lender to deliver a request to assign or sell such Debenture or portion thereof to the Company shall not affect the legality,  validity, or binding effect of such assignment or sale and (z) such assigning or selling Lender shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Debenture in accordance with the terms hereof, the Lender shall not be required to physically surrender this Debenture to the Company unless (A) the full Conversion Amount represented by this Debenture is being converted or (B) the Lender has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Debenture upon physical surrender of this Debenture. The Lender and the Company shall maintain records showing the Principal and Interest, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Lender and the Company, so as not to require physical surrender of this Debenture upon conversion.

(c)    **Conversion Procedure**

The holder of this Debenture desiring to convert such Debenture shall provide the Company with a Notice of Conversion, in the form attached hereto as Schedule "A", duly executed by the registered holder or his legal representatives or his attorney duly appointed by an instrument in writing in form and execution satisfactory to the Company exercising his right to convert this Debenture in accordance with the provisions of this Section.  The Lender shall also specify the name or names, with addresses in which the certificate or certificates representing the Shares issuable upon conversion shall be registered.  Thereupon the Lender or his nominee or assignee shall be entitled to be entered in the books of the Company as at the date of conversion (being the date upon which the Company receives a Notice of Conversion) as the holder of that number of Shares into which this Debenture is convertible in accordance with the provisions of this Section and, as soon as practicable thereafter, the Company shall deliver to the holder, or his nominee or assignee, certificates for such Shares, but in any event, within three (3) business days of receipt of the notice of conversion.  If the Company fails to transmit to the Lender the Shares within 3 Business Days of receipt of the notice of conversion, then the Lender will have the right to rescind such conversion.  The Company shall be responsible for any and all taxes that may be payable with respect to the issuance or delivery of the Shares; provided, however, that the Lender shall not be obligated to pay any transfer taxes resulting from any transfer requested by any Lender in connection with any such conversion. No fractional Shares or scrip representing fractional Shares shall be issued upon the conversion of this Debenture.  As to any fraction of a Share which the Lender would otherwise be entitled to purchase upon such conversion, the Company shall, at its election, either pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Conversion Price or round up to the next whole Unit.  The Company covenants and agrees to indemnify the Lender for any losses it suffers, directly or indirectly, as a result of the Lender failing to provide the certificates as stipulated in this Section 2(c). Partial exercises of this Debenture resulting in purchases of a portion of the total number of Shares available hereunder shall have the effect of lowering the outstanding number of Shares purchasable hereunder in an amount equal to

- 4 -

the applicable number of Shares purchased. If this Debenture shall have been exercised in part, the Company shall, at the request of a Lender and upon surrender of this Debenture, at the time of delivery of the Shares, deliver to the Lender a new Debenture evidencing the rights of the Lender to purchase the unpurchased Shares called for by this Debenture, which new Debenture shall in all other respects be identical with this Debenture. The Lender and the Company shall maintain records showing the number of Shares purchased and the date of such purchases. The Company shall deliver any objection to any notice of conversion within one (1) Business Day of receipt of such notice. **The Lender and any assignee, by acceptance of this Debenture, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Shares hereunder, the number of Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof.**

(d)     **Adjustments**

    (i)     **Stock Dividends and Splits**. Subject to subsection (ii) below, the Conversion Price shall be subject to adjustment from time to time in the events and in the manner provided in this section.

        (A)     If and whenever at any time after the date hereof and prior to the Expiry Time the Company shall:

            (1)     issue common shares or otherwise makes a distribution or distributions on its Shares (as defined in the Subscription Agreement) or any other equity or equity equivalent securities payable in Shares (which, for avoidance of doubt, shall not include any Shares issued by the Company upon conversion of this Debenture) to all or substantially all the holders of the Shares as a stock dividend;

            (2)     subdivide its outstanding common shares into a greater number of shares;

            (3)     consolidate (including by way of reverse stock split) its outstanding common shares into a smaller number of shares: or

            (4)     issues by reclassification any Shares of the Company,

(any of such events in (1), (2) (3) and (4) being called a "**Common Share Reorganization**"), then the Conversion Price shall be adjusted, effective immediately after the record date at which the holders of Shares are determined for the purpose of the Common Share Reorganization, by multiplying the Conversion Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the number of common shares outstanding on such record date before giving effect to such Common Share Reorganization and the denominator of which shall be the number of Common Shares (excluding treasury shares, if any) outstanding immediately after giving effect to such Common Share Reorganization (including, in the case where securities exchangeable for or convertible into common shares are distributed, the number of common shares that would have been outstanding had all such securities

been exchanged for or converted into common shares on such record date), and the number of Shares issuable upon conversion of this Debenture shall be proportionately adjusted such that the aggregate Conversion Price of this Debenture shall remain unchanged.

(B)     **Subsequent Rights Offerings**. In addition to any adjustments pursuant to Section 2(c)(i) above, if and whenever at any time after the date hereof and prior to the Maturity Date the Company shall fix a record date for the issuance of rights, options, warrants, securities or other property to all or substantially all of the holders of any class of securities under which such holders are entitled to acquire common shares or securities ("Purchase Rights"), then the Lender will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Lender could have acquired if the Lender had held the number of Shares acquirable upon complete conversion of this Debenture immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Shares are to be determined for the grant, issue or sale of such Purchase Rights.

(C)     **Pro Rata Distributions**. During such time as this Debenture is outstanding, if the Company (or any successor corporation), as applicable, shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of Shares, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "**Distribution**"), at any time after the issuance of this Debenture, then, in each such case, the Lender shall be entitled to participate in such Distribution to the same extent that the Lender would have participated therein if the Lender had held the number of Shares acquirable upon complete conversion of this Debenture immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of Shares are to be determined for the participation in such Distribution.

(D)     **Fundamental Transaction**. If, at any time while this Debenture is outstanding, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person, (ii) the Company, directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Shares are permitted to sell, tender or exchange their Shares for other securities, cash or property and has been accepted by the holders of 50% or more of the outstanding Shares (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Shares or any compulsory share exchange

- 6 -

pursuant to which the Shares are effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a securities purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the outstanding Shares (not including any Shares held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (each a "**Fundamental Transaction**"), then, upon any subsequent conversion of this Debenture, the Lender shall have the right to receive, for each Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, at the option of the Lender, the number of Shares of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "**Alternate Consideration**") receivable as a result of such Fundamental Transaction by a holder of the number of Shares for which this Debenture is convertible immediately prior to such Fundamental Transaction. For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one Share in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Shares are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Lender shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. The Company shall cause any successor entity in a Fundamental Transaction in which the Company (or any successor corporation), as applicable, is not the survivor (the "**Successor Entity**") to assume in writing all of the obligations of the Company under this Debenture in accordance with the provisions of this Section 2(D). At the option of the Successor Entity, it may deliver to the Lender in exchange for this Debenture a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Debenture which is convertible for a corresponding number of Shares, as applicable, of such Successor Entity (or its parent entity) equivalent to the Shares acquirable and receivable upon conversion of this Debenture prior to such Fundamental Transaction, and with a conversion price which applies the Conversion Price hereunder to such Shares (but taking into account the relative value of the Shares pursuant to such Fundamental Transaction and the value of such Shares, such number of Shares and such conversion price being for the purpose of protecting the economic value of this Debenture immediately prior to the consummation of such Fundamental Transaction). Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this

Debenture referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company, and shall assume all of the obligations of the Company under this Debenture with the same effect as if such Successor Entity had been named as the Company herein. "**Person**" means any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any governmental or political subdivision or any agency, department or instrumentality thereof.

(ii)     Rules for Calculating Adjustments (For the purpose of subsection (i)):

(A)     The adjustments provided for in subsection (i) are cumulative and such adjustments shall be made successively whenever an event referred to therein shall occur, subject to the following subsections of this subsection (ii).

(B)     No adjustment in the Conversion Price shall be required unless such adjustment would result in a change of at least 1% in the prevailing Conversion Price, provided, however, that any adjustments which, except for the provisions of this subsection (ii)(B), would otherwise have been required to be made shall be carried forward and taken into account in any subsequent adjustment.

(C)     If a dispute shall at any time arise with respect to adjustments provided for in subsection (i), such dispute shall be determined by the Company's auditors, or if they are unable or unwilling to act, by such other firm of independent chartered accountants as may be selected by the directors and any such determination shall be final and conclusive and binding upon the Company and the holder.

(D)     If the Company shall set a record date to determine the holders of the common shares for the purpose of entitling them to receive any dividend or distribution or any subscription or purchase rights and shall, thereafter and before the distribution to such shareholders of any such dividend, distribution or subscription or purchase rights, legally abandon its plan to pay or deliver such dividend, distribution or subscription or purchase rights, then no adjustment in the Conversion Price or the number of Shares issuable upon conversion of the Debenture shall be required by reason of the setting of such record date.

(E)     In the absence of resolution of the directors fixing a record date for a Common Share Reorganization, Capital Reorganization, Rights Offering or Special Distribution, the Company shall be deemed to have fixed as the record date therefor the date on which the Common Share Reorganization, Capital Reorganization, Rights Offering or Special Distribution is effected.

(F)     As a condition precedent to the taking of any action which would require any adjustment in any of the conversion rights pursuant to the Debenture, including the Conversion Price and the number or class of shares or other securities which are to be received upon the conversion thereof, the

- 8 -

Company shall take any corporate action which may, in the opinion of counsel, be necessary in order that the Company have unissued and reserved in its authorized share capital and may validly and legally issue as fully paid and non-assessable all the shares or other securities which the holder is entitled to receive on the total conversion thereof in accordance with the provisions thereof.

(G)    If, in the opinion of the board of directors, the provisions of subsection (i) are not strictly applicable, or if strictly applicable would not fairly protect the rights of the holder in accordance with the intent and purposes hereof, the board of directors shall make any adjustment in such provisions for the benefit of the holder as the board of directors deems appropriate.

(H)    If at any time a question or dispute arises with respect to adjustments provided for in subsection 2(C)(i) such question or dispute will be conclusively determined by the auditor of the Company or, if they are unable or unwilling to act, by such other firm of chartered accountants as may be selected by action of directors of the Company and any such determination, subject to regulatory approval and absent manifest error, will be binding upon the Company and the Borrower. The Company will provide such auditor or chartered accountant with access to all necessary records of the Company.

(iii)    Whenever the number or class of shares or other securities which are to be received upon the conversion of this Debenture or the Conversion Price shall require an adjustment pursuant to subsection (ii), the Company shall forthwith obtain a certificate signed by a senior officer of the Company, setting forth in reasonable detail, the event requiring the adjustment and the method by which such adjustment was calculated (including an opinion on the fair value, as determined by the board of directors of the Company, of any evidences of indebtedness, shares of stock, other securities or property or warrants, options or other subscription or purchase rights referred to in subsection (ii)) and specifying the number or class of shares or other securities which are to be received upon the conversion hereof and describing the numbers and kind of any other securities issuable upon conversion of this Debenture, and any change in the Conversion Price thereof, after giving effect to such adjustment or change. The Company shall promptly, and in any case within 30 days after the making of such adjustment, cause a signed copy of such certificate to be delivered to the Lender. The Company shall keep at its office or agency copies of all such certificates and cause the same to be available for inspection upon receipt of reasonable notice at said office during normal business hours by the Lender.

(iv)    If (A) the Company shall declare a dividend (or any other distribution in whatever form) on its common shares, (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of its common shares, (C) the Company shall authorize the granting to all holders of its common shares rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of its common shares, any consolidation or merger to which the Company is a party, any sale or transfer of

all or substantially all of the assets of the Company, or any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property, or (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, then, in each case, the Company shall cause to be delivered by facsimile or email to the Lender at its last facsimile number or email address as it shall appear upon the Register of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of its common shares of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of its common shares of record shall be entitled to exchange their common shares for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice. The Lender shall remain entitled to convert this Debenture during the period commencing on the date of such notice to the effective date of the event triggering such notice except as may otherwise be expressly set forth herein.

**(d)     Reservation of Securities**

The Company covenants and agrees that, so long as any part of the Principal Amount or interest under this Debenture is outstanding and entitled to the right of conversion herein provided, it will at all times ensure that all of the Shares upon a Conversion and Shares issuable in lieu of interest payable on this Debenture, have been duly created, reserved, allotted for issuance and authorized for issuance, so as to enable all of such outstanding Principal Amount of the Debenture to be converted into Shares upon the basis and upon the terms and conditions herein provided in this section 2, and that upon being issued, all such securities will be validly issued as fully paid and non-assessable securities in the capital of the Company.

**(e)     Regulatory Approvals and Filing in Connection with Conversion**

If any Shares of the Company allotted or to be allotted for the purpose of conversion of this Debenture require registration with or approval of any governmental or other authority under any laws of Canada or a province of Canada before such securities may be validly issued upon conversion and traded on any stock exchange on which the common shares are then listed and posted for trading, the Company will take such action as may be necessary to secure such registration or approval, as the case may be.

**3.     EXCHANGE RATE**

The exchange rate for the purpose of converting this Debenture into Shares or the payment of interest in Shares shall be fixed at $1.330 Canadian dollars for one (1) United States. By way of illustration, a US$1,000 Debenture shall have an equivalent Canadian dollar value of $1,330 and be convertible into 1,330 Shares. Alternatively, an interest payment of US$60 dollars shall have

- 10 -

an equivalent Canadian dollar value of $79.80 pursuant to which 79 Shares are issuable. No fractional Shares will be issued.

**4.    REDEMPTION**

Subject to the provisions of this Section, if at any time after the date that is the later of (i) four months from the issuance date of the Debenture or (ii) the date the Company becomes a reporting issuer under applicable Canadian securities legislation, the VWAP for each of any 10 consecutive Trading Days (such period the "Threshold Period"), exceeds CDN$1.50 (subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the original issue date), the Company may, within 1 Trading Day after the end of any such Threshold Period, deliver a written notice to the Lender (an "Optional Redemption Notice" and the date such notice is deemed delivered hereunder, the "Optional Redemption Notice Date") of its irrevocable election to redeem all (and not less than all) of the then outstanding principal amount of this Debenture for cash in an amount equal to principal amount of the Debenture plus any accrued interest on the 20th Trading Day following the Optional Redemption Notice Date (such date, the "Optional Redemption Date", such 10 Trading Day period, the "Optional Redemption Period" and such redemption, the "Optional Redemption"). The Optional Redemption Amount is payable in full on the Optional Redemption Date. The Company covenants and agrees that it will honor all Notices of Conversion tendered from the time of delivery of the Optional Redemption Notice through the date all amounts owing thereon are due and paid in full. The Company's determination to pay an Optional Redemption in cash shall be applied ratably to all of the holders of the then outstanding Debentures based on their (or their predecessor's) initial purchases of Debentures. If any portion of the payment pursuant to an Optional Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything herein contained to the contrary, if any portion of the Optional Redemption Amount remains unpaid after such date, the Lender may elect, by written notice to the Company given at any time thereafter, to invalidate such Optional Redemption, *ab initio*, and, the Company shall have no further right to exercise such Optional Redemption. Notwithstanding anything to the contrary in this Section, the Company's determination to redeem in cash shall be applied ratably among the Lenders. The Lender may elect to convert the outstanding principal amount of the Debenture prior to actual payment in cash for any redemption under this Section by the delivery of a Notice of Conversion to the Company in accordance with section 2(c) above.

**5.    DEFAULT**

If any of the following events shall occur and be continuing unremedied for a period of thirty (30) days (an "**Event of Default**"), the Lender may, at its option, demand immediate payment of the entire outstanding Principal Amount of this Debenture and all due and accrued interest thereon, and all other indebtedness of the Company to the Lender hereunder or otherwise shall thereupon become immediately due and payable, namely:

(a)    the non-payment when due (whether at stated maturity, upon acceleration, upon required prepayment or otherwise) of any amounts owing to the Lender under this Debenture and such non-payment continues for five (5) Business Days;

(b)    the Company becomes insolvent, or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors;

(c)    the Company initiates proceedings under the *Companies' Creditors Arrangement Act;*

(d)    insolvency, receivership or bankruptcy proceedings are commenced against the Company;

(e)    Upon a "**Change in Control**" of the Company, meaning: (i) an acquisition of any voting securities of the Company (the "**Voting Securities**") by any "person" (as the term "person" is used for purposes of Section 13(d) or Section 14(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), immediately after which such person has "beneficial ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of the combined voting power of the Company's then outstanding Voting Securities without the approval of the Company's Board of Directors (the "**Board**"); (ii) a merger or consolidation that results in more than 50% of the combined voting power of the Company's then outstanding Voting Securities of the Company or its successor changing ownership (whether or not approved by the Board); (iii) the sale of all or substantially all of the Company's assets in one or a series of related transactions; or (iv) approval by the members of the Company of a plan of complete liquidation of the Company. The Company shall give the Lender no less than thirty (30) days written notice of a potential Change in Control;

(f)    if any final judgment for the payment of money in excess of $100,000 is rendered against the Company and the Company does not discharge the same or cause it to be discharged or vacated within ninety (90) days from the entry thereof, or does not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and does not secure a stay of execution pending such appeal within ninety (90) days after the entry thereof;

(g)    if the Company defaults in any material respect under any other secured or unsecured material indebtedness for borrowed money, other than any indebtedness owed to officers, directors or stockholders of the Company, mortgage or security agreement covering any part of its property;

(h)    if the Company defaults in the observance or performance of any other material term, agreement, covenant or condition of this Debenture, and the Company fails to remedy such default within fifteen (15) days after notice by the Lender to the Company of such default, or, if such default is of such a nature that it cannot with due diligence be cured within said fifteen (15) day period, if the Company fails, within said fifteen (15) days, to commence all steps necessary to cure such default, and fails to complete such cure within forty five (45) days after the end of such fifteen (15) day period;

(i)    except for specific defaults set forth in this Section, if the Company defaults in the observance or performance of any material term, agreement or condition of the Debenture, and such default continues after the end of any applicable cure period provided for therein; or

(j)    if any of the following exist uncured for fifteen (15) days following written notice to the Company: (i) the failure, subject to applicable survival periods, of any representation or warranty made by the Company to the Lender pursuant to the Subscription Agreement to be true and correct in all material respects or (ii) the Company fails to provide the Lender with any certification or evidence required to be provided pursuant to the terms of this Debenture;

- 12 -

Commencing 5 days after the occurrence of any Event of Default that results in the eventual acceleration of this Debenture, the interest rate on this Debenture shall accrue at an interest rate equal to the lesser of 18% per annum or the maximum rate permitted under applicable law. Upon the payment in full, the Lender shall promptly surrender this Debenture to or as directed by the Company. In connection with such acceleration described herein, the Lender need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Lender may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law.

**6.    COVENANTS**

As long as any portion of this Debenture remains outstanding, unless the holders of at least 51% in principal amount of the then outstanding Debentures shall have otherwise given prior written consent, the Company shall not, directly or indirectly, enter into, create, incur, assume, guarantee or suffer to exist any indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any income or profits therefrom.

**7.    TRANSFER AND ASSIGNMENT**

The Lender is the person entitled to receive the principal of this Debenture and all other monies payable hereunder and to give a discharge hereof. Subject to compliance with any applicable securities laws, this Debenture and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Debenture at the principal office of the Company or its designated agent, together with a written assignment of this Debenture duly executed by the Lender or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Debenture or Debentures in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Debenture evidencing the portion of this Debenture not so assigned, and this Debenture shall promptly be cancelled. Notwithstanding anything herein to the contrary, the Lender shall not be required to physically surrender this Warrant to the Company unless the Lender has assigned this Debenture in full, in which case, the Lender shall surrender this Debenture to the Company within three (3) Business Days of the date the Lender delivers an assignment form to the Company assigning this Debenture full. The Debenture, if properly assigned in accordance herewith, may be exercised by a new holder for the purchase of Shares without having a new Debenture issued.

**8.    MUTILATED, DESTROYED, LOST OR STOLEN DEBENTURES.**

In case this Debenture shall become mutilated or defaced, or be destroyed, lost or stolen, the Company shall execute and deliver a new debenture of like principal amount in exchange and substitution for the mutilated or defaced Debenture, or in lieu of and in substitution for the destroyed, lost or stolen Debenture. In the case of a mutilated or defaced Debenture, the Lender shall surrender such Debenture to the Company for exchange. In the case of any destroyed, lost or stolen Debenture, the Lender shall furnish to the Company: (a) evidence to the Company's satisfaction of the destruction, loss or theft of such Debenture and (b) such security or indemnity as may be reasonably required by the Company to hold the Company harmless with respect to the replacement of such Debenture.

9.    **WAIVER OF DEMAND, PRESENTMENT, ETC.**

The Company hereby expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, bringing of suit and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereunder, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder.

10.    **PAYMENT**

Except as otherwise provided for herein, all payments with respect to this Debenture shall be made in lawful currency of the United States of America by cheque or wire transfer of immediately available funds, at the option of the Lender, at the principal office of the Lender or such other place or places or designated accounts as may be reasonably specified by the Lender in a written notice to the Company at least one (1) business day prior to payment. Payment shall be credited first to the accrued interest then due and payable and the remainder applied to principal.

11.    **ASSIGNMENT**

The rights and obligations of the Company and the Lender of this Debenture shall be binding upon, and inure to the benefit of, the permitted successors, assigns, heirs, administrators and transferees of the parties hereto. This Debenture is not assignable by the Lender without the written consent of the Company.

12.    **WAIVER AND AMENDMENT**

Any provision of this Debenture, including, without limitation, the due date hereof, and the observance of any term hereof, may be amended, waived or modified (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the holders of greater than 50% of the face amount of all then outstanding Debenture.

13.    **NOTICES**

Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or mailed by registered or certified mail, postage prepaid, or delivered by facsimile transmission, to the Company at 1383 West 8th Avenue, Vancouver, B.C. V6H 3W4, Attention: Chief Executive Officer, or to the Lender at its address or facsimile number set forth in the records of the Company. Any party hereto may by notice so given change its address for future notice hereunder. Notice shall conclusively be deemed to have been given when personally delivered or when deposited in the mail in the manner set forth above and shall be deemed to have been received when delivered or, if notice is given by facsimile transmission, when delivered with confirmation of receipt.

14.    **CONSENT TO JURISDICTION**

The Company irrevocably consents and agrees for the benefit of the Lender that any legal action, suite or proceeding against it with respect to its legislations, liabilities or any other matter arising out of or in connection with this Convertible Redeemable Debenture may be brought in the courts of the Province of British Columbia and, until all amounts due and to become due in respect of

- 14 -

the Convertible Redeemable Debenture have been paid, or until any such legal action, suit or proceeding commenced prior to such payment has been concluded, hereby irrevocably consents and irrevocably submits to the non-exclusive jurisdiction of each such court in person and, generally and unconditionally with respect to any action, suit or proceeding for themselves and in respect of their properties, assets and revenues.

## 15.    GOVERNING LAW

This Debenture shall be governed by and construed in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein.

## 16.    SEVERABILITY

If one or more provisions of this Debenture are held to be unenforceable under applicable law, such provisions shall be excluded from this Debenture, and the balance of this Debenture shall be interpreted as if such provisions were so excluded and shall be enforceable in accordance with its terms.

## 17.    HEADINGS

Section headings in this Debenture are for convenience only and shall not be used in the construction of this Debenture.

**[REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

- 15 -

**IN WITNESS WHEREOF** the Company has duly executed this Debenture.

TRUE PHARMASTRIP INC.

per:

Name:
Title:

- 16 -

**Schedule "A"**

**CONVERSION NOTICE**

**2019 CB#057**

**TO:   TRUE PHARMASTRIP INC.** (the "Company")

This Conversion Notice shall be delivered pursuant to the terms and conditions of a 8.0% Unsecured Senior Convertible Redeemable Debenture (the "Debenture") dated July 31, 2019 between the Company and Gordon Smith, as Lender.

The undersigned Lender hereby irrevocable elects to convert either (i) the entire Principal Amount, or (ii) $ _____ of the Principal Amount, into_____ Shares of the Company at a deemed conversion price of CDN $1.00 per Share in accordance with the terms and conditions contained in the Debenture. The Lender directs that the Shares issuable and deliverable upon the conversion be issued and delivered to the person indicated below. Capitalized terms used herein and not otherwise defined herein which are defined in the Debenture shall have the respective meanings given to such terms in the Debenture.

Dated this              day of                    , 20____.


_____
(Signature of Lender)

Print name in which Shares issued on conversion are to be issued, delivered and registered. Note: If Shares are to be issued in the name of a person other than the Lender, the signature must be notarized.

Name                          Address of Registered Lender

_____         _____

                                _____

                                _____

Exhibit 1 - Subscription Agreement

THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND
EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY U.S. STATE, AND WILL BE ISSUED IN
RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED
(THE "U.S. SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN
EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT OR PURSUANT TO AN AVAILABLE
EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE U.S.
SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE U.S. STATE SECURITIES LAWS.

TRUE PHARMASTRIP INC.

SUBSCRIPTION AGREEMENT FOR CONVERTIBLE REDEEMABLE DEBENTURE UNITS

TO:    TRUE PHARMASTRIP INC. (the "Corporation")

The Subscriber (as hereinafter defined) hereby irrevocably subscribes for and agrees to purchase from the Corporation that
number of unsecured convertible, redeemable debenture units of the Corporation (the "Units") set out below at a price of
US$1,000 per Debenture (the "Subscription Price"). The Subscriber agrees to be bound by the terms and conditions set
forth in the attached "Terms and Conditions of Subscription for Unsecured Convertible Redeemable Debenture Units",
including, without limitation, the terms, representations, warranties and covenants set forth in the applicable schedules
attached thereto. The Subscriber further agrees, without limitation, that the Corporation may rely upon the Subscriber's
representations, warranties and covenants contained in such documents. In addition to this face page, the Subscriber must
also complete all applicable schedules attached hereto.

PLEASE PRINT ALL INFORMATION (OTHER THAN SIGNATURES), AS APPLICABLE, IN THE SPACE PROVIDED BELOW

| | |
|---|---|
| GORDON SMITH | Number of Units: 50 x US $1,000 |
| Name of Subscriber | Aggregate Subscription Cost: 950,000 US |
| Account Reference (if applicable) GORDON SMITH | (the Subscription Amount) |
| By: | Please complete if purchasing as agent or trustee for a principal (beneficial purchaser) (a "Disclosed Principal") and not purchasing as trustee or agent for accounts fully managed by it. |
| Authorized Signature | |
| Official Capacity or Title - if the Subscriber is not an individual | |
| Name of individual whose signature appears above if different than the name of the subscriber printed above. | (Name of Disclosed Principal) |
| Subscriber's Address, including Municipality, State/Province and Zip/Postal Code: | (Address of Disclosed Principal) |
| 1325 Howard Ave 338 | |
| 650 245 3118   gsmith@fairdal.com | Account Reference (if applicable) |
| (Telephone Number)   (Email Address) | |

By executing this Subscription Agreement, you are consenting to the collection, use and disclosure of personal information in the manner described
in the privacy notice on page 16 of this Subscription Agreement.

ACCOUNT REGISTRATION INFORMATION:

| | |
|---|---|
| GORDON SMITH | |
| (Name) | |
| Account Reference (if applicable): | |

DELIVERY INSTRUCTIONS AS SET FORTH BELOW:

Gordon Smith
(Name)

Account Reference (if applicable):

Address, including Municipality, State/Province and Zip/Postal
Code:
1325 Howard Ave, 338
Burlingame CA 94010
650 245 3118
(Telephone Number)    (Email Address)
Number and kind of securities of the Corporation held, directly or
indirectly, if any:

Address, including Municipality, State/Province and Zip/Postal
Code:
1325 Howard Ave, 338 Burlingame CA 94010
650 245 3118 gsmith@    (Contact Name) fairdal.com
(Telephone Number)    (Contact Name)

State whether Subscriber is:
(i)    an Insider (as defined herein) of the Corporation:
       Yes ☐    No ☑
(ii)   a Registrant (as defined herein) of the Corporation:
       Yes ☐    No ☑
(iii)  a Related Party (as defined herein) of the Corporation:
       Yes ☐    No ☑

THIS CORPORATION DERIVES ITS REVENUES FROM THE CANNABIS INDUSTRY INCERTAIN U.S. STATES, WHICH INDUSTRY IS ILLEGAL UNDER U.S. FEDERAL LAW.

Although certain states and territories of the U.S. authorize medical or recreational cannabis production and distribution by licensed or registered entities, under U.S. federal law, the possession, use, cultivation, and transfer of cannabis and any related drug paraphernalia is illegal and any such acts are criminal acts under federal law under any and all circumstances under the *Controlled Substances Act* (the "CSA").

Many U.S. states have enacted legislation to regulate the sale and use of medical cannabis without limits on tetrahydrocannabinol ("THC"), while other states have regulated the sale and use of medical cannabis with strict limits on the levels of THC. Notwithstanding the permissive regulatory environment of medical cannabis at the state level, cannabis continues to be categorized as a Schedule I controlled substance under the CSA in the United States and as such, is illegal under United States federal law.

As a result of the conflicting views between state legislatures and the federal government regarding cannabis, involvement in the cannabis industry in the United States is subject to inconsistent legislation and regulation. Unless and until the United States federal government amends the CSA with respect to cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a significant risk that U.S. federal authorities may enforce current federal law, which may adversely affect the future operations of the Corporation in the United States. See "Risk Factors Related to the United States Regulatory System" attached hereto as Schedule E. As a result, the Corporation may be subject to significant direct and indirect interaction with public officials.

THERE CAN BE NO ASSURANCE THAT THIRD PARTY SERVICE PROVIDERS, INCLUDING, BUT NOT LIMITED TO, SUPPLIERS, CONTRACTORS AND BANKS WILL NOT SUSPEND OR WITHDRAW SERVICES WHICH COULD NEGATIVELY IMPACT THE BUSINESS OF THE CORPORATION.

## ACCEPTANCE

The Corporation hereby accepts the subscription for Units as set forth on the face page of this Agreement (as defined herein) on the terms and conditions contained in this Agreement (including all applicable schedules) this 31st day of July, 2019.

**TRUE PHARMASTRIP INC.**

Jacques Poujade, President & C.E.O.

- 3 -

<div style="border:1px solid black; padding:10px;">

**IMPORTANT INSTRUCTIONS – PLEASE READ CAREFULLY**

</div>

**PLEASE MAKE SURE THAT YOUR SUBSCRIPTION INCLUDES:**

1.   a signed copy of this Subscription Agreement;

2.   a certified cheque or bank draft in an amount equal to the Subscription Amount payable in US dollars to the Corporation's counsel and escrow agent, **"Sui & Company In Trust"** OR a wire transfer or direct deposit to:

| | |
|---|---|
| Beneficiary's Bank: | The Royal Bank of Canada |
| Branch Address: | 20 King Street West |
| | Toronto, Ontario M5H 1C4 Canada |
| | |
| Swift: | ROYCCAT2 |
| Branch Transit Number: | 06012 |
| | |
| **Account Name:** | **Sui & Company (US$) Trust Account** |
| Account # | 401-228-2 |
| Account Address: | 1800-130 King Street West, Toronto, ON M5X 1E3 |

PLEASE NOTE THAT THE FAILURE TO PROVIDE ALL OF THE ABOVE INFORMATION IN RESPECT OF WIRE TRANSFERS MAY RESULT IN THE COMPLETION OF YOUR SUBSCRIPTION FOR UNITS HEREUNDER BEING REJECTED OR DELAYED.

3.   <u>If the Subscriber is a U.S. Purchaser</u>, **a copy of the Certification of U.S. Purchaser in the form attached to this Agreement as Schedule "A".**

4.   <u>If the Subscriber is a Canadian Purchaser</u>, one (1) copy of the Representation Letter in the form attached to this Subscription Agreement as Schedule "B" (including a duly completed and initialed copy of Exhibit B-1 to Schedule "B") **and, if you are an individual described in paragraphs (j), (k), or (l) of the definition of "accredited investor" in Section 1.1 of NI 45-106 (which definition is reproduced in Exhibit B-1 to Schedule "B")**, a duly completed and signed copy of Exhibit B-2 to Schedule "B";

5.   **<u>If the Subscriber is a resident of a jurisdiction outside of both Canada and the United States</u>,** a copy of the Representation Letter in the form attached to this Subscription Agreement as Schedule "C";

6.   **<u>ALL SUBSCRIBERS must provide a properly completed and duly executed copy of the Private Placement Questionnaire in the form attached as Schedule "D" to this Subscription Agreement</u>.**

**PLEASE DELIVER THE AFOREMENTIONED DOCUMENTS AND PAYMENT TO:**

Sui & Company, Solicitors
Suite 1800-130 King Street
Toronto, Ontario
M5X 1E3

Attention: Erwin Sui
Phone: (416) 360-6481
Email: erwin@suico.com

**TERM SHEET**

**Private Placement of Convertible Redeemable Debenture Units**

**TRUE PHARMASTRIP INC.**

March 20, 2019

---

| | |
|---|---|
| **Issuer:** | True Pharmastrip Inc. (the **Corporation**), a company incorporated under the laws of the Province of British Columbia, Canada. |
| **Offering:** | Convertible, redeemable debenture units (the **Units**). Each Unit shall consist of US $1,000 principal amount of 8% unsecured convertible, redeemable debentures (the **Debentures**) and 666 common share purchase warrants (the **Warrants)** of the Corporation. |
| **Price:** | US $1,000 per Unit |
| **Maximum Offering:** | US $10,000,000 (10,000 Units) subject to the right of the Company and the placement agent to increase the maximum offering amount to $15,000,000 (15,000 Units) to cover over-subscriptions |
| | There is no minimum offering size before the Corporation may commence closing on subscriptions received. See below under "Closing Date". Subscriptions will be received by the Corporation until the maximum offering size has been reached. |
| **Debentures:** | The principal amount owing under the Debentures will be payable in cash on the date that is 24 months from the Closing Date (the **Maturity Date**). |
| | The Debentures shall bear interest at a rate of 8% per annum, calculated in United States dollars, from the date of issuance, payable semi-annually in arrears on June 30 and December 31 of each year, commencing December 31, 2019. The December 31, 2019 interest payment will represent accrued interest for the period from the Closing Date to December 31, 2019. Interest shall be paid in the form of common shares (the **Shares)** of the Corporation at an issue price of CAN$1.00 per Share. |
| | The Debentures will be convertible at the holder's option on the earlier of: |
| | (i)     the Maturity Date; and |
| | (ii)    the business day immediately preceding the date fixed by the Corporation for redemption (see below under "Redemption") |
| | into that number of Shares in the capital of the Corporation calculated on the basis of the aggregate principal amount in Canadian dollars (see below under "Exchange Rate") of the Debentures issued divided by the conversion price of CDN $1.00 per Share. |
| | The Debentures will be direct, unsecured obligations of the Corporation, ranking equally with one another and senior to all other existing and future unsecured indebtedness of the Corporation. The Debentures are non-voting securities of the Corporation and carry no right to participate in earnings of the Corporation and, on liquidation and winding up of the Corporation, in its assets. |
| **Warrants:** | Each Warrant will entitle the holder to acquire one Share of the Corporation at a price of CDN $1.25 per share for a period of five (5) years from the date of issuance. |
| **Exchange Rate:** | The exchange rate for the purpose of converting a Debenture into Shares or the payment of interest in Shares shall be fixed at $1.330 Canadian dollars for one (1) United States dollar which is the average exchange rate posted by the Bank of Canada for the 30 day period prior to this Offering. By way of illustration, a US$1,000 Debenture shall have an equivalent Canadian dollar value of $1,330 and be convertible into 1,330 Shares. Alternatively, an interest payment of US$60 dollars shall have an equivalent Canadian dollar value of $79.80 pursuant to which 80 Shares are issuable. No fractional Shares will be issued. |

**TERM SHEET (Cont'd)**

**Private Placement of Convertible Redeemable Debenture Units**

**TRUE PHARMASTRIP INC.**

March 20, 2019

| | |
|---|---|
| **Redemption:** | Notwithstanding the conversion rights of a holder as set out above, the Corporation may, at any time after the date that is the later of (i) four months from the issuance date of the Debentures or (ii) the date the Corporation becomes a reporting issuer under applicable Canadian securities legislation, redeem not less than all of the then outstanding principal amount of the Debentures for cash in an amount equal to the principal amounts of the Debentures plus any accrued interest on the Debentures, if the common shares of the Corporation have been trading on any stock exchange at a volume weighted average trading price of CDN$1.50 for at least ten (10) consecutive trading days. The Corporation shall provide twenty (20) trading days written notice to a Debenture holder of its intention to redeem. Holders may continue to convert their Debentures into Shares at any time up to redemption. |
| **Acceleration of Warrants:** | If the volume weighted average trading price of the common shares exceeds CDN $2.50 per common share for any period of 10 consecutive trading days on any stock exchange (the "Determination"), the Corporation shall have the right to accelerate the expiry date of the Warrants by giving thirty (30) days' written notice to holders of the Warrants via certified mail or overnight mail (the "Acceleration Notice"). Holders of the Warrants may exercise such Warrants until the thirtieth (30th) calendar day following the Determination. |
| **Resale Restrictions:** | The Units, the Debentures, the Warrants and the Shares underlying the Units, the finder's warrants and the Shares underlying and finder's warrants will be subject to resale restrictions pursuant to applicable securities laws. |
| **Selling Jurisdictions:** | The Units will be sold on a private placement basis to: |

(i)    "accredited investors" (as defined in Rule 501(a) of Regulation D) in the United States pursuant to Section 4(a)(2) and/or Regulation D under the Securities Act of 1933, as amended;

(ii)    accredited investors in Canada pursuant to an appropriate exemption under National Instrument 45-106 Prospectus Exemptions; and to

(iii)    qualified accredited investors resident outside of the United States and Canada.

| | |
|---|---|
| **Prospectus:** | Shortly after closing, the Corporation intends to file and clear a prospectus with a provincial securities commission in Canada which will enable the Corporation to become a reporting issuer under applicable Canadian securities legislation. The prospectus is also intended to enable the Corporation to apply for a listing of its Shares on a stock exchange in Canada. There can be no assurance that the Shares will be accepted for listing on such stock exchange. |
| **Use of Proceeds:** | The net proceeds from this offering will be used for working capital and general corporate purposes. |
| **Finder's Fee:** | The Corporation may pay a cash fee equal to 8.0% of the gross proceeds and non-transferable finder's warrants equal to 8.0% of the amount raised under the Offering to qualified finders. Each finder's warrant shall entitle the finder to acquire one Share of the Corporation at a price of CDN $1.00 for a period of two years following issuance. No commission will be payable in respect of Units sold pursuant to Section 4(a)(2) of the U.S. Securities Act and Rule 506 of Regulation D to a finder who is not registered as a broker-dealer under the U.S. Securities Exchange Act of 1934, as amended, and applicable U.S. state securities laws, or unless such finder is exempt from such registration requirements. |
| **Closing Date:** | Closing shall occur as subscriptions and funds are received until the Maximum Offering has been reached but in no event shall a closing extend beyond April 30, 2019 except on consent of the Corporation. |

- 6 -

## TERMS AND CONDITIONS OF SUBSCRIPTION FOR
## CONVERTIBLE REDEEMABLE DEBENTURE UNITS OF TRUE PHARMASTRIP INC.

**1.**     **Definitions.** In this Subscription Agreement:

(a)     "Subscription Amount" has the meaning set forth on the face page hereof;

(b)     "Closing Date" means such date(s) as the Corporation may determine;

(c)     "Shares" means common shares in the capital of the Corporation;

(d)     "Corporation" means True Pharmastrip Inc., a corporation organized under the laws of British Columbia;

(e)     "Debenture" means the unsecured convertible, redeemable debentures to be issued by the Corporation;

(f)     "Offering" shall have the meaning ascribed thereto in paragraph 2(b) hereof;

(g)     "Underlying Securities" means the Debentures, the Warrants, the Shares issuable in lieu of interest payable on the Debentures, and the Shares issuable upon conversion of the Debenture, and the exercise of the Warrants;

(h)     "Units" has the meaning set forth on the Term Sheet page hereof; and

(i)     "Warrants" has the meaning set forth on the Term Sheet page hereof.

**2.**     **Acknowledgements of the Subscriber.** The Subscriber acknowledges (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) that:

(a)     this subscription is subject to rejection or acceptance by the Corporation in whole or in part, and is effective only upon acceptance by the Corporation;

(b)     the Units subscribed for by the Subscriber hereunder form part of a larger issue and sale by the Corporation of US$10,000,000 of Units (10,000 Units) at a subscription price of US$1,000 per Unit (the "**Offering**") subject to the right of the Company and the placement agent to increase the maximum offering amount to $15,000,000 (15,000 Units) to cover over-subscriptions;

(c)     the Subscriber is responsible for obtaining such legal and tax advice as it considers appropriate in connection with the execution, delivery and performance by it of this Subscription Agreement and the Subscriber further acknowledges that the Corporation's counsel is acting as counsel to the Corporation and not as counsel to the Subscriber; and

(d)     **there are risks associated with an investment in the Units and, as a result, the Subscriber may lose its entire investment.**

**3.**     **Representations, Warranties and Covenants of the Subscriber.** By executing this Subscription Agreement, the Subscriber (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) represents, warrants and covenants to the Corporation and its counsel (and acknowledges that the Corporation and its counsel are relying thereon) that:

(a)     if the Subscriber is an individual, the Subscriber is of the full age of majority in the jurisdiction in which this Subscription Agreement is executed and is legally competent to execute and deliver this Subscription Agreement, to perform all of its obligations hereunder, and to undertake all actions required of the Subscriber hereunder;

(b)     if the Subscriber is not an individual, the Subscriber has the requisite power, authority, legal capacity and competence to execute and deliver and be bound by this Subscription Agreement, to perform all of its obligations hereunder, and to undertake all actions required of the Subscriber hereunder, and all necessary approvals of its directors, partners, shareholders, trustees or otherwise with respect to such matters have been given or obtained;

(c)     if the Subscriber is a body corporate, partnership, unincorporated association or other entity, the Subscriber has been duly incorporated or created and is validly subsisting under the laws of its jurisdiction of incorporation or creation;

(d)     this Subscription Agreement has been duly and validly authorized, executed and delivered by, and constitutes a legal, valid, binding and enforceable obligation of, the Subscriber;

(e)     the execution, delivery and performance by the Subscriber of this Subscription Agreement and the completion of the transactions contemplated hereby do not and will not result in a violation of any law, regulation, order or ruling applicable to the Subscriber, and do not and will not constitute a breach of or default under any of the Subscriber's constating (i.e. governing or charter) documents (if the Subscriber is not an individual) or any agreement or covenant to which the Subscriber is a party or by which it is bound;

(f)     the Subscriber confirms that the Subscriber (and, if the Subscriber is not purchasing as principal, each beneficial purchaser for whom the Subscriber is acting):

    (i)     has such knowledge in financial and business affairs as to be capable of evaluating the merits and risks of its investment in the Units;

    (ii)     is capable of assessing the proposed investment in the Units as a result of the Subscriber's own experience or as a result of advice received from a person registered under applicable securities legislation;

    (iii)     is aware of the characteristics of the Underlying Securities and the risks relating to an investment therein; and

    (iv)     is able to bear the economic risk of loss of its entire investment in the Units;

(g)     the Subscriber understands that no securities commission, stock exchange, governmental agency, regulatory body or similar authority has made any finding or determination or expressed any opinion with respect to the merits of investing in the Units;

(h)     the Subscriber understands and acknowledges that no prospectus has been filed by the Corporation with any securities commission or similar regulatory authority in any jurisdiction in connection with the issuance of the Units and that the Units are being offered for sale only on a "private placement" basis and that the sale of the Units is conditional upon such sale being exempt from the requirements to file and obtain a receipt for a prospectus, and the requirement to sell securities through a registered dealer, or upon the issuance of such orders, consents or approvals as may be required to enable such sale to be made without complying with such requirements, and that as a consequence of acquiring the Units pursuant to such exemptions:

    (i)     the Subscriber is restricted from using some of the civil remedies otherwise available under applicable securities laws;

    (ii)     the Subscriber will not receive information that would otherwise be required to be provided to it under applicable securities laws; and

    (iii)     the Corporation is relieved from certain obligations that would otherwise apply under applicable securities laws;

(i)     the Subscriber confirms that neither the Corporation nor any of its directors, employees, officers or affiliates, have made any representations (written or oral) to the Subscriber:

    (i)     regarding the future value of the Units or the Underlying Securities;

    (ii)     that any person will resell or repurchase the Units or Underlying Securities; or

    (iii)     that any person will refund the purchase price of the Units;

(j)     the Subscriber confirms that it has been advised to consult its own legal and financial advisors with respect to the suitability of the Units as an investment for the Subscriber, the tax consequences of purchasing and dealing with the

- 8 -

Units or Underlying Securities, and the resale restrictions and "hold periods" to which the Units or Underlying Securities are or may be subject under applicable securities legislation or stock exchange rules, and has not relied upon any statements made by or purporting to have been made on behalf of the Corporation with respect to such suitability, tax consequences, resale restrictions and "hold periods";

(k)     except for the Subscriber's knowledge regarding its subscription for Units hereunder, the Subscriber has no knowledge of a "material fact" or a "material change" (as those terms are defined in the *Securities Act* (British Columbia)) in the affairs of the Corporation that has not been generally disclosed;

(l)     the Subscriber is resident in the jurisdiction indicated on the face page of this Subscription Agreement as the "Subscriber's Residential Address" and the purchase by and sale to the Subscriber of the Units, and any act, solicitation, conduct or negotiation directly or indirectly in furtherance of such purchase and sale (whether with or with respect to the Subscriber or any beneficial purchaser) has occurred only in such jurisdiction;

(m)    the Subscriber acknowledges that it and/or the Corporation may be required to provide applicable securities regulatory authorities or stock exchanges with information concerning the identities of the beneficial purchasers of the Units and the Subscriber agrees that, notwithstanding that the Subscriber may be purchasing the Units as agent for an undisclosed principal, the Subscriber will provide to the Corporation, on request, particulars as to the identity of such undisclosed principal as may be required by the Corporation in order to comply with the foregoing;

(n)     unless the Subscriber satisfies subsection 3(o), the Subscriber satisfies one of subsections (i), (ii), (iii) or (iv) below:

(i)     If the Subscriber is a U.S. Purchaser, the Subscriber acknowledges, represents, warrants and covenants to and with the Corporation that, as at the date given above and at the Closing:

(A)     the Subscriber and each beneficial purchaser for which it is acting, if any, is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended) (the "U.S. Securities Act"), and as set out in Schedule "A" - "Certification of US Purchaser" hereto, which the Subscriber has duly completed and delivered concurrently herewith;

(B)     the Subscriber is purchasing the Units as principal for its own account, or for the account of a beneficial purchaser for which it is acting as fiduciary or agent, for investment purposes only, and not with a view to the resale of distribution of all or any of the Units in violation of the United States federal or state securities laws;

(C)     the Subscriber acknowledges that the Units and Underlying Securities have not been registered under the U.S. Securities Act or the securities laws of any state of the United States, and therefore may not be offered or sold in the United States or to, or for the account or benefit of, a U.S. Person, unless registered under the U.S. Securities Act and the securities laws of all applicable states of the United States or an exemption from such registration requirements is available, and the Subscriber therefore acknowledges and agrees that the Units will be "restricted securities" within the meaning of Rule 144 under the U.S. Securities Act, and may not be offered, sold, pledged or otherwise transferred, directly or indirectly, unless (i) they are subsequently registered under the U.S. Securities Act and applicable U.S. state securities laws or (ii) an exemption or exclusion from the registration requirements of the U.S. Securities Act and applicable U.S. state securities laws is available, and that prior to any transfer of Units, the Subscriber may be required to deliver to the Corporation and the transfer agent for the Units a legal opinion of recognized counsel, or other evidence in form and substance reasonably satisfactory to the Corporation, to the effect that such transfer does not require registration under the U.S. Securities Act or applicable U.S. state securities laws;

(D)     the Subscriber understands, acknowledges and agrees that upon the original issuance of the Units, and until such time as the same is no longer required under applicable requirements of the U.S. Securities Act or applicable U.S. state securities laws, the certificates representing the Units may bear a legend in substantially the following form, in addition to any other legends required by applicable law:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE ISSUER THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY, ONLY (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION; (B) TO THE ISSUER, (C) OUTSIDE THE UNITED STATES PURSUANT TO RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE LOCAL LAWS AND REGULATONS, (D) PURSUANT TO THE EXEMPTIONS FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF AVAILABLE, AND IN ACCORDANCE WITH APPLICABLE U.S. STATE SECURITIES LAWS, OR (E) PURSUANT TO ANOTHER APPLICABLE EXEMPTION UNDER THE U.S. SECURITIES ACT AND ANY APPLICABLE U.S. STATE SECURITIES LAWS, AFTER, IN THE CASE OF TRANSFERS PURSUANT TO CLAUSE (D) OR (E), PROVIDING TO THE COMPANY A LEGAL OPINION OR OTHER EVIDENCE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE ISSUER, TO THE EFFECT THAT SUCH TRANSFER DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT. DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE GOOD DELIVERY IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA."

(ii)     **if the Subscriber is resident in or otherwise subject to the applicable securities laws of any province of Canada,** the Subscriber is purchasing the Units as principal (or is deemed to be purchasing as principal) for its own account, not for the benefit of any other person, the Subscriber is an "accredited investor" as defined in National Instrument 45-106 entitled *Prospectus Exemptions* ("**NI 45-106**") (or, if applicable for Subscribers in Ontario, the corresponding categories for the definition of an "accredited investor" as defined in Section 73.3 of the *Securities Act* (Ontario)), which definitions are reproduced in Exhibit B-1 to Schedule "B" attached hereto, the Subscriber was not created or used solely to purchase or hold securities as an accredited investor as described in paragraph (m) of the definition of "accredited investor" in NI 45-106 and reproduced in Exhibit B-1 to Schedule "B" hereto, the Subscriber is not a trust company or trust corporation registered under the laws of Prince Edward Island that is not registered or authorized under the *Trust and Loan Companies Act* (Canada) or under comparable legislation in another jurisdiction of Canada **and the Subscriber has executed and delivered to the Corporation a Representation Letter in the form attached hereto as Schedule "B" indicating that the Subscriber fits within one of the categories of "accredited investor" set forth in such definitions (including a duly completed and initialed copy of Exhibit B-1 to Schedule "B") and, if the Subscriber is an individual described in paragraphs (j), (k), or (l) of the definition of "accredited investor" in Section 1.1 of NI 45-106, a duly completed and signed copy of Exhibit B-2 to Schedule "B";**

(iii)    **if the Subscriber is not purchasing the Units as principal,** it is duly authorized to enter into this Subscription Agreement and to execute and deliver all documentation in connection with the purchase on behalf of each beneficial purchaser, each of whom is purchasing as principal for its own account, not for the benefit of any other person, and not with a view to the resale or distribution of all or any of the Units or Underlying Securities, it acknowledges that the Corporation may be required by law to disclose to certain regulatory authorities the identity of each beneficial purchaser of Units for whom it may be acting, and it and each beneficial purchaser is resident in the jurisdiction set out as the "Subscriber's Residential Address" and the purchase by and sale of the Units, and any act, solicitation, conduct or negotiation directly or indirectly in furtherance of such purchase and sale (whether with or with respect to the Subscriber or any beneficial purchaser) has occurred only in such jurisdiction, and it is acting as agent for a beneficial purchaser, who is disclosed on the face page of this Subscription Agreement, who is resident in the jurisdiction set out in the "Disclosed Beneficial Purchaser Information" and who complies with section 3(n) hereof as if all references therein were to the beneficial purchaser rather than to the Subscriber and the Subscriber has concurrently **executed and delivered to the Corporation a Representation Letter in the form attached hereto as Schedule "B" indicating that the Subscriber fits within the category of "accredited investor" set forth in such definitions (including a duly completed and initialed copy of Exhibit B-1 to Schedule "B") and, if the Subscriber is an individual described in paragraphs (j), (k), or (l) of the definition of "accredited investor" in Section 1.1 of NI 45-106, a duly completed and**

signed copy of Exhibit B-2 to Schedule "B"; or

(iv) **if it is not purchasing the Units pursuant to (i) or (ii), it and each person on whose behalf the Subscriber is contracting is a resident of a jurisdiction outside of both Canada and the United States, it has concurrently executed and delivered the Representation Letter in the form attached to this Subscription Agreement as Schedule "C"** and will provide such evidence of compliance with all matters described in such Representation Letter as the Corporation and its counsel may request including that: (a) the purchase of the Units does not contravene any of the applicable securities laws in the Subscriber's jurisdiction of residence and does not trigger (i) any obligation to prepare and file a prospectus, an offering memorandum or similar document, or any other ongoing reporting requirements with respect to such purchase or otherwise, or (ii) any registration or other obligation on the part of the Corporation; and (b) the sale of the Units as contemplated in this Subscription Agreement would, if completed, be made pursuant to an exemption from the prospectus and registration requirements under applicable securities legislation of the Subscriber's jurisdiction of residence;

(o) the Subscriber understands that it may not be able to resell the Units or Underlying Securities except in accordance with limited exemptions available under applicable securities legislation, regulatory policy and stock exchange rules, and that the Subscriber is solely responsible for (and the Corporation is not in any way responsible for) the Subscriber's compliance with applicable resale restrictions;

(p) the Subscriber acknowledges that:

(i) no securities commission or similar regulatory authority has reviewed or passed on the merits of the Units or Underlying Securities;

(ii) there is no government or other insurance covering the Units or Underlying Securities;

(iii) there are risks associated with the purchase of the Units and Underlying Securities;

(iv) there are restrictions on the Subscriber's ability to resell the Units and Underlying Securities and it is the responsibility of the Subscriber to find out what those restrictions are and to comply with them before selling the Units and Underlying Securities; and

(v) the Corporation has advised the Subscriber that the Corporation is relying on an exemption from the requirements to provide the Subscriber with a prospectus and to sell securities through a person or company registered to sell securities under the *Securities Act* (British Columbia) and other applicable securities laws and, as a consequence of acquiring Units and the Underlying Securities pursuant to this exemption, certain protections, rights and remedies provided by the *Securities Act* (British Columbia) and other applicable securities laws, including statutory rights of rescission or damages, will not be available to the Subscriber;

(q) the Subscriber understands that, any certificates representing the Units or the Underlying Securities and any certificates representing any of the Common Shares issued upon exercise of the Warrants which are issued within four months after the Closing Date are to bear a legend substantially in the following form indicating that the resale of such securities is restricted:

**"Unless permitted under securities legislation, the holder of this security must not trade the security before the date that is 4 months and a day after the later of (i) *[insert distribution date]*, and (ii) the date the issuer became a reporting issuer in any province or territory."**

and the Subscriber further acknowledges that it has been advised to consult its own legal counsel in its jurisdiction of residence for full particulars of the resale restrictions applicable to it;

(r) the Subscriber has not received or been provided with, nor has it requested, nor does it have any need to receive, any offering memorandum, or any other document (other than the annual financial statements, interim financial statements or any other document (excluding offering memoranda, prospectuses or other offering documents) the content of which is prescribed by statute or regulation) describing the business and affairs of the Corporation, which has been prepared for delivery to and review by prospective purchasers in order to assist them in making an investment decision in respect of the purchase of Units pursuant to the Offering;

(s)  the Subscriber has not become aware of any advertisement in printed media of general and regular paid circulation or on radio, television or other form of telecommunication or any other form of advertisement (including electronic display or the Internet) or sales literature with respect to the distribution of the Units or Underlying Securities;

(t)  the Subscriber is aware that the Units and Underlying Securities have not been and will not be registered under the United States *Securities Act of 1933,* as amended (the "U.S. Securities Act") or the securities laws of any U.S. state and that the Units and Underlying Securities may not be offered or sold, directly or indirectly, in the United States without registration under the U.S. Securities Act or applicable state laws or compliance with requirements of an exemption from registration and it acknowledges that the Corporation has no present intention of filing a registration statement under the *U.S. Securities Act* or applicable state laws in respect of the Units and Underlying Securities;

(u)  if the Subscriber is not a "U.S. Person" (as that term is defined by Regulation S under the U.S. Securities Act, which definition includes, but is not limited to, an individual resident in the United States, an estate or trust of which any executor or administrator or trustee, respectively, is a U.S. Person and any partnership or corporation organized or incorporated under the laws of the United States), it is not acquiring the Underlying Securities for the account or benefit of a U.S. Person or a person in the United States;

(v)  the Subscriber undertakes and agrees that it will not offer or sell any of the Units or Underlying Securities in the United States unless such securities are registered under the U.S. Securities Act and the securities laws of all applicable states of the United States, or an exemption from such registration requirements is available;

(w)  if required by applicable securities legislation, regulations, rules, policies or orders or by any securities commission, stock exchange or other regulatory authority, the Subscriber will execute, deliver, file and otherwise assist the Corporation in filing, such reports, undertakings and other documents with respect to the issue of the Units;

(x)  except as disclosed in writing to the Corporation, the Subscriber does not act jointly or in concert with any other person or company for the purposes of acquiring securities of the Corporation;

(y)  the Subscriber has reviewed the "Privacy Notice" attached to this Subscription Agreement, and agrees to and accepts all covenants, representations and consents as set out therein;

(z)  the funds representing the Subscription Amount which will be advanced by the Subscriber to the Corporation hereunder will not represent proceeds of crime for the purposes of the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)* (the "**PCMLTFA**") or the *Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act* of the United States (the "**Patriot Act**") and the Subscriber acknowledges that the Corporation may in the future be required by law to disclose the Subscriber's name and other information relating to this Subscription Agreement and the Subscriber's subscription hereunder, on a confidential basis, pursuant to the PCMLTFA and/or the Patriot Act. To the best of its knowledge: (i) none of the subscription funds to be provided by the Subscriber: (A) have been or will be derived from or related to any activity that is deemed criminal under the law of Canada, the United States of America, or any other jurisdiction; or (B) are being tendered on behalf of a person or entity who has not been identified to the Subscriber; and (ii) it shall promptly notify the Corporation if the Subscriber discovers that any of such representations ceases to be true, and to provide the Corporation with appropriate information in connection therewith;

(aa)  the Subscriber acknowledges that the Corporation may complete additional financings in the future in order to develop the business of the Corporation and to fund ongoing development. There is no assurance that such financing will be available and if available, on reasonable terms. Any such financings may have a dilutive effect on current security holders of the Corporation, including the Subscriber;

(bb)  if the Subscriber is contracting under this Subscription Agreement on behalf of another person or persons, the representations, warranties, covenants, acknowledgements, confirmations and statements made by the Subscriber in this Subscription Agreement are true and correct with respect to such person or persons on whose behalf the Subscriber is so contracting, as if such representations, warranties, covenants, acknowledgements, confirmations and statements were made directly by such person or persons; and

(cc)  the Subscriber acknowledges that an investment in the Units is subject to a number of risk factors and the Subscriber covenants and agrees to comply with applicable securities legislation, orders or policies concerning the purchase, holding of, and resale of the Units and Underlying Securities.

4.  **Timeliness of Representations, etc.** The Subscriber agrees (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) that the representations, warranties and covenants of the Subscriber herein will be true and correct both as of the execution of this Subscription Agreement and as of the Closing Time (as defined herein), and will survive the completion of the distribution of the Units.

5.  **Indemnity.** The Subscriber acknowledges that the Corporation and its counsel are relying upon the representations, warranties and covenants of the Subscriber set forth herein in determining the eligibility (from a securities law perspective) of the Subscriber (or, if applicable, the eligibility of another on whose behalf the Subscriber is contracting hereunder to subscribe for Units) to purchase Units under the Offering, and hereby agrees to indemnify the Corporation and its directors, officers, employees, advisers, affiliates, shareholders and agents (including their respective legal counsel) against all losses, claims, costs, expenses, damages or liabilities that they may suffer or incur as a result of or in connection with their reliance on such representations, warranties and covenants. The Subscriber undertakes to immediately notify the Corporation's counsel at Sui & Company, Solicitors, Suite 1800 – 130 King Street West, Toronto, Ontario M5X 1E3, attention : Erwin Sui email: erwin@suico.com fax (416) 360-3761 of any change in any statement or other information relating to the Subscriber set forth herein that occurs prior to the Closing Time.

6.  **Deliveries by Subscriber prior to Closing.** The Subscriber agrees to deliver to the Corporation, or as the Corporation may direct, not later than 5:00 p.m. (Toronto Time) on such date of which the Subscriber receives notice:

(a)  this duly completed and executed Subscription Agreement;

(b)  a certified cheque, bank draft or wire transfer made payable to "Sui & Company In Trust" in an amount equal to the Subscription Amount, or payment of the same amount in such other manner as is acceptable to the Corporation;

(c)  a properly completed and duly executed copy of the appropriate investor qualification form(s) as described on page 2 of this Subscription Agreement;

(d)  one manually signed and duly completed Private Placement Questionnaire in the form attached as Schedule "D"; and

(e)  such other documents as may be requested by the Corporation as contemplated by this Subscription Agreement.

7.  **Partial Acceptance or Rejection of Subscription.** The Corporation may, in its absolute discretion, accept or reject the Subscriber's subscription for Units as set forth in this Subscription Agreement, in whole or in part, and the Corporation reserves the right to allot to the Subscriber less than the amount of Units subscribed for under this Subscription Agreement. Notwithstanding the foregoing, the Subscriber acknowledges and agrees that the acceptance of this Subscription Agreement will be conditional upon among other things, the sale of the Units to the Subscriber being exempt from any prospectus and offering memorandum requirements of applicable securities laws. The Corporation will be deemed to have accepted this Subscription Agreement upon the delivery at Closing of the certificates representing the Units to the Subscriber or upon the direction of the Subscriber in accordance with the provisions hereof. If this Subscription Agreement is rejected in whole, any certified cheque(s) or bank draft(s) delivered by the Subscriber on account of the Subscription Amount for the Units subscribed for will be promptly returned to the Subscriber without interest. If this Subscription Agreement is accepted only in part, a cheque representing the amount by which the payment delivered by the Subscriber exceeds the subscription price of the number of Units sold to the Subscriber pursuant to a partial acceptance of this Subscription Agreement will be promptly delivered to the Subscriber without interest.

8.  **Time and Place of Closing.** The sale of the Units will be completed at the offices of Sui & Company, Solicitors, counsel to the Corporation, in Toronto, Ontario at 2 :00 p.m. (Toronto time) or such other time as the Corporation may determine (the "**Closing Time**") on the Closing Date. The Corporation reserves the right to close the Offering in multiple tranches, so that one or more closings may occur after the initial closing.

9.  **Subject to Regulatory Approval.** The obligations of the parties hereunder are subject to all required regulatory approvals being obtained.

10.  **Representations and Warranties of the Corporation.** The Corporation hereby represents and warrants to the Subscriber (and acknowledges that the Subscriber is relying thereon) that:

(a)     the Corporation has the full corporate right, power and authority to execute and deliver this Subscription Agreement and to issue the Units to the Subscriber;

(b)     the Corporation is duly incorporated and validly subsisting, and is qualified to carry on business in each jurisdiction in respect of which the carrying out of the activities contemplated hereby make such qualification necessary;

(c)     the Corporation has complied or will comply with all applicable corporate and securities laws in connection with the offer and sale of the Units;

(d)     upon acceptance by the Corporation, this Subscription Agreement shall constitute a binding obligation of the Corporation enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting the enforcement of creditors' rights generally and to the general principles of equity including the fact that specific performance is available only in the discretion of the court; and

(e)     the execution, delivery and performance of this Subscription Agreement by the Corporation and the issue of the Units to the Subscriber pursuant hereto does not and will not constitute a breach of or default under the constating (i.e. governing or charter) documents of the Corporation, or any law, regulation, order or ruling applicable to the Corporation, or any agreement to which the Corporation is a party or by which it is bound.

**11.     No Partnership.** Nothing herein shall constitute or be construed to constitute a partnership of any kind whatsoever between the Subscriber and the Corporation.

**12.     Governing Law.** The contract arising out of acceptance of this Subscription Agreement by the Corporation shall be governed by and construed in accordance with the laws of the Province of British Columbia and the federal laws of Canada applicable therein. The parties irrevocably attorn to the exclusive jurisdiction of the courts of the Province of British Columbia.

**13.     Time of Essence.** Time shall be of the essence of this Subscription Agreement.

**14.     Entire Agreement.** This Subscription Agreement represents the entire agreement of the parties hereto relating to the subject matter hereof, and there are no representations, covenants or other agreements relating to the subject matter hereof except as stated or referred to herein.

**15.     Electronic Copies.** The Corporation shall be entitled to rely on delivery of a facsimile or other electronic copy of executed subscriptions, and acceptance by the Corporation of such facsimile or electronic copies shall be legally effective to create a valid and binding agreement between the Subscriber and the Corporation in accordance with the terms hereof.

**16.     Counterpart.** This Subscription Agreement may be executed in one or more counterparts each of which so executed shall constitute an original and all of which together shall constitute one and the same agreement.

**17.     Severability.** The invalidity, illegality or unenforceability of any provision of this Subscription Agreement shall not affect the validity, legality or enforceability of any other provision hereof.

**18.     Survival.** The covenants, representations and warranties contained in this Subscription Agreement shall survive the closing of the transactions contemplated hereby, and shall be binding upon and enure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

**19.     Interpretation.** The headings used in this Subscription Agreement have been inserted for convenience of reference only and shall not affect the meaning or interpretation of this Subscription Agreement or any provision hereof. In this Subscription Agreement, unless otherwise indicated, all references to money amounts are to United States Dollars.

**20.     Amendment.** Except as otherwise provided herein, this Subscription Agreement may only be amended by the parties hereto in writing.

**21.     Costs**. The Subscriber acknowledges and agrees that all costs incurred by the Subscriber (including any fees and disbursements of any special counsel retained by the Subscriber) relating to the sale of the Units to the Subscriber

- 14 -

shall be borne by the Subscriber.

22.    **Withdrawal**. The Subscriber, on its own behalf and, if applicable, on behalf of others for whom it is contracting hereunder, agrees that this subscription is made for valuable consideration and may not be withdrawn, cancelled, terminated or revoked by the Subscriber, on its own behalf and, if applicable, on behalf of others for whom it is contracting hereunder.

23.    **Assignment.** Neither party may assign all or part of its interest in or to this Subscription Agreement without the consent of the other party in writing.

24.    **Language**. The Subscriber acknowledges that it has consented to and requested that all documents evidencing or relating in any way to the sale of the securities be drawn up in the English language only. *Nous reconnaissons par les présentes avoir consenti et demandé que tous les documents faisant foi ou se rapportant de quelque manière à l'achat des titres soient rédigés en anglais seulement.*

## PRIVACY NOTICE

The Subscriber acknowledges that this Subscription Agreement and the Exhibits hereto require the Subscriber to provide certain personal information to the Corporation. Such information is being collected by the Corporation for the purposes of completing the Offering, which includes, without limitation, determining the Subscriber's eligibility (or that of any Disclosed Beneficial Purchaser) to purchase the Units under applicable securities laws, preparing and registering certificates representing the Units and any Underlying Securities to be issued to the Subscriber and completing filings required by any stock exchange or securities regulatory authority. In addition, such personal information may be used or disclosed by the Corporation for the purpose of administering the Corporation's relationship with the Subscriber or, if applicable, the beneficial purchaser for whom the Subscriber is contracting. For example, such personal information may be used by the Corporation to communicate with the Subscriber or, if applicable, the beneficial purchaser for whom the Subscriber is contracting (such as by providing annual or quarterly reports), to prepare tax filings and forms or to comply with its obligations under taxation, securities and other laws (such as maintaining a list of holders of shares). The Subscriber's personal information (and that of any Disclosed Beneficial Purchaser) may also be disclosed by the Corporation to (a) stock exchanges or securities regulatory authorities (including the Ontario Securities Commission (the "OSC") and the British Columbia Securities Commission (the "BCSC"), the TSX Venture Exchange and l'Autorité des marchés financiers), (b) the Corporation's registrar and transfer agent, (c) Canadian tax authorities, and (d) any of the other parties involved in the Offering, including legal counsel, and may be included in closing books in connection with the Offering.

By executing this Subscription Agreement, the Subscriber (on its own behalf and on behalf of any Disclosed Beneficial Purchaser for whom it is contracting hereunder) consents to the foregoing collection, use and disclosure of the Subscriber's (and any Disclosed Beneficial Purchaser's) personal information. The Subscriber (on its own behalf and on behalf of any Disclosed Beneficial Purchaser for whom it is contracting hereunder) also consents to the filing of copies or originals of any of the Subscriber's documents delivered in connection with this Subscription Agreement as may be required to be filed with any stock exchange or securities regulatory authority in connection with the transactions contemplated hereby and expressly consents to the collection, use and disclosure of the Subscriber's (and any Disclosed Beneficial Purchaser's) personal information a stock exchange for the purposes identified by such exchange, from time to time. The Subscriber (on its own behalf and on behalf of any Disclosed Beneficial Purchaser for whom it is contracting hereunder) further acknowledges that it has been notified by the Corporation: (a) of the requirement to deliver to the OSC, the BCSC and l'Autorité des marchés financiers the full name, residential address and telephone number of the purchaser of the securities, the number and type of securities purchased, the total purchase price, the exemption relied upon and the date of distribution; (b) that this information is being collected indirectly by the OSC, BCSC and l'Autorité des marchés financiers under the authority granted to it in securities legislation; (c) that this information is being collected for the purposes of the administration and enforcement of the securities legislation of Ontario, British Columbia and Quebec; (d) that the Administrative Support Clerk can be contacted at Ontario Securities Commission, Suite 1903, Box 55, 20 Queen Street West, Toronto, Ontario, M5H 3S8, or at (416) 593-3684, and can answer any questions about the OSC's indirect collection of this information; and (e) that the BCSC can be contacted at British Columbia Securities Commission, P.O. Box 10142, Pacific Centre, 701 West Georgia Street, Vancouver, British Columbia, V7Y 1L2, Telephone: (604) 899-6500, Toll free across Canada: 1-800-373-6393, Facsimile: (604) 899-658, and can answer any questions about the BCSC's indirect collection of this information.

## SCHEDULE "A"

## PROVISIONS APPLICABLE TO A UNITED STATES PURCHASER

## CERTIFICATION OF U.S. PURCHASER

**NOTE: the provisions on this page are applicable ONLY if the Purchaser is in the United States or is a "U.S. person" as defined in Regulation S under the United States Securities Act of 1933, as amended.**

TO:    **TRUE PHARMASTRIP INC.** (the "Corporation")

*(Capitalized terms not specifically defined in this Certification have the meaning ascribed to them in the Subscription Agreement to which this Schedule is attached.)*

In connection with the execution of the Subscription Agreement to which this Schedule is attached, the undersigned (the "Purchaser") represents, warrants and covenants (which representations, warranties and covenants shall survive the Closing) to the Corporation (and acknowledges that the Corporation is relying thereon) that:

(a)    it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment and it is able to bear the economic risk of loss of the investment in the Units;

(b)    the Corporation has provided to it the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and it has had access to such information concerning the Corporation as it has considered necessary or appropriate in connection with its investment decision to acquire the Units and that any answers to questions and any request for information have been complied with to the Purchaser's satisfaction;

(c)    it is purchasing the Units for its own account or for the account of one or more persons for whom it is exercising sole investment discretion, (a "Beneficial Purchaser"), for investment purposes only and not with a view to resale or distribution in violation of applicable securities laws and, in particular, neither it nor any Beneficial Purchaser for whose account it is purchasing the Units has any intention to distribute either directly or indirectly any of the Units  or Underlying Securities in the United States; provided, however, that this paragraph shall not restrict the Purchaser from selling or otherwise disposing of any of the Units or Underlying Securities pursuant to registration thereof pursuant to the United States Securities Act of 1933, as amended (the "U.S. Securities Act") and any applicable state securities laws or under an exemption from such registration requirements;

(d)    it, and if applicable, each Beneficial Purchaser for whose account it is purchasing the Units is a U.S. Accredited Investor that satisfies one or more of the categories of U.S. Accredited Investor indicated below (the Purchaser must initial "SUB" for the Purchaser, and "BP" for each Beneficial Purchaser, if any, on the appropriate line(s)):

   _____    Category 1    A bank, as defined in Section 3(a)(2) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity; or

   _____    Category 2    A savings and loan association or other institution as defined in Section 3(a)(5)(A) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity; or

   _____    Category 3    A broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended; or

   _____    Category 4    An insurance company as defined in Section 2(13) of the U.S. Securities Act; or

   _____    Category 5    An investment company registered under the United States Investment Corporation Act of 1940; or

   _____    Category 6    A business development company as defined in Section 2(a)(48) of the United States Investment Corporation Act of 1940; or

   _____    Category 7    A small business investment company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the United States Small Business Investment Act of 1958; or

   _____    Category 8    A plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets in excess of U.S. $5,000,000; or

   _____    Category 9    An employee benefit plan within the meaning of the United States Employee Retirement Income Security Act of 1974 in which the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan with total assets in excess of U.S. $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; or



| _____ | Category 10 | A private business development company as defined in Section 202(a)(22) of the United States Investment Advisers Act of 1940 as amended; or |
| _____ | Category 11 | An organization described in Section 501(c)(3) of the United States Internal Revenue Code of 1986, as amended, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of U.S. $5,000,000; or |
| _____ | Category 12 | Any director or executive officer of the Corporation; or |
| _____ | Category 13 | A natural person whose individual net worth, or joint net worth with his or her spouse, excluding the value of his or her primary residence net of any mortgage obligation secured by the property, exceeds US$1,000,000. For purposes of this calculation, if the mortgage or other indebtedness secured by the Purchaser's primary residence exceeds its value and the mortgagee or other lender has recourse to the Purchaser personally for any deficiency, the amount of any excess must be considered a liability and deducted from the Purchaser's net worth; or |
| _____ | Category 14 | A natural person who had an individual income in excess of |
|  |  | U.S. $200,000 in each of the two most recent years or joint income   with   that   person's spouse  in  excess  of  U.S. |
|  |  | $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or |
| _____ | Category 15 | A trust, with total assets in excess of U.S. $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the U.S. Securities Act; or |
| _____ | Category 16 | Any entity in which all of the equity owners meet the requirements of at least one of the above categories; |

(e)    it understands that upon the issuance thereof, and until such time as the same is no longer required under the applicable requirements of the U.S. Securities Act or applicable U.S. state laws and regulations, the certificates representing the Units, and all securities issued in exchange therefor or in substitution thereof, will bear a legend in substantially the following form:

"THE SECURITIES REPRESENTED (OR ISSUABLE UPON CONVERSION OR EXERCISE) HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE ISSUER THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY, ONLY (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION; (B) TO THE ISSUER, (C) OUTSIDE THE UNITED STATES PURSUANT TO RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE LOCAL LAWS AND REGULATIONS, (D) PURSUANT TO THE EXEMPTIONS FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF AVAILABLE, AND IN ACCORDANCE WITH APPLICABLE U.S. STATE SECURITIES LAWS, OR (E) PURSUANT TO ANOTHER APPLICABLE EXEMPTION UNDER THE U.S. SECURITIES ACT AND ANY APPLICABLE U.S. STATE SECURITIES LAWS, AFTER, IN THE CASE OF TRANSFERS PURSUANT TO CLAUSE (D) OR (E), PROVIDING TO THE COMPANY A LEGAL OPINION OR OTHER EVIDENCE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE ISSUER, TO THE EFFECT THAT SUCH TRANSFER DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT."

*provided that,* if any Units or Underlying Securities are being sold in accordance with Rule 904 of Regulation S, and if the Corporation is a "foreign issuer" within the meaning of Regulation S at the time of sale, the legend may be removed by providing to the Corporation or its transfer agent (i) a declaration in the form attached hereto as Appendix A (or as the Corporation may prescribe from time to time) and (ii) if required by the Corporation, an opinion of counsel, of recognized standing reasonably satisfactory to the Corporation, or other evidence reasonably satisfactory to the Corporation, that the proposed transfer may be effected without registration under the U.S. Securities Act;

*and provided, further, that,* if any Units or Underlying Securities are being sold under Rule 144, the legend may be removed by delivering to the Corporation or its transfer agent an opinion of counsel of recognized standing reasonably satisfactory to the Corporation, that the legend is no longer required under applicable requirements of the U.S. Securities Act or state securities laws;

(f)    it acknowledges that the Units and Underlying Securities are "restricted securities", as such term is defined under Rule 144 under the U.S. Securities Act, and may not be offered, sold, pledged, or otherwise transferred, directly or indirectly, without prior registration under the U.S. Securities Act and applicable state securities laws, and it agrees that if it decides to offer, sell, pledge or otherwise transfer, directly or indirectly, any of the Units or Underlying Securities absent such registration, it will not offer, sell, pledge or otherwise transfer, directly or indirectly, any of the Units or Underlying Securities, directly or indirectly, except as permitted by paragraph (e) above and the legend included therein;

(g)    it understands and acknowledges that (i) if the Corporation is deemed to have been at any time previously an issuer with no or

- A3 -

nominal operations and no or nominal assets other than cash and cash equivalents, Rule 144 under the U.S. Securities Act may not be available for resale of the Units or Underlying Securities and (ii) the Corporation is not obligated to make Rule 144 under the U.S. Securities Act available for resales of such Units or Underlying Securities;

(h)    it understands and acknowledges that the Corporation has no obligation or present intention of filing with the United States Securities and Exchange Commission or with any state securities administrator any registration statement in respect of resales of the Units or Underlying Securities in the United States;

(i)    the office or other address of the Purchaser at which the Purchaser received and accepted the offer to purchase the Units is the address listed on this Agreement on the first page of this Agreement;

(j)    it understands and agrees that there may be material tax consequences to the Purchaser of an acquisition, disposition or exercise of any of the Units or Underlying Securities; the Corporation gives no opinion and makes no representation with respect to the tax consequences to the Purchaser under United States, state, local or foreign tax law of the Purchaser's acquisition or disposition of such Units or Underlying Securities;

(k)    it understands and acknowledges that the Corporation (i) is not obligated to remain a "foreign issuer" within the meaning of Regulation S, (ii) may not, at the time the Units or Underlying Securities are resold by it or at any other time, be a foreign issuer, and (iii) may engage in one or more transactions which could cause the Corporation not to be a foreign issuer, and if the Corporation is not a foreign issuer at the time of sale or transfer of the Units or Underlying Securities pursuant to Rule 904 of Regulation S, the certificates representing the Units or Underlying Securities may continue to bear the legend described above by paragraph (e);

(l)    it understands and agrees that the Units have not been and will not be registered under the U.S. Securities Act, or applicable state securities laws, and the Units are being offered and sold to the Purchaser in reliance upon exemptions available under Rule 506 of Regulation D under the U.S. Securities Act and/or Section 4(a)(2) of the U.S. Securities Act;

(m)    it has not purchased the Units as a result of any form of "general solicitation" or "general advertising" (as defined under Regulation D of the U.S. Securities Act), including any advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio, television or internet or any seminar or meeting whose attendees have been invited by general solicitation or general advertising;

(n)    it understands and acknowledges that the Corporation is incorporated outside the United States and its properties are located outside the United States. Consequently, it may be difficult to provide service of process on the Corporation for court proceedings in the United States and it may be difficult to enforce any judgment against the Corporation in the United States; and

(o)    it acknowledges that the representations, warranties and covenants hereto are made by it with the intent that they may be relied upon by the Corporation in determining its eligibility or the eligibility of others on whose behalf it is contracting thereunder to purchase the Units. It agrees that by accepting Units it shall be representing and warranting that the representations and warranties above are true as at the Closing with the same force and effect as if they had been made by it at the Closing and that they shall survive the purchase by it of Units and shall continue in full force and effect notwithstanding any subsequent disposition by it of such securities.

The Purchaser undertakes to notify the Corporation immediately of any change in any representation, warranty or other information relating to the Purchaser or any Beneficial Purchaser set forth herein which takes place prior to the Closing.

Dated:                          , 2019.

If a Corporation, Partnership or Other Entity:                 If an Individual:

                                                              GORDON   SMITH
_____                       _____
Name of Entity                                                Name of Individual

_____                       _____
Type of Entity                                                Signature Print

_____
Signature of Person Signing

_____
Print or Type Name and Title of Person Signing

**EXHIBIT "B-1" TO SCHEDULE "B"**

**TO BE COMPLETED BY ACCREDITED INVESTORS**

| |
|---|
| **PLEASE MARK YOUR INITIALS BESIDE THE CATEGORY BELOW TO WHICH YOU BELONG** |

Please complete the Representation Letter to the Corporation by marking your initials beside the category of "accredited investor" to which you belong within the meaning of Section 1.1 of NI 45-106 and Section 73.3(1) of the *Securities Act* (Ontario), as applicable:

**Meaning of "Accredited Investor"**

"Accredited investor" is defined in Section 1.1 of NI 45-106 to mean any person who fits within any of the following categories at the time of the sale of securities to that person:

_____ (a)      (i)      except in Ontario, a Canadian financial institution, or a bank listed in Schedule III of the Bank Act (Canada),

                (ii)      in Ontario, (A) a bank listed in Schedule I, II or III to the Bank Act (Canada); (B) an association to which the Cooperative Credit Associations Act (Canada) applies or a central cooperative credit society for which an order has been made under subsection 473 (1) of that Act; or (C) a loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services cooperative or credit union league or federation that is authorized by a statute of Canada or Ontario to carry on business in Canada or Ontario, as the case may be,

_____ (b)      (i)      except in Ontario, the Business Development Bank of Canada incorporated under the Business Development Bank of Canada Act (Canada),

                (ii)      in Ontario, the Business Development Bank of Canada,

_____ (c)      (i)      except in Ontario, a subsidiary of any person referred to in paragraphs (a) or (b), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary,

                (ii)      in Ontario, a subsidiary of any person referred to in paragraphs (a) through (e) above, if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary,

_____ (d)      (i)      except in Ontario, a person registered under the securities legislation of a jurisdiction of Canada as an adviser or dealer,

                (ii)      in Ontario, a person or company registered under the securities legislation of a province or territory of Canada as an adviser or dealer, except as otherwise prescribed by the regulations under the Securities Act (Ontario),

_____ (e)      an individual registered under the securities legislation of a jurisdiction of Canada as a representative of a person referred to in paragraph (d),

_____ (e.1)      an individual formerly registered under the securities legislation of a jurisdiction of Canada, other than an individual formerly registered solely as a representative of a limited market dealer under one or both of the Securities Act (Ontario) or the Securities Act (Newfoundland and Labrador),

_____ (f)      (i)      except in Ontario, the Government of Canada or a jurisdiction of Canada, or any crown corporation, agency or wholly owned entity of the government of Canada or a jurisdiction of Canada,

                (ii)      in Ontario, the Government of Canada, the government of a province or territory of Canada, or any Crown corporation, agency or wholly owned entity of the Government of Canada or the government of a province or territory of Canada,

_____ (g)      (i)      except in Ontario, a municipality, public board or commission in Canada and a metropolitan community, school board, the Comité de gestion de la taxe scolaire de l'île de Montréal or an intermunicipal management board in Québec,

                (ii)      in Ontario, a municipality, public board or commission in Canada and a metropolitan community, school board, the Comité de gestion de la taxe scolaire de l'île de Montréal or an intermunicipal management board in Québec,

_____ (h)      (i)      except in Ontario, any national, federal, state, provincial, territorial or municipal government of or in any

- B-1-2 -

foreign jurisdiction, or any agency of that government,

   (ii)   in Ontario, any national, federal, state, provincial, territorial or municipal government of or in any foreign jurisdiction, or any agency of that government,

_____ (i)   (i)   except in Ontario, a pension fund that is regulated by either the Office of the Superintendent of Financial Institutions (Canada) or a pension commission or similar regulatory authority of a jurisdiction of Canada,

   (ii)   in Ontario, a pension fund that is regulated by the Office of the Superintendent of Financial Institutions (Canada) or a pension commission or similar regulatory authority of a province or territory of Canada,

 (j)   an individual who, either alone or with a spouse, beneficially owns, directly or indirectly, financial assets having an aggregate realizable value that, before taxes, but net of any related liabilities, exceeds $1,000,000,

*[Note: Financial assets include cash and securities, but do not include a personal residence – see the definition of "financial assets" later in this certificate. Financial assets are generally liquid or relatively easy to liquidate. You must subtract any liabilities related to your financial assets to calculate your net financial assets—see the definition of "related liabilities". Financial assets held in a group RRSP under which you do not have the ability to acquire the financial assets and deal with them directly are not considered to be beneficially owned by you. If you meet the higher financial asset threshold set out in paragraph (j.1), then initial paragraph (j.1) instead of this paragraph (j).]*

*[Note: If you are an accredited investor described in this paragraph (j), and do not meet the higher financial asset threshold set out in paragraph (j.1), you must deliver a completed Form 45-106F9 – Form for Individual Accredited Investors (See Exhibit B-2 hereto).]*

_____ (j.1)   an individual who beneficially owns financial assets having an aggregate realizable value that, before taxes but net of any related liabilities, exceeds $5,000,000,

*[Note: The financial assets of your spouse (including financial assets in a spousal RRSP) cannot be included in the calculation of net financial assets under this paragraph (j.1). See definition of "financial assets" below. If you meet the financial asset threshold set out in this paragraph (j.1), you are not required to complete Exhibit B-2.]*

_____ (k)   an individual whose net income before taxes exceeded $200,000 in each of the two most recent calendar years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the two most recent calendar years and who, in either case, reasonably expects to exceed that net income level in the current calendar year, [Note: You are required to complete Exhibit B-2]

*[Note: If individual accredited investors wish to purchase through wholly-owned holding companies or similar entities, such purchasing entities must qualify under section (t) below, which must be initialed and complete. If you are an accredited investor described in this paragraph (k), you must deliver a completed Form 45-106F9 – Form for Individual Accredited Investors (See Exhibit B-2 hereto).]*

_____ (l)   an individual who, either alone or with a spouse, has net assets of at least $5,000,000.

*[Note: To calculate your net assets, take the value of your total assets (which may include a personal residence) and subtract your total liabilities (which may include a mortgage). The value attributed to assets should reasonably reflect their estimated fair value. Income tax should be considered a liability if the obligation to pay it is outstanding at the time of the subscription.]*

*[Note: If you are an accredited investor described in this paragraph (l), you must deliver a completed Form 45- 106F9 – Form for Individual Accredited Investors (See Exhibit B-2 hereto).]*

_____ (m)   a person, other than an individual or an investment fund, that has net assets of at least $5,000,000, as shown on its most recently prepared financial statements,

_____ (n)   an investment fund that distributes or has distributed its securities only to:

   (i)   a person that is or was an accredited investor at the time of the distribution,

   (ii)   a person that acquires or acquired securities in the circumstances referred to in section 2.10 of National Instrument 45-106 (where the person subscribes for a minimum amount investment) and Section 2.19 of National Instrument 45-106 (where the person makes an additional investment in investment funds), or

   (iii)   a person described in paragraph (i) or (ii) that acquires or acquired securities under section 2.18 of National Instrument 45-106 (investment fund reinvestment),

_____ (o)   an investment fund that distributes or has distributed securities under a prospectus in a jurisdiction of Canada for which the regulator or, in Quebec, the securities regulatory authority, has issued a receipt,

_____ (p)   a trust company or trust corporation registered or authorized to carry on business under the Trust and Loan Companies Act (Canada) or under comparable legislation in a jurisdiction of Canada or a foreign jurisdiction, acting on behalf of a fully managed account managed by the trust company or trust corporation, as the case may be,

- B-1-3 -

_____ (q)     a person acting on behalf of a fully managed account managed by that person, if that person is registered or authorized to carry on business as an adviser or the equivalent under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction,

_____ (r)     a registered charity under the Income Tax Act (Canada) that, in regard to the trade, has obtained advice from an eligibility adviser or an adviser registered under the securities legislation of the jurisdiction of the registered charity to give advice on the securities being traded,

_____ (s)     an entity organized in a foreign jurisdiction that is analogous to any of the entities referred to in paragraphs (a) to (d) or paragraph (i) in form and function,

_____ (t)     a person in respect of which all of the owners of interests, direct, indirect or beneficial, except the voting securities required by law to be owned by directors, are persons that are accredited investors,

***Note: If you initialled (t), then indicate the name and category of accredited investor (by reference to the applicable letter of this Exhibit B-1) of each of the owners of interests (attach additional pages if more than three):***

| Name | Category of Accredited Investor |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

_____ (u)     an investment fund that is advised by a person registered as an adviser or a person that is exempt from registration as an adviser,

_____ (v)     a person that is recognized or designated by the securities regulatory authority or, except in Ontario and Québec, the regulator as an accredited investor, or

_____ (w)     a trust established by an accredited investor for the benefit of the accredited investor's family members of which a majority of the trustees are accredited investors and all of the beneficiaries are the accredited investor's spouse, a former spouse of the accredited investor or a parent, grandparent, brother, sister, child or grandchild of that accredited investor, of that accredited investor's spouse or of that accredited investor's former spouse.

***Note: If you initialled (w), then indicate the name and category of accredited investor (by reference to the applicable letter of this Exhibit B-1) of each of the following (attach additional pages if more than three trustees):***

| | Name | Category of Accredited Investor |
|---|---|---|
| Individual who established trust: | _____ | _____ |
| Trustee | _____ | _____ |
| Trustee | _____ | _____ |

---

**PLEASE MARK YOUR INITIALS BESIDE THE CATEGORY ABOVE TO WHICH YOU BELONG**

---

**Interpretative Aids**

The following definitions relate to certain of the categories set forth above:

(a)     "Canadian financial institution" means:

     (i)     an association governed by the Cooperative Credit Associations Act (Canada) or a central cooperative credit society for which an order has been made under section 473(1) of that Act, or

     (ii)     a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services cooperative, or league that, in each case, is authorized by an enactment of Canada or a jurisdiction of Canada to carry on business in Canada or a jurisdiction of Canada;

(b)     "Canadian securities regulatory authorities" means the securities commissions and similar regulatory authorities of each of the provinces or territories of Canada;

(c)     "eligibility adviser" means:

     (i)     a person that is registered as an investment dealer or in an equivalent category of registration under the securities legislation of the jurisdiction of a purchaser and authorized to give advice with respect to the type of security being

distributed; and

(ii) in Saskatchewan or Manitoba, also means a lawyer who is a practicing member in good standing with a law society of a jurisdiction of Canada or a public accountant who is a member in good standing of an institute or association of chartered accountants, certified general accountants or certified management accountants in a jurisdiction of Canada provided that the lawyer or public accountant must not:

(A) have a professional, business or personal relationship with the issuer, or any of its directors, executive officers, founders, or control persons; and

(B) have acted for or been retained personally or otherwise as an employee, executive officer, director, associate or partner of a person that has acted for or been retained by the issuer or any of its directors, executive officers, founders or control persons within the previous 12 months;

(d) "EVCC" means an employee venture capital corporation that does not have a restricted constitution, and is registered under Part 2 of the Employee Investment Act (British Columbia), R.S.B.C. 1996 c. 112, and whose business objective is making multiple investments;

(e) "financial assets" means:

(i) cash;

(ii) securities; or

(iii) a contract of insurance, a deposit or an evidence of a deposit that is not a security for the purposes of securities legislation;

(f) "foreign jurisdiction" means a country other than Canada or a political subdivision of a country other than Canada;

(g) "fully managed account" means an account for which a person or company makes the investment decisions if that person or company has full discretion to trade in securities for the account without requiring the client's express consent to a transaction;

(h) "investment fund" means a mutual fund or a non-redeemable investment fund, and, for greater certainty in British Columbia, includes an EVCC and a VCC;

(i) "jurisdiction" means a province or territory of Canada;

(j) "non-redeemable investment fund" means an issuer, (i) whose primary purpose is to invest money provided by its securityholders; (ii) that does not invest (A) for the purpose of exercising or seeking to exercise control of an issuer, other than an issuer that is a mutual fund or a non-redeemable investment fund, or (B) for the purpose of being actively involved in the management of any issuer in which it invests, other than an issuer that is a mutual fund or a non- redeemable investment fund; and (iii) that is not a mutual fund;

(k) "person" includes:

(i) an individual,

(ii) a corporation,

(iii) a partnership, trust, fund and an association, syndicate, organization or other organized group of persons, whether incorporated or not, and

(iv) an individual or other person in that person's capacity as a trustee, executor, administrator or personal or other legal representative;

(l) "related liabilities" means:

(i) liabilities incurred or assumed for the purpose of financing the acquisition or ownership of financial assets, or

(ii) liabilities that are secured by financial assets;

(m) "securities legislation" means, for the local jurisdiction, the statute and other instruments issued by the securities regulator authority of the local jurisdiction;

(n) "subsidiary" means an issuer that is controlled directly or indirectly by another issuer and includes a subsidiary of that subsidiary; and

(o) "VCC" means a venture capital corporation registered under Part 1 of the Small Business Venture Capital Act (British Columbia), R.S.B.C. 1996 c. 429 whose business objective is making multiple investments.

All monetary references in this Schedule "B" are in Canadian dollars.

EXHIBIT "B-2" TO SCHEDULE "B"

Form 45-106F9
*Form for Individual Accredited Investors*

| WARNING! |
| --- |
| This investment is risky. Don't invest unless you can afford to lose all the money you pay for this investment. |

**SECTION 1 TO BE COMPLETED BY THE ISSUER OR SELLING SECURITY HOLDER**

**1. About your investment**

| Type of securities:    UNITS | Issuer:    TRUE PHARMASTRIP INC. |
| --- | --- |

| Purchased from: *[Instruction: Indicate whether securities are purchased from the issuer or a selling security holder.]* |
| --- |
| Issuer |

**SECTIONS 2 TO 4 TO BE COMPLETED BY THE PURCHASER**

**2. Risk acknowledgement**

| | Your initials |
| --- | --- |
| This investment is risky. Initial that you understand that: | *(initials)* |
| Risk of loss – You could lose your entire investment of $ 50,000 . *[Instruction: Insert the total dollar amount of the investment.]* | *(initials)* |
| Liquidity risk – You may not be able to sell your investment quickly – or at all. | *(initials)* |
| Lack of information – You may receive little or no information about your investment. | *(initials)* |
| Lack of advice – You will not receive advice from the salesperson about whether this investment is suitable for you unless the salesperson is registered. The salesperson is the person who meets with, or provides information to, you about making this investment. To check whether the salesperson is registered, go to www.aretheyregistered.ca. | *(initials)* |

**3. Accredited investor status**

| You must meet at least one of the following criteria to be able to make this investment. Initial the statement that applies to you. (You may initial more than one statement.) The person identified in section 6 is responsible for ensuring that you meet the definition of accredited investor. That person, or the salesperson identified in section 5, can help you if you have questions about whether you meet these criteria. | Your initials |
| --- | --- |
| • Your net income before taxes was more than $200,000 in each of the 2 most recent calendar years, and you expect it to be more than $200,000 in the current calendar year. (You can find your net income before taxes on your personal income tax return.) | *(initials)* |
| • Your net income before taxes combined with your spouse's was more than $300,000 in each of the 2 most recent calendar years, and you expect your combined net income before taxes to be more than $300,000 in the current calendar year. | *(initials)* |
| • Either alone or with your spouse, you own more than $1 million in cash and securities, after subtracting any debt related to the cash and securities. | *(initials)* |
| • Either alone or with your spouse, you have net assets worth more than $5 million. (Your net assets are your total assets (including real estate) minus your total debt.) | *(initials)* |

**4. Your name and signature**

| By signing this form, you confirm that you have read this form and you understand the risks of making this investment as identified in this form. |
| --- |

| First and last name (please print):    Gordon  Smith | |
| --- | --- |
| Signature:    *(signature)* | Date:    7/13/2019 |

- B-2-2 -

| **SECTION 5 TO BE COMPLETED BY THE SALESPERSON** |
|---|

| **5. Salesperson information** |
|---|

*[Instruction: The salesperson is the person who meets with, or provides information to, the purchaser with respect to making this investment. That could include a representative of the issuer or selling security holder, a registrant or a person who is exempt from the registration requirement.]*

First and last name of salesperson (please print):

| Telephone: | Email: |
|---|---|

Name of firm (if registered):

| **SECTION 6 TO BE COMPLETED BY THE ISSUER OR SELLING SECURITY HOLDER** |
|---|

| **6. For more information about this investment** |
|---|

For investment in an investment fund
*[Insert name of investment fund]*
*[Insert name of investment fund manager] [Insert address of investment fund manager]*
*[Insert telephone number of investment fund manager] [Insert email address of investment fund manager]*
*[If investment is purchased from a selling security holder, also*
*insert name, address, telephone number and email address of selling security holder here]*

**For more information about prospectus exemptions, contact your local securities regulator. You can find contact information at www.securities-administrators.ca.**

*Form instructions:*

1.  *This form does not mandate the use of a specific font size or style but the font must be legible.*

2.  *The information in sections 1, 5 and 6 must be completed before the purchaser completes and signs the form.*

**The purchaser must sign this form. Each of the purchaser and the issuer or selling security holder must receive a copy of this form signed by the purchaser. The issuer or selling security holder is required to keep a copy of this form for 8 years after the distribution.**

SCHEDULE "C"

REPRESENTATION LETTER

*(FOR NON-CANADIAN RESIDENT INVESTORS ONLY, EXCLUDING U.S. PURCHASERS)*

TO:    TRUE PHARMASTRIP INC. (the "Corporation")

*(Capitalized terms not specifically defined in this Schedule have the meaning ascribed to them in the Subscription Agreement to which this Schedule is attached)*

In connection with the execution by the undersigned Subscriber of the Subscription Agreement which this Representation Letter forms a part of, the undersigned Subscriber hereby represents, warrants, covenants and certifies to the Corporation that:

1.  The undersigned Subscriber and (if applicable) any other purchaser for whom it is acting hereunder, is resident in the jurisdiction set out as the "Subscriber's Residential Address" on the face page of the Subscription Agreement (the "Foreign Jurisdiction") and the undersigned Subscriber certifies that it and (if applicable) any other purchaser for whom it is acting hereunder is not resident in or otherwise subject to applicable securities laws of any province or territory of Canada.

2.  The undersigned Subscriber and (if applicable) any other purchaser for whom it is acting hereunder, is a purchaser which is purchasing the Units pursuant to an exemption from any prospectus or securities registration or similar requirements under the applicable securities laws of the Foreign Jurisdiction or any other securities laws to which the Subscriber and (if applicable) any other purchaser for whom the Subscriber is acting hereunder are otherwise subject.

3.  The purchase of Units by the Subscriber, and any other purchaser for whom it is acting hereunder, does not contravene any of the applicable securities laws in the Foreign Jurisdiction or any other securities laws to which the Subscriber and (if applicable) any other purchaser for whom the Subscriber is acting hereunder are otherwise subject and does not result in: (i) any obligation of the Corporation to prepare and file a prospectus, an offering memorandum or similar document; or (ii) any obligation of the Corporation to make any filings with or seek any approvals of any kind from any regulatory body in such jurisdiction or any other ongoing reporting requirements with respect to such purchase or otherwise; or (iii) any registration or other obligation on the part of the Corporation under the applicable securities laws in the Foreign Jurisdiction or any other securities laws to which the Subscriber and (if applicable) any other purchaser for whom the Subscriber is acting hereunder are otherwise subject.

4.  The Units are being acquired for investment purposes only and not with a view to the resale or distribution of all or any of the Underlying Securities.

5.  The undersigned Subscriber and (if applicable) any other purchaser for whom it is acting hereunder, are knowledgeable of, and have been independently advised as to, the securities laws of the Foreign Jurisdiction or any other securities laws to which the Subscriber and (if applicable) any other purchaser for whom the Subscriber is acting hereunder are otherwise subject.

6.  The undersigned Subscriber and (if applicable) any other purchaser for whom it is acting hereunder, is aware that its ability to enforce civil liabilities under applicable securities laws may be affected adversely by, among other things: (A) the fact that the Corporation is organized under the laws of a province of Canada; (B) some or all of the directors and officers may be residents of Canada; and (C) all or a substantial portion of the assets of the Corporation and said persons may be located outside the Foreign Jurisdiction.

7.  Upon execution of this Schedule by the undersigned Subscriber, this Representation Letter shall be incorporated into and form a part of the Subscription Agreement.

DATED at _____ this ___ day of _____, 2019.

GORDON SMITH
Name of Subscriber (please print)

By: _____
Authorized Signature

Lord, visual
Official Title or Capacity (please print)

Name of Signatory (please print name of individual whose signature appears above if different than name of Subscriber)

## SCHEDULE "D"

### FOR COMPLETION BY ALL SUBSCRIBERS

### INFORMATION REGARDING THE SUBSCRIBER

Please check the appropriate box (and complete the required information, if applicable) in each section:

1.  Security Holdings. The Subscriber and all persons acting jointly and in concert with the Subscriber own, directly or indirectly, or exercises control or direction over (provide additional detail as applicable):

    ☐ _____ common shares of TRUE PHARMASTRIP INC. (the "Corporation") and/or the following other kinds of shares and convertible securities (including but not limited to convertible debt, warrants and options) entitling the Subscriber to acquire additional common shares or other kinds of shares of the Corporation:

    _____

    _____

    ☒ No shares of the Corporation or securities convertible into shares of the Corporation.

2.  Insider Status. The Subscriber either:

    ☐ Is an "Insider" of the Corporation as defined in the *Securities Act* (British Columbia), by virtue of being:

    (a) a director or senior officer of the Corporation;

    (b) a director or senior officer of a company that is an Insider or subsidiary of the Corporation;

    (c) a person that beneficially owns or controls, directly or indirectly, voting shares of the Corporation carrying more than 10% of the voting rights attached to all the Issuer's outstanding voting shares;

    (d) the Corporation itself if it holds any of its own securities.

    ☒ Is not an Insider of the Corporation.

DATED at _____, this ___ day of _____, 2019.

GORDON SMITH
Name of Subscriber (please print)

650 245 3178
Telephone Number of Subscriber

gsmith @ randals.com
e-mail address

Signature of Subscriber or Authorized Signatory, as applicable

If applicable, print name of Authorized Signatory and Office

<p style="text-align:center"><b>SCHEDULE "E"</b></p>

<p style="text-align:center"><b>SELECTED RISK FACTORS</b></p>

<p style="text-align:center"><b>RISKS RELATED TO THE UNITED STATES REGULATORY SYSTEM</b></p>

***While cannabis is legal in many U.S. state jurisdictions, it continues to be a controlled substance under United States federal law.***

Unlike in Canada which has federal legislation uniformly governing the cultivation, distribution, sale and possession of medical cannabis, in the United States, cannabis is largely regulated at the state level. To the Company's knowledge, there are, to date, a total of 33 states, plus the District of Columbia, Puerto Rico and Guam, that have legalized cannabis in some form. Notwithstanding the permissible regulatory environment of medical cannabis at the state level, cannabis continues to be categorized as a controlled substance under the CSA and as such, violates federal law in the United States.

The United States Congress has passed appropriations bills each of the last three years that have not appropriated funds for the prosecution of cannabis offences of individuals who are in compliance with state medical cannabis laws. American courts have construed these appropriations bills to prevent the federal government from prosecuting individuals when those individuals comply with state law. However, because this conduct continues to violate federal law, American courts have observed that should Congress at any time choose to appropriate funds to fully prosecute the CSA, any individual or business – even those that have fully complied with state law – could be prosecuted for violations of federal law. And if Congress restores funding, the government will have the authority to prosecute individuals for violations of the law where before it lacked funding under the CSA's five-year statute of limitations.

Violations of federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Company, including its reputation and ability to conduct business, the listing of its securities on various stock exchanges, its financial position, operating results, profitability or liquidity or the market price of its publicly traded shares. In addition, it is difficult for the Company to estimate the time or resources that would be needed for the investigation of any such matters or its final resolution because, in part, the time and resources that may be needed are dependent on the nature and extent of any information requested by the applicable authorities involved, and such time or resources could be substantial.

***The approach to the enforcement of cannabis laws may be subject to change or may not proceed as previously outlined.***

As a result of the conflicting views between state legislatures and the federal government regarding cannabis, involvement in the cannabis industry in the United States is subject to inconsistent legislation and regulation. The response to this inconsistency was addressed in the Cole Memo addressed to all United States Attorneys acknowledging that notwithstanding the designation of cannabis as a controlled substance at the federal level in the United States, several U.S. states have enacted laws relating to cannabis.

The Cole Memo outlined certain priorities for the DOJ relating to the prosecution of cannabis offences. In particular, the Cole Memo noted that in jurisdictions that have enacted laws legalizing cannabis in some form and that have also implemented strong and effective regulatory systems to control the cultivation, distribution and possession of cannabis, conduct in compliance with those laws and regulations is less likely to be a priority at the federal level. Notably, however, the DOJ has never provided specific guidelines for what regulatory and enforcement systems it deems sufficient under the Cole Memo standard.

In light of limited investigative and prosecutorial resources, the Cole Memo concluded that the DOJ should be focused on addressing only the most significant threats related to cannabis. States where medical cannabis had been legalized were not characterized as a high priority.

However, in March 2017, former Attorney General Jeff Sessions again noted limited federal resources and acknowledged that much of the Cole Memo had merit; however, he disagreed that it had been implemented effectively and, on January 4, 2018, then Attorney General Jeff Sessions issued the Sessions Memo, which rescinded the Cole Memo. The Sessions Memo rescinded previous nationwide guidance specific to the prosecutorial authority of the United States Attorneys relative to cannabis enforcement on the basis that they are unnecessary, given the well-established principles governing federal prosecution that are already in place. Those principles are included in chapter 9.27.000 of the United States Attorneys' Manual and require federal prosecutors deciding which cases to prosecute to weigh all relevant considerations, including federal law enforcement priorities set by the Attorney General, the seriousness of the crime, the deterrent effect of criminal prosecution, and the cumulative impact of particular crimes on the community.

As a result of the Sessions Memo, federal prosecutors are now free to utilize their prosecutorial discretion to decide whether to prosecute cannabis activities despite the existence of state-level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memo as to the priority they should ascribe to such cannabis activities, and as a result it is uncertain how active federal prosecutors will be in relation to such activities. Further, the Sessions Memo did not discuss the treatment of medical cannabis by federal prosecutors.

Medical cannabis is currently protected against enforcement by enacted federal legislation in the form of the Rohrabacher-Blumenauer Amendment which similarly prevents federal prosecutors from using federal funds to impede the implementation of medical cannabis laws enacted at the state level, subject to Congress restoring such funding. Subsequent to the issuance of the Sessions Memo on January 4, 2018, the United States Congress passed its omnibus appropriations bill, SJ 1662, which for the fourth consecutive year contained the

Rohrabacher-Blumenauer Amendment language (referred to in 2018 as the Rohrabacher-Leahy Amendment) and continued the protections for the medical cannabis marketplace and its lawful participants from interference by the DOJ up and through the 2018 appropriations deadline of September 30, 2018. On February 15, 2019, President Donald J. Trump signed into law an omnibus spending bill that renewed the Rohrabacher-Blumenauer Amendment until September 30, 2019. Due to the ambiguity of the Sessions Memo in relation to medical cannabis, there can be no assurance that the federal government will not seek to prosecute cases involving cannabis businesses that are otherwise compliant with state law.

***The Company is operating at a regulatory frontier. The cannabis industry is a new industry that may not succeed.***

Should the federal government in the U.S. change course and decide to prosecute those dealing in medical or other cannabis under applicable law, there may not be any market for the Company's products and services in the U.S. Additionally, cannabis is a new industry subject to extensive regulation, and there can be no assurance that it will grow, flourish, or continue to the extent necessary to permit the Company to succeed.

***Future operations in the United States cannabis market may become the subject of heightened scrutiny.***

Any future operations in the United States cannabis market may become the subject of heightened scrutiny by regulators, stock exchanges, clearing agencies and other authorities in Canada. As a result, the Company may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Company's ability to operate in the United States or any other jurisdiction, in addition to those described herein.

***Regulatory scrutiny of the Company's industry may negatively impact its ability to raise additional capital.***

The Company's business activities rely on newly established and/or developing laws and regulations in multiple jurisdictions. These laws and regulations are rapidly evolving and subject to change with minimal notice. Regulatory changes may adversely affect the Company's profitability or cause it to cease operations entirely. The cannabis industry may come under scrutiny by the U.S. FDA, the SEC, the DOJ, the Financial Industry Regulatory Authority (FINRA) or other federal or other applicable state or nongovernmental regulatory authorities or self-regulatory organizations that supervise or regulate the production, distribution, sale or use of cannabis for medical or non-medical purposes in the U.S. It is impossible to determine the extent of the impact of any new laws, regulations or initiatives that may be proposed, or whether any proposals will become law. The regulatory uncertainty surrounding the Company's industry may adversely affect the business and operations of the Company, including without limitation, the costs to remain compliant with applicable laws and the impairment of its ability to raise additional capital, create a public trading market in the U.S. or elsewhere for securities of the Company, which could reduce, delay or eliminate any return on investment in the Company.

***U.S. State and local laws and regulations may heavily regulate brands and forms of cannabis products and there is no guarantee that the Company's proposed products and brands will be approved for sale and distribution in any state.***

U.S. States generally only allow the manufacture, sale and distribution of cannabis products that are grown in that state and may require advance approval of such products. Certain states and local jurisdictions have promulgated certain requirements for approved cannabis products based on the form of the product and the concentration of the various cannabinoids in the product. If the Company produces products that are derived from plant-based (rather than synthetic) cannabinoids, the Company intends to follow the guidelines and regulations of each applicable state and local jurisdiction in preparing products for sale and distribution, there is no guarantee that such products will be approved to the extent necessary. If the products are approved, there is a risk that any state or local jurisdiction may revoke its approval for such products based on changes in laws or regulations or based on its discretion or otherwise.

***We may have difficulties accessing the services of banks in the United States due to the nature of our business.***

The use, sale, or possession of all forms of cannabis in the United States is illegal under federal law. As a Schedule I drug under the federal Controlled Substances Act of 1970, cannabis is considered to have "no accepted medical use" and have a high potential for abuse and physical or psychological dependence. As a result, historically many banks have not accepted for deposit funds from persons/entities that are engaged in cannabis-related businesses, including those engaged in developing drugs containing cannabinoids such as our Company. There can be no assurance that the Company will not experience difficulty in opening accounts and otherwise using the services of banks.

***Due to the classification of cannabis as a Schedule I controlled substance under the CSA, banks and other financial institutions which service the cannabis industry are at risk of violating certain financial laws, including anti-money laundering statutes.***

Because the manufacture, distribution, and dispensation of cannabis remains illegal under the CSA, banks and other financial institutions providing services to cannabis-related businesses risk violation of federal anti-money laundering statutes (18 U.S.C. §§ 1956 and 1957), the unlicensed money-remitter statute (18 U.S.C. § 1960) and the U.S. Bank Secrecy Act. These statutes can impose criminal liability for engaging in certain financial and monetary transactions with the proceeds of a "specified unlawful activity" such as distributing controlled substances which are illegal under federal law, including cannabis, and for failing to identify or report financial transactions that involve the proceeds of cannabis-related violations of the CSA. The Company may also be exposed to the foregoing risks if it produces drugs derived from plant-based (rather than synthetic) cannabinoids.

***Any re-classification of cannabis or changes in U.S. controlled substance laws and regulations may affect the Company's business.***

If cannabis is re-categorized as a Schedule II or lower controlled substance, the ability to conduct research on the medical benefits of

- E3 -

cannabis would most likely be simpler and more accessible; however, if cannabis is re-categorized as a Schedule II or other controlled substance, and the resulting re-classification would result in the requirement for FDA approval if medical claims are made for any of the Company's products, such as medical cannabis. As a result, the manufacture, importation, exportation, domestic distribution, storage, sale and use of such products may be subject to a significant degree of regulation by the DEA. In that case, the Company may be required to be registered (licensed) to perform these activities and have the security, control, recordkeeping, reporting and inventory mechanisms required by the DEA to prevent drug loss and diversion. Obtaining the necessary registrations may result in delay of the manufacturing or distribution of the Company's anticipated products. The DEA conducts periodic inspections of certain registered establishments that handle controlled substances. Failure to maintain compliance could have a material adverse effect on the Company's business, financial condition and results of operations. The DEA may seek civil penalties, refuse to renew necessary registrations, or initiate proceedings to restrict, suspend or revoke those registrations. In certain circumstances, violations could lead to criminal proceedings. Furthermore, if the FDA, DEA, or any other regulatory authority determines that the Company's products may have potential for abuse, it may require the Company to generate more clinical or other data than the Company currently anticipates establishing whether or to what extent the substance has an abuse potential, which could increase the cost and/or delay the launch of that product.

***U.S. federal trademark and patent protection may not be available for the intellectual property of the Company due to the current classification of cannabis as a Schedule I controlled substance.***

As long as cannabis remains illegal under U.S. federal law as a Schedule I controlled substance pursuant to the CSA, the benefit of certain federal laws and protections which may be available to most businesses, such as federal trademark and patent protection regarding the intellectual property of a business, may not be available to the Company if it determines to produce drugs using cannabis. As a result, the Company's intellectual property may never be adequately or sufficiently protected against the use or misappropriation by third-parties. In addition, since the regulatory framework of the cannabis industry is in a constant state of flux, the Company can provide no assurance that it will ever obtain any protection of its intellectual property, whether on a federal, state or local level.

***The Company's contracts may not be legally enforceable in the United States.***

If, in the future, the Company enters into contracts that involve cannabis and/or other activities that are not legal under U.S. federal law and in some jurisdictions, the Company may face difficulties in enforcing its contracts in U.S. federal and certain state courts.

## ASCENDANT ALTERNATIVE STRATEGIES, LLC.
## INVESTOR QUESTIONNAIRE

### Confidential Subscriber Questionnaire

To:  Ascendant Alternative Strategies, LLC

      I.    The Subscriber represents and warrants that he or it comes within one category **marked below**, and that for any category marked, he or it has truthfully set forth, where applicable, the factual basis or reason the Subscriber comes within that category.  ALL INFORMATION IN RESPONSE TO THIS SECTION WILL BE KEPT STRICTLY CONFIDENTIAL EXCEPT AS NECESSARY FOR THE COMPANY AND/OR THE PLACEMENT AGENT TO COMPLY WITH LAW AND/OR ANY RULES PROMULGATED BY ANY REGULATORY AGENCY.  The undersigned shall furnish any additional information which Ascendant Alternative Strategies, LLC, (the "Company") deems necessary in order to verify the answers set forth below.



**Category X** The undersigned is an individual (not a partnership, corporation, etc.) whose individual net worth, or joint net worth with his or her spouse, presently exceeds $1,000,000.  For purposes of calculating "net worth" under this paragraph: (i) the person's primary residence shall not be included as an asset; (ii) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

**Category B** The undersigned is an individual (not a partnership, corporation, etc.) who had an individual income in excess of $200,000 in each of the two most recent years, or joint income with his or her spouse in excess of $300,000 in each of those years (in each case including foreign income, tax exempt income and full amount of capital gains and losses but excluding any income of other family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year.

**Category C** ___ The undersigned is a director or executive officer of the Company which is issuing and selling the Units in the Partnership.

Category D __    The undersigned is a bank; a savings and loan association; insurance company; registered investment company; registered business development company; licensed small business investment company ("SBIC"); or employee benefit plan within the meaning of Title 1 of ERISA and (a) the investment decision is made by a plan fiduciary which is either a bank, savings and loan association, insurance company or registered investment advisor, or (b) the plan has total assets in excess of $5,000,000 or is a self directed plan with investment decisions made solely by persons that are accredited investors.

_____
_____
(describe entity)

Category E __    The undersigned is a private business development company as defined in section 202(a)(22) of the Investment Advisors Act of 1940.

_____
_____
(describe entity)

Category F __    The undersigned is either a corporation, partnership, Massachusetts business trust, or non-profit organization within the meaning of Section 501(c)(3) of the Internal Revenue Code, in each case not formed for the specific purpose of acquiring the Units and with total assets in excess of $5,000,000.

_____
_____
(describe entity)

Category G __    The undersigned is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Units, where the purchase is directed by a "sophisticated person" as defined in Regulation 506(b)(2)(ii) under the Securities Act.

Category H __    The undersigned is an entity (other than a trust) all the equity owners of which are "accredited investors" within one or more of the above categories. If relying upon this Category alone, each equity owner must complete a separate copy of this Agreement.

_____
_____
(describe entity)

2

Category I ___        The undersigned is not within any of the categories above and is therefore
not an accredited investor.

For purposes hereof, "individual income" means adjusted gross income less any income
attributable to a spouse or to property owned by a spouse, increased by the following amounts (but
not including any amounts attributable to a spouse or to property owned by a spouse): (i) the
amount of any interest income received which is tax-exempt under Section 103 of the Internal
Revenue Code of 1986, as amended (the "Code"), (ii) the amount of losses claimed as a limited
partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction
claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income
from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the
provisions of Section 12.02 of the Code.

The undersigned agrees that the undersigned will notify the Company at any time on or prior to
the execution of this Agreement in the event that the representations and warranties in this
Agreement shall cease to be true, accurate and complete.

II.    SUITABILITY (please answer each question)

(a)    For an individual Subscriber, please describe your current employment, including the
company by which you are employed and its principal business:
CEO of Dipoki aka an online marketplace

(b)    For an individual Subscriber, please describe any college or graduate degrees held by you:
BS Economics Santa Clara
MBA Santa Clara

(c)    For all Subscribers, please list types of prior investments:
Multiple private equity Investments
Public Securities

(d)    For all Subscribers, please state whether you have you participated in other private
placements before:

YES  X            NO_____

3

(e)    If your answer to question (d) above was "YES", please indicate frequency of such prior participation in private placements of:

|  | Public Companies | Private Companies |
|---|---|---|
| Frequently | X | X |
| Occasionally | | |
| Never | | |

(f)    For individual Subscribers, do you expect your current level of income to significantly decrease in the foreseeable future:

YES_____        NO  X

(g)    For trust, corporate, partnership and other institutional Subscribers, do you expect your total assets to significantly decrease in the foreseeable future:

YES_____        NO_____

(h)    For all Subscribers, do you have any other investments or contingent liabilities which you reasonably anticipate could cause you to need sudden cash requirements in excess of cash readily available to you:

YES_____        NO  X

(i)    For all Subscribers, are you familiar with the risk aspects and the non-liquidity of the investments for which you seek to subscribe?

YES  X        NO _____

(j)    For all Subscribers, do you understand that there is no guarantee of financial return on this investment and that you run the risk of losing your entire investment?

YES  X        NO_____

4

III.    MANNER IN WHICH TITLE IS TO BE HELD. **(circle one)**

| | | |
|---|---|---|
| | (a) | Individual Ownership |
| | (b) | Community Property |
| | (c) | Joint Tenant with Right of Survivorship (both parties must sign) |
| | (d) | Partnership* |
| | (e) | Tenants in Common |
| | (f) | Corporation* |
| | (g) | Trust* |
| | (h) | Limited Liability Company* |
| | (i) | Other |

*If Notes are being subscribed for by an entity, the attached Certificate of Signatory must also be completed.

IV.    FINRA AFFILIATION.

Are you affiliated or associated with an FINRA member firm (please check one):

Yes _____          No ___X___

If Yes, please describe:

_____
_____
_____

*If Subscriber is a Registered Representative with an FINRA member firm, have the following acknowledgment signed by the appropriate party:

The undersigned FINRA member firm acknowledges receipt of the notice required by Rule 3050 of the NASD Conduct Rules.

_____
Name of FINRA Member Firm

By: _____
        Authorized Officer

Date: _____

5

V.    The undersigned is informed of the significance to the Company of the foregoing representations and answers contained in the Confidential Investor Questionnaire contained herein and such answers have been provided under the assumption that the Company will rely on them.

VI.    In furnishing the above information, the undersigned acknowledges that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that the undersigned qualifies as a Purchaser under Section 4(2) and/or Regulation D of the Securities Act of 1933 and applicable State Securities laws for the purposes of the proposed investment.

VII.    The undersigned understands and agrees that the Company may request further information of the undersigned in verification or amplification of the undersigned's knowledge of business affairs, the undersigned's assets and the undersigned's ability to bear the economic risk involved in an investment in the securities of the Company.

VIII.    The undersigned represents to you that (a) the information contained herein is complete and accurate on the date hereof and may be relied upon by you and (b) the undersigned will notify you immediately of any change in any such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he, she or it has read and understands the Subscription Agreement related hereto.

IX.    In order for the Company to comply with applicable anti-money laundering/U.S. Treasury Department Office of Foreign Assets Control ("OFAC") rules and regulations, Subscriber is required to provide the following information:

1.    **Payment Information**

(a)    Name and address (including country) of the bank from which Subscriber's payment to the Company is being wired (the "Wiring Bank"):

Charles Schwab Bank
2360 Corporate Circle
Henderson, NV 89074

(b)    Subscriber's wiring instructions at the Wiring Bank:

(c)    Is the Wiring Bank located in the U.S. or another "FATF Country"\*?

___X___ Yes    _____ No

(d)    Is Subscriber a customer of the Wiring Bank?

___X___ Yes    _____ No

2.    **Additional Information**

**For Individual Investors:**

___X___ A government issued form of picture identification (*e.g.*, passport or drivers license).

___X___ Proof of the individual's current address (*e.g.*, current utility bill), if not included in the form of picture identification.

**For Funds of Funds or Entities that Invest on Behalf of Third Parties:**

_____ A certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (*e.g.*, certificate of good standing).

_____ An "incumbency certificate" attesting to the title of the individual executing these subscription materials on behalf of the prospective investor.

_____ A completed copy of a certification that the entity has adequate anti-money laundering policies and procedures ("AML Policies and Procedures") in place that are consistent with the USA PATRIOT Act, OFAC and other relevant federal, state or non-U.S. anti-money laundering laws and regulations (with a copy of the entity's current AML Policies and Procedures to which such certification relates).

_____ A letter of reference any entity not located in the U.S. or other FATF country, from the entity's local office of a reputable bank or brokerage firm that is incorporated, or has its principal place of business located, in the U.S. or other FATF Country certifying that the prospective investor maintains an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective investor's integrity.

**For all other Entity Investors:**

---

\* As of the date hereof, countries that are members of the Financial Action Task Force on Money Laundering ("FATF Country") are:  Argentina, Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, Ireland, Italy, Japan, Luxembourg, Mexico, Kingdom of the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden, Switzerland, Turkey, United Kingdom and the United States of America.

7

_____ A certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing).

_____ An "incumbency certificate" attesting to the title of the individual executing these subscription materials on behalf of the prospective investor.

_____ A letter of reference from the entity's local office of a reputable bank or brokerage firm that is incorporated, or has its principal place of business located, in the U.S. or other FATF Country certifying that the prospective investor maintains an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective investor's integrity.

_____ If the prospective investor is a privately-held entity, a certified list of the names of every person or entity who is directly or indirectly the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the Subscriber, including (i) country of citizenship (for individuals) or principal place of business (for entities) and, (ii) for individuals, such individual's principal employer and position.

_____ If the prospective investor is a trust, a certified list of (i) the names of the current beneficiaries of the trust that have, directly or indirectly, 25% or more of any interest in the trust, (ii) the name of the settlor of the trust, (iii) the name(s) of the trustee(s) of the trust, and (iv) the country of citizenship (for individuals) or principal place of business (for entities).

X.    ADDITIONAL INFORMATION.

A TRUST MUST ATTACH A COPY OF ITS DECLARATION OF TRUST OR OTHER GOVERNING INSTRUMENT, AS AMENDED, AS WELL AS ALL OTHER DOCUMENTS THAT AUTHORIZE THE TRUST TO INVEST IN THE SECURITIES.  ALL RESOLUTIONS AND DOCUMENTATION MUST BE COMPLETE AND CORRECT AS OF THE DATE HEREOF.

XI.    INFORMATION VERIFICATION CONSENT.

BY SIGNING THIS SUBSCRIPTION AGREEMENT, SUBSCRIBER HEREBY GRANTS THE PLACEMENT AGENT PERMISSION TO REVIEW ALL PUBLICLY AVAILABLE INFORMATION REGARDING SUBSCRIBER, INCLUDING, BUT NOT LIMITED TO INFORMATION PROVIDED BY THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") FOR THE PURPOSE OF VERIFYING INFORMATION PROVIDED BY SUBSCRIBER HEREIN.

INVESTOR QUESTIONNAIRE EXECUTION PAGE

_____
Signature

_____
Signature (if purchasing jointly)

GORDON   SMITH
_____
Name Typed or Printed

_____
Name Typed or Printed

Individual
_____
Entity Name

_____
Entity Name

1325 Howard Ave, 338
_____
Address

_____
Address

Burlingame CA 94010
_____
City, State and Zip Code

_____
City, State and Zip Code

7/19/19
_____
Date

_____
Date

---

FOR INTERNAL USE ONLY

**Reviewed by Placement Agent:**      ☑ Yes        ☐ No

**Date Reviewed:**    7/22/19

---

9

| Form **W-9** | Request for Taxpayer | Give Form to the |
| (Rev. November 2017) | Identification Number and Certification | requester. Do not |
| Department of the Treasury Internal Revenue Service | ▶ Go to www.irs.gov/FormW9 for instructions and the latest information. | send to the IRS. |

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

GORDON SMITH

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☒ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3)

Exempt payee code (if any) _____

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

Exemption from FATCA reporting code (if any) _____

(Applies to accounts maintained outside the U.S.)

☐ Other (see instructions) ▶

5 Address (number, street, and apt. or suite no.) See instructions.

1326 Howard Ave, 338

Requester's name and address (optional)

6 City, state, and ZIP code

Burlingame CA 94010

7 List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see What Name and Number To Give the Requester for guidelines on whose number to enter.

Social security number

5 5 2 – 7 6 – 3 4 5 3

or

Employer identification number

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign Here | Signature of U.S. person ▶ | Date ▶ 7/19/1 |

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/FormW9.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.

Cat. No. 10231X                    Form **W-9** (Rev. 11-2017)

