**LITIGATION AND BUSINESS LAW GROUP, INC.**
 Michael W. Kinney, Esq. (106781)
73-745 El Paseo Drive, Suite 12B
Palm Desert, California 92260
Telephone:  760.341.1100
Email:      mkinney@lblglaw.com

Attorneys Specially Appearing for
True Pharmastrip Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

|  |  |
|---|---|
| IN RE TRUE PHARMASTRIP INC., A Canadian Corporation | ) Case No. 8:23-bk-11489-SC<br>)<br>)<br>)<br>) **REQUEST FOR JUDICIALNOTICE IN**<br>) **SUPPORT OF TRUE PHARMASTRIP,**<br>) **INC'S  OPPOSITION TO PETITIONING**<br>) **CREDITORS MOTION FOR**<br>) **APPOINTMENT OF AN INTERIM**<br>) **TRUSTEE**<br>)<br>)<br>) **Date:   August 24, 2023**<br>) **Time: 8:30 a.m.**<br>) **Ctrm.**<br>)<br>)<br>)<br>)<br>)<br>) |

True Pharmastrip Inc. ("TPI") hereby submits the following Request For Judicial Notice in support of its opposition to the Petitioning Creditors motion for appointment of an Interim Trustee. TPI hereby request, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice of the following items:

1. The declaration of Jacques Poujade, filed in *Federal Trade Commission v. Jason Cardiff, et al.*, United States District Court for the Central District of California, Case No. 5:18-cv-02104 (the "FTC Action"). A true and correct coy of the foregoing document is attached hereto as Exhibit 1.

2. Minute Order dated August 5, 2021 filed in the FTC Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 2.

3. Minute Order dated August 26, 2021 filed in the FTC Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 3.

4. Receiver's Final Report filed in the FTC Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 4.

5. Minute Order dated December 2, 2021 filed in the FTC Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 5.

6. Final Judgment filed in the FTC Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 6.

7. Petitioning Creditors' First Amended Cross-Complaint filed in *Robb Evans & Associates LLC v. Redwood Scientific Technologies, Inc., et al., and the related cross-actions*, LASC Case No. 22STCV04546, a pending interpleader action ("Interpleader Action"). A true and correct coy of the foregoing document is attached hereto as Exhibit 7.

8. Tentative on TPI's demurrer to the First Amended Cross-Complaint filed in the Interpleader Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 8.

9. Notice of Ruling on Demurrer filed in the Interpleader Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 9.

10. Court Docket in the Interpleader Action. A true and correct coy of the foregoing document is attached hereto as Exhibit 10.

Facts subject to judicial notice include those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Courts regularly take judicial notice of "undisputed matters of public record, including documents on file in federal or state courts." *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131-

32 (9th Cir. 2012) (internal citations omitted); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Kurtz v. Intelius, Inc*., 2011 U.S.Dist.LEXIS 101922, *3-*4 (E.D.Cal. Sept. 9, 2011). Exhibits 1 through 6 are court records from the FTC Action. Items 7 through 9 are court documents from the Interpleader Action.

Information made publicly available by government entities, including data, is also subject to judicial notice. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 676 n.6 (9th Cir. 2017).

Dated August 9, 2023                                    LITIGATION AND BUSINESS LAW GROUP, INC.

*Michael Kinney*
_____

Michael W. Kinney, specially appearing for alleged debtor
True Pharmastrip, Inc.

# EXHIBIT 1

**LITIGATION AND BUSINESS LAW GROUP, INC.**
Michael W. Kinney, Esq. (106781)
41690 Ivy Street, Suite C
Murrieta, California 92562
Telephone: 951.296.9910
Email: mkinney@lblglaw.com

Attorneys for Jacques Poujade

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No 5:18-cv-02104-SJO-PLAx |
| Plaintiff | |
| v. | **CORRECTED DECLARATION OF JACQUES POUJADE IN IN RESPONSE TO ORDER TO SHOW CAUSE** |
| JASON CARDIFF, individually and as an owner, officer, director, or member of REDWOOD SCIENTIFIC TECHNOLOGIES, Inc. etc. et. al. | **Date:    July 30, 2019**<br>**Time:    10:00 a.m.**<br>**Ctrm:    10C** |
| Defendants | |

I

I, Jacques Poujade, declare and state as follows:

1.    I am over the age of 18 and I know each of the following facts to be true of my own personal knowledge or have gained such knowledge from the books and records made under my supervision and control.

## CREATION AND FORMATION OF A MANUFACTURING BUSINESS

1.    I was born in Canada and my brother Richard Poujade ("Richard") lives Canada and works for the Canada Revenue Agency which serves the same function as the Internal Revenue Service in the United States. In June 2018 Richard and I discussed the growth of the cannabis industry in the United States and Canada and how it was slated to change significantly in Canada because of legislation which would make the sale of edible THC products legal.

2.    After talking with my brother I reached out to Jason Cardiff who I knew to have experience with selling products using thin strips. I discussed with Jason Cardiff my idea of producing and manufacturing oral thin film strips with THC as the active ingredient. I wanted to manufacture the product. Jason Cardiff suggested that we load a single machine on a truck and move it from state to state where cannabis is legal. After I researched the idea, I determined that it was not feasible for a variety of reasons.

3.    I came up with the idea of manufacturing THC infused oral strips ("Pharmastrip Products") in Canada and in each state where cannabis sales were legal. I was aware that there were CBD products on the market made from hemp oil but when I searched for oral strips using THC oil I did not find any products. I knew that products containing cannabis could not be transported over state or country lines and that the manufacture of such products had to be state specific or country specific. I thought that this concept would create a completely new product in the marketplace. I told Richard of my idea and we discussed incorporating a company. Because we were both Canadian citizens and to be able to manufacture and sell products in Canada, I decided to incorporate in Canada.

2

4.    My idea was significantly different from what I discovered in the market because it involved an entirely new product-- oral thin film strips with THC as the active ingredient and the actual manufacture of the product using machines that could be purchased from China. The sale of the products would be to distributors, not retail. The business of manufacturing products and selling to distributors is significantly different from the business of simply buying someone else's products and reselling them to consumers. There were many challenges as the project was to purchase manufacturing equipment for oral thin film strips and produce a strip with infused THC.  The challenges related to licensing (each jurisdiction, country or state has its unique licensing structure, typically requiring licensing for manufacturing, distribution, and retail to consumer), which required machinery to be purchased for each jurisdiction I discussed possible names for the company with Jason Cardiff and on June 18, 2018 I came up with the name Pharmastrip and Richard Poujade is the owner of the domain www.pharmastrip.com. I registered multiple domain names containing the name "pharmastrip" on Go Daddy true and correct copies of which are attached hereto as Exhibit 8.

5.    Jason Cardiff agreed to handle the incorporation of the company and Clover Cannastrip Thin Film Technologies, Inc. ("TPI")  was incorporated under the B.C. *Business Corporations Act* on July 31, 2018. The original incorporator was Jason Cardiff. Jason Cardiff subscribed for 100 Class A Common Shares of TPI for nominal consideration. Jason Cardiff was issued stock certificate A-1. He contributed no capital to TPI. It was contemplated at this time that Jason Cardiff would receive additional shares of stock but no additional shares of stock have ever been issued to him or any company in which he has an interest.

6.    On July 31, 2018, I subscribed for 100 Class A Common Shares for nominal consideration through a company I owned, Ange Gardien LLC, which was issued stock certificate A-2.

3

7.      Around this time, I knew that Jason Cardiff was interested in importing pre-manufactured CBD infused strips from an overseas manufacturer. These were hemp based, not THC based products. He referred to this product as Cloverstrips and was either selling or proposing to sell the Cloverstrips retail. I never considered this an option for TPI and TPI never sold or marketed Cloverstrips for sale..

## THE CARDIFFS WITHDRAW FROM TPI

8.      Neither Jason Cardiff (nor his wife)    invested any capital in TPI, and TPI did not have the money necessary to purchase the machines for manufacturing the products. One such machine was located in Florida and the cost of the machine was somewhere close to $1,000,000. I subsequently found out that similar equipment was manufactured in China and could be purchased for about $150,000.

9.      Prior to even incorporating TPI, I started making inquiries to various brokers and venture capital firms in Canada. One such company was Haywood Securities, Inc. ("Haywood"). I first spoke with Haywood in June 2018. We spoke on multiple occasions and prior to incorporating TPI, Jason Cardiff and I flew to Toronto and met with Haywood. I wanted Haywood to help raise capital for the purchase of machinery and start-up of the business. I told Haywood that the long-term plan was to take a company public in Canada.  After that meeting, including after TPI was incorporated, I spoke with Haywood many more times over the telephone about the proposed business and they were interested and thought they could secure investments. Prior to the incorporation of TPI Jason Cardiff provided literature to Haywood relating to a product he was selling called Cloverstrips which had nothing to do with the THC based products.

10.     At this time, TPI was truly a start-up company that was conducting no business and was without a bank account.

11.    In August 2018, Haywood got back to me and told me that their due diligence showed that Jason Cardiff and Eunjung Cardiff ("Cardiffs") were being investigated by the FTC. I was told by Haywood that they could not go forward with Jason Cardiff as a shareholder of TPI. I was also told by Haywood that they had told several investors about TPI and that there was considerable interest.

12.    It became absolutely clear to me from Haywood's response that I could not go forward with any effort to raise capital if Jason Cardiff was a shareholder of TPI.

13.    Based on the above, I told Jason Cardiff in August, 2018, that under no circumstances could he or Eunjung (a) hold an ownership interest in TPI, or (b) have any direct or indirect control of TPI. I told him that if he did not withdraw from TPI, I was walking away. At that time, TPI had no money, no assets, and without Haywood, no ability to raise capital.

14.    A short time after our meeting and before any capital was raised, and long before the FTC filed its action against the Cardiffs and their companies, Jason Cardiff tendered his shares (Certificate A-1) for cancellation back to me. The shares were canceled and this cancelation was entered into the stock register of TPI. The shares were cancelled on August 29, 2018. As of August 29, 2018, Ange Gardien LLC. was the sole shareholder of TPI. The cancelation of the shares of Jason Cardiff was recorded in the official registry of TPI. A true and correct copy of the resolutions and agreement relating to the shares is attached hereto as Exhibit 1.

15.    No other shares have been issued to the Cardiffs or to any company in which they have an interest.

16.    On August 30th, Jason Cardiff flew to Canada to meet Haywood to inform them that he was no longer a shareholder.  I did not believe that Haywood would accept the news of the Cardiffs withdrawal from TPI over the telephone. For this reason, Jason Cardiff flew to Canada to tell Haywood.  I did not attend the meeting.  After the meeting,

Haywood told me that both Jason and Eunjung needed to resign as directors before the company issued stock in consideration of any financing.

17.    When TPI was formed we did not elect officers, but I contemplated that the Cardiffs and I would each be officers of TPI. It did not matter to me what office I held. However, after Haywood re-iterated their position to Jason on his trip, I told Jason Cardiff that I had to be the CEO and president of the company and the only officer of the company. He agreed. Regardless of what Jason has said, he was never an officer of TPI.

18.    Haywood told me that Haywood would try and make introductions to proposed investors.

19.    In late August 2018, Jason Cardiff, and I discussed the need to open a bank account for TPI. He agreed to take on that responsibility and he opened a bank account at TD Canada Bank ("TPI Account"). I provided Jason Cardiff with all of my information, including a driver's license and passport to put my name on the account. I just learned that I am not on the account because I had to be there in person when the account was opened. The Cardiff's did not have the authority to execute the banking documents on October 4th, 2018 to represent that they were officers of TPI. Jason Cardiff was a signer on the account. They were not, and have never been, officers of True Pharmastrip.

## .FIRST ROUND OF CAPITAL INFUSION INTO TPI

20.    In September 2018 Gundyco ITF XIB Private Capital LP ("XIB") agreed to and did invest the sum of $500,000 CAD in TPI in return for 2,500,000 shares of stock. I signed the subscription agreement a true and correct copy of which is attached hereto as Exhibit 2.

21.    In September, 2018, FSD Pharma agreed to purchase 7,500,000 shares of stock in TPI, together with warrants, for $1,500,000 (Canadian dollars ("CAD"). I signed

6

the subscription documents on behalf of TPI. A true and correct copy of the subscription

documents are attached hereto as Exhibit 3.

22.    The funds from each of the above transactions were received by the law firm

Irwin/Lowy in Canada in September, 2018. The sum of $500,000.00 CAD was thereafter

wired to the TPI Account on September 10, 2018. After certain fees and commissions

were deducted from the FSD Pharma investment by Irwin/Lowy, the sum of $1,340,000

was wired into the TPI Account on September 13, 2018. The funds from the FSD Pharma

transaction should have been sent to TPI's current counsel Erwin Sui because even

though the money had been paid in the transactions had not closed.

## FORMATION OF PHARMASTRIP CORP.

23.    On September 19, 2018, shortly after the funds were received on the first

two transaction, TPI incorporated a wholly-owned subsidiary called Pharmastrip Corp

under the *Canada Business Corporations Act* ("Pharmastrip"). I had used the business

model of a parent and wholly owned subsidiary before in other businesses. The sole

director and sole officer of Pharmastrip is Richard Poujade, who is the president of

Pharmastrip. Richard Poujade is the only person who has executed any contract for

Pharmastrip. Neither Jason nor Eunjung Cardiff are or ever have been officers, directors,

or shareholders of Pharmastrip, nor do they have any interest whatsoever in this

company. They have never been signers on any Pharmastrip account.

24.    TPI made the decision to form a wholly owned subsidiary, Pharmastrip

Corp. (a federally chartered entity), for many different purposes including preserving and

protecting the rights to the name "Pharmastrip," but also be the operating entity entering

into joint venture and licensing agreements with owners of the required licensing in each

state or jurisdiction (Canada for instance) where manufacturing of the strips was

contemplated. Canada had just passed its national Cannabis legislation and proved to be

welcoming to the cannabis enterprises including a fervent capital markets environment.

Other challenges included banking as THC is not legal nationally or by Federal statute in the U.S.  All banking would have to be done in Canada where cannabis is legal. Another reason for forming the subsidiary was that TPI was incorporated under the laws of the Province of British Columbia whereas Pharmastrip was incorporated under the federal laws of Canada which I understood would provide it with additional rights and opportunities. Probably the most important reason for forming a subsidiary was that given all the regulations relating to the cannabis industry, I felt it important that TPI not be involved in either the manufacture or sale of cannabis products. A way to create separation from the actual manufacture and sale of products was to form a wholly owned subsidiary that under joint venture, collaboration and other agreements could handle the manufacture and sale of cannabis products. Also, since the manufacture of the cannabis infused products was not yet legal in Canada I knew that the initial efforts of the company would be in the United States.  In my experience it is relatively standard practice to have a parent company and a subsidiary.

**CARDIFFS' RESIGNATION AS DIRECTORS IS DOCUMENTED**

25.     The official effective date for the Cardiffs resignations as directors of TPI is October 8, 2018.  Notice of the resignations was filed with the B.C Corporate Registry on November 16, 2018. A copy of the resolution approving the resignation is attached hereto as Exhibit 4. A copy of the filing with the B.C Corporate Registry is attached to the Declaration of Erwin Sui.

26.     The FTC argues that the timing of the resignations is suspect. The timing is perfectly reasonable. The Cardiffs agreed to resign as directors and made this representation to Haywood and because various transactions were set to close and it was important that the resignation occur prior to that time. The first transaction was on October 10, 2018, when TPI issued approximately 8,000,000 Class A Common Shares to

certain parties, including Ange Gardien LLC. Other than Ange Gardien, LLC (through me) these parties are unrelated or have no connections with the Cardiffs.

27.     On October 16, 2018 the Company closed a $0.01 seed round with Haywood Securities Inc. for 2,500,000 Class A Common Shares. This transaction was to have taken place sooner. These parties are unrelated or have no connections with the Cardiffs. Haywood wanted this deal to close before the FSD Pharma deal and the XIB transactions because these transactions were at $.20 per share and the Haywood deal was at $.01 per share. Haywood also wanted to delay the above transactions because it was bringing in additional subscribers at $.20 per share as discussed below in paragraph 34.

28.     I had to ensure that the Cardiffs were out as directors before the Haywood transaction closed. Otherwise Haywood would have pulled the FSD Pharma and XIB deals, as well as the other financing discussed in paragraph 34 below. This would also have irreparably damaged TPI's relationship with Haywood. This is why the official effective date of the resignations was October 8, 2018.

**OCTOBER BANKING TRANSACTIONS**

29.     In early October 2018 I noticed a significant amount of activity in the TPI Account and I questioned Jason Cardiff about it. I learned for the first time that Jason Cardiff had obtained a "fob" from TD Canada Bank a few days earlier to be used to make wire transfers from the TPI Account.

30.     After his resignation, Jason and I met to handle the turnover of all control items to include any banking passcodes, temporary checks and other company items in his possession. As a resigned director I understood this to be one of the Cardiffs' obligations under Canadian corporate law. The Cardiffs did not have the fob or any checks when the TRO was issued. I believed from my conversation with Jason Cardiff that all of the payments he made from the TPI Account between October 2, 2018 and October 9, 2018 were for TPI business purposes, including all of the large payments

made on October 9, 2018 which he told me were for machinery that had been ordered by TPI. This is how the transactions were booked in TPI's accounting records. The first time I learned the truth about the transactions was on July 3, 2019 when I saw the most recent brief filed by the Receiver.

31.    On October 16, 2018, I transferred the sum of $1,200,000 relating to the FSD Pharma transaction to the trust account of Erwin Sui pending the close of the Haywood deal at $.01 per share. I retained $360,000 in the TPI Account in case something went wrong with the Haywood transaction. I had not made any prior wire transfers and to ensure that there were no issues with the transfer I was with Jason Cardiff when the transfer was made.

32.    On October 18, 2018, after the Haywood seed transaction closed, I wired the sum of $360,000 to Richard Poujade. It was wired to him personally because he had not yet opened a bank account for Pharmastrip. It is my understanding that he immediately opened a Pharmastrip account and deposited the sum of $360,000. I was with Jason Cardiff when the transfer was made.

33.    At the time of the transactions referred to above, *I had no actual notice of the TRO. In fact, I have never seen the TRO to this date.*

## ADDITIONAL CAPITAL INFUSION

34.    On or about November 5, 2018 TPI closed the FSD Pharma transaction, the XIB transaction, and an additional round of financing with Haywood subscribers. The investment was for $2,020,000 CAD in return for 10,100,000 shares. I signed each of the subscription agreements and these parties are unrelated and have no connections with the Cardiffs. The money was wired directly into Erwin Sui's account and never came into the TPI Account. *At the time of this transaction I had no actual notice of the TRO. In fact, I have never seen the TRO.*

35.    TPI filed notices of the share sales with the British Columbia Securities Commission and the Securities and Exchange Commission. Each of the filings required TPI to list all officers and directors of the company. I was the only officer and director and mine is the only name that appears. True and correct copies of the filings are attached hereto as Exhibit 9.

36.    TPI currently has five directors, including myself and former United States Congressman Dana Rohrabacher. I recruited each of the directors. I am the CEO of TPI. There are over 140 shareholders and giving effect to the warrants there are approximately 66,000,000 shares of stock commitments. True and correct copies of the documents relating to the election and appointment of the directors are attached hereto as Exhibit 6.

37.    As a single director on a five-person board I have no ability to control the affairs of TPI or its assets. Decisions relating to the company must be put to a vote. I own stock in TPI through Ange Gardien LLC., but my ownership interest is less than eight percent (8%) which provides me with no ability to exert any control over TPI or its assets. I am not an officer, shareholder, or director of Pharmastrip.

### THE BUSINESS OF TPI AND PHARMASTRIP

38.    TPI does not manufacture or sell any products.

39.    Pharmastrip Products containing THC are considered an edible which are not currently legal for sale in Canada. The manufacture of the Pharmastrip Products containing THC began in March 2019 in Cathedral City, California.

40.    The Pharmastrip Products are not manufactured by Pharmastrip, but instead they are manufactured by licensed third parties using machines owned by Pharmastrip. Neither the Cardiffs nor any companies with which they are associated have paid any money toward the purchase of the machines. All money has come from the investors and has been paid by either TPI or Pharmastrip.

41.     TPI paid a portion of the purchase price for the machines. The payments are reflected in the bank statements of TPI attached by the FTC as exhibits to the OSC. Each payment was made directly to the manufacturer in China. These payments were as follows (all in Canadian dollars):

10/9/2018          $46,145.07

10/9/2018          $46,145.07

42.     Pharmastrip paid the balance of the purchase price for two of the machines and is currently making payments on the third. No money was paid by the Cardiffs for any of the machines.

## ALPHATECH

43.     On or about November 29, 2017 I formed a company by the name of Alphatech Holdings LLC ("Alphatech") which the FTC prominently mentions in its filings. It is a single member limited liability company and I am the sole member. It was formed as I was beginning a technology project related to block chain and Artificial Intelligence. I later chose to incorporate a company in Delaware and Alphatech remained largely dormant until October 2018. The Cardiffs have no interest whatsoever in Alphatech and have never had any interest. They are neither employees nor consultants of Alphatech and have no direct or indirect control of any aspect of its business.

44.     In the fourth quarter of 2018, I made the decision to have AlphaTech Holdings, LLC be the marketing and machine solutions company in the U.S. for companies such as Pharmastrip. Alphatech sells no products either on a wholesale or retail basis. Alphatech employs the chief chemist Dr. Yang who designs and formulates all of the Pharmastrip Products. Dr. Yang is essential to the formulation of the Pharmastrip Products. Dr. Yang cannot work in Canada because Pharmastrip Products cannot yet be manufactured there. To work in the United States, he requires a Visa and

12

must work for a company in the United States. For this reason, it was agreed that Alphatech would employ Dr. Yang.

45.    Since the manufacturing of the Pharmastrip Products was being done in California it was agreed that Alphatech would be a channel partner for Pharmastrip and handle the research and branding of the Pharmastrip Products in the United States. Through Dr. Yang this includes the research, formulation, and development of the Pharmastrip Products. An accounting of the expenses of Alphatech which have directly benefitted Pharmastrip are attached hereto as Exhibit 7.

46.    To capitalize Alphatech so that it could meet its expenses, Pharamastrip originally loaned Alphatech the sum of $100,000 pursuant to a written promissory note. Pharmastrip has agreed to loan and has loaned further amounts to Alphatech. For accounting reasons this was handled as a loan instead of Pharmastrip purchasing Alphatech and operating it as a subsidiary. Also, this may have negatively impacted the Visa of Dr. Yang.

47.    The Cardiffs are not employees or consultants of Alphatech. They are not signatories on the bank account of Alphatech and have no access to it.

48.    I stated in my prior declaration that, "Therefore, [TPI] and Pharmastrip cannot yet conduct business in Canada and for this reason, and to save money, they are using their attorney's address as their business address." I should have clarified this better to say that they "cannot yet conduct the business of manufacturing and/or selling Pharmastrip Products," because the Canadian Cannabis legislation governing the eligibility of edible products was being phased in and not effective till October 17th, 2019.

**THE INJUNCTION AND TRO WERE NOT SERVED ON ME.**

49.    Neither the FTC nor the receiver served me personally or any other way with a copy of the TRO.  Only after the issuance of the OSC did I receive the Injunction from the FTC or the receiver.  I understand that a copy was provided to my attorney in

connection with the deposition of Peter Picciano, an employee of Tri-Emerald Financial Group, Inc. but I did not see it at that time.

50.     In my prior declaration I stated that, "in October 2018, Jason Cardiff told me that all of his assets were seized, and that an injunction was issued prohibiting him from having a checking account. Mr. Cardiff told me that he had no ability to support his family or pay his bills." This statement is true however this was the extent of what I knew about the matter as I never saw the TRO or the Injunction until recently.

51.     When I was told about the asset freeze by Jason Cardiff, there were no shares of stock of TPI, Pharmastrip, or Alphatech owned by the Cardiffs, they were not officers or directors of TPI, Pharmastrip or Alphatech, and no assets of TPI, Pharmastrip, or Alphatech were controlled or owned, directly or indirectly, by any of the parties that I now know are named in the Injunction. Until very recently I certainly had no idea that the FTC now claims that the assets and business of TPI, Pharmastrip, and Alphatech belonged to or were controlled by the Cardiffs. At no time has TPI owned any assets that were controlled or owned, directly or indirectly, for any of the parties named in the TRO, nor have the Cardiffs owned any shares of stock (other than the cancelled shares previously mentioned) in TPI or Pharmastrip or interests of any kind in Alphatech.

52.     I made a loan to Jason Cardiff of $150,000 in November 2018. The loan was made through Alphatech. Through an oversight, Alphatech allowed the payments to exceed $150,000.00. While I was out of town, my staff effected payments on the Cardiff's behalf which exceeded the agreed upon principal amount of the loan. As soon as the mistake was discovered, the Alphatech bank account was closed and a new account opened. I understand that the FTC was made aware of this immediately. To date the sum of $169,855.81 has been paid on behalf of Mr. Cardiff to his creditors from the Alphatech account. I have paid no sums to the Cardiffs or on their behalf other than through

Alphatech. There was never an additional payment to Jason Cardiff of $150,000 only payments made on his behalf of $169,855.81

53.     On February 11, 2019, I provided Mr. Cardiff with an accounting of the loan. I was told that he needed it for the FTC.

54.     In reading the OSC I see that the FTC now takes the position that the above loan was improper. The FTC was asked point blank about this in March of this year but did not ever say that the funding had to stop. I have never received a demand or request from the receiver to stop funding the loan.

55.     In reliance on the silence of the FTC and the receiver, after they were informed of the loan, I continued to fund it through Alphatech under the good faith belief that there were no objections to the loan or the continued funding of it, and therefore not in violation of the Injunction. I still have that belief, however, if the FTC or Receiver notified me or Alphatech that they objected to the loan, the payments would have stopped immediately upon being so notified. Told them everything.**PHARMASTRIP BANK RECORDS**

56.     In compliance with the FTC's request for documents to include bank statements of Pharmastrip, I was informed by Pharmastrip's counsel that under Canadian law the company would not produce these.  I asked for a letter from their attorney on multiple occasions. Pharmastrip's counsel responded to me with the letter attached hereto as Exhibit 5.

**CARDIFFS' BUSINESS IS NOT RELATED TO TPI, PHARMASTRIP OR ALPHATECH**

57.     The FTC makes numerous misstatements in its moving papers claiming that the Cardiffs' businesses are related to TPI, Pharmastrip, and Alphatech. They are not and never have been and these unsupported claims are addressed and clarified below.

15

## CLOVERSTRIPS HAVE NO RELATION TO TPI OR PHARMASTRIP
## PRODUCTS

58.     Throughout the OSC I read numerous FTC references to "Cloverstrips." This product has nothing to do with TPI, Pharmastrip, or Alphatech. These are CBD only strips derived from hemp, manufactured overseas and purchased for direct resale to consumers. The Pharmastrip Products are solely manufactured in the United States, all contain THC as the active ingredient, and are sold only to distributors. TPI, Pharmastrip and Alphatech have never sold Cloverstrips or marketed them for sale. Prior to the incorporation of TPI Jason Cardiff provided various materials that referred to the Cloverstrip products he was selling to Haywood. Haywood prepared certain documents they used in presentations. This is how they ended up in certain written materials, however, these were never products sold or manufactured by TPI, Pharmastrip or Alphatech, and do not intend to ever sell such products.

.

59.     The FTC claims that True CBD and Cloverstrips are the same. This is untrue for several reasons. First, no True CBD strips exist for Pharmastrip and none are sold by Pharmastrip, TPI. There are many such products on the market using the True CBD name but these are all hemp based products. All products manufactured by Pharmastrip contain THC as the active ingredient . and could never be sold online. Because they contain THC as an active ingredient they also cannot possibly contain the same active ingredients as any products sold by Redwood Scientific.

60.     In September 2018, TPI did purchase some CBD infused strips for the purpose of providing potential investors with a rough idea of what an infused strip looks like. This purchase took place several months before the first machine was delivered by the manufacturer and five months before any Pharmastrip Product was manufactured.

## REDWOOD SCIENTIFIC HAS NEVER DEVELOPED PACKAGING FOR TPI

61.     The FTC argues that Redwood Scientific developed the packaging for
Cloverstrips. This may be true. However, TPI, Pharmastrip and Alphatech have never
sold Cloverstrips or used the packaging and Cloverstrips have nothing to do with TPI,
Pharmastrip or Alphatech. The referenced packaging is for Harmony, Melody and
Serenity products. These products have never been sold or manufactured by TPI,
Pharmastrip or Alphatech, and they never will be manufactured or sold by them.
Pharmastrip has developed its own packaging that is completely different from the
Cloverstrip packaging attached to the OSC.

**THE ACTIONS OF REDWODD SCIENTIFIC AND ADVANCED MEN'S
INSTITUTE HAVE NO RELATIONSHIP TO TPI AND PHARMASTRIP**

62.     The FTC states in its OSC that: (a) Advanced Men's Institute registered
Cloverstrips with the FDA, (b) Advanced Men's Institute and Redwood Scientific were
importing Cloverstrips from the same company that manufactured the products discussed
in the complaint, (c) Jason Cardiff instructed purchasers of Cloverstrips to make
payments to Intel Property LLC., (d) the Cardiffs opened merchant accounts, (e) Jason
Cardiff signed a scope of work agreement for the development of Cloverstrips, Harmony,
Melody and Serenity CBD strips and (f) Jason Cardiff applied for business liability
insurance for TPI signing on behalf of Intel Property and listing an Upland address.
These claims are irrelevant.

63.     Concerning the above, Cloverstrips have nothing to do with TPI ,
Pharmastrip, and Alphatech who have never manufactured, sold or distributed
Cloverstrips. Cloverstrips are not part of the product line. The Cardiffs sold Cloverstrips
on their own and any actions they took with regard to Cloverstrips were independent of
TPI, Pharmastrip, and Alphatech. It was always my understanding that the Cardiffs were
trying to sell the Cloverstrip business as a venture separate and distinct from TPI and

17

Pharmastrip. Further, TPI, Alphatech, and Pharmastrip have never used or had merchant

accounts. TPI does not now nor has it ever had business insurance.

### JASON CARDIFF HAS NEVER SIGNED A CONTRACT ON BEHALF OF TPI.

64.    The FTC claims that Jason Cardiff signed a distributor agreement for Clover

Cannabis Thin Film Technologies with Mark Meeley. "Clover Cannabis Thin Film

Technologies" is not TPI and TPI has no distributor agreements with Mark Meeley or any

other party. TPI has no distributor agreements for among other reasons it does not sell

any products.

65.    Since August 10th there are no, or I am not aware of any contract that Jason

Cardiff has signed on behalf of TPI, nor has the FTC turned over any contracts or

agreements. Since the beginning of TPI, including when it was named Clover Cannastrip

Thin Film Technologies, Inc., I have signed the contracts and agreements.

### JASON CARDIFF'S ACTIONS DO NOT SHOW HE OWNS OR CONTROLS TPI
### OR PHARMASTRIP

66.    In its OSC the FTC points to various events which it contends show Jason

Cardiff's control and ownership over the assets of TPI, Alphatech, and Pharmastrip.

These include that: (a) Jason Cardiff is listed in the presentation as President and CEO in

a brochure found at his office, (b) Jason Cardiff signed a check on September 27, 2018

for a patent law firm, (c) Jason Cardiff was listed as president of Pharmastrip as early as

July 1, 2018 on a draft agreement with Oregon Thin Film Technologies, (d) Jason Cardiff

has communicated with Ty Sherrell since the Injunction, (e) F/X Media has worked on

sub-brands containing the same active ingredients as the stop smoking and sexual

performance products, and (f) Jason Cardiff had access to the pharmastrip.com account.

67.    From July 31, 2018 through late August Jason Cardiff was involved with

TPI as a director and shareholder. Prior to the surrender of his stock it was discussed that

he would be an active part of the company. However, this all changed dramatically and

on October 8th, 2018 he resigned as a director.  As for the check he allegedly signed, TPI does not use checks and no check has ever cleared its account. Since Pharmastrip was not formed until September 19, 2018 the draft agreement is just that. Lastly, Pharmastrip products use THC, it is highly unlikely that they contain the same active ingredients as the stop smoking and sexual performance products of Redwood. All Pharmastrip products are third party tested by the state of CA and cannot include other active ingredients.

68.    As for post injunction communications, Jason Cardiff was a consultant for Pharmastrip. I have read his job offer letter and the contact with Ty Sherrill seems to fall within it. On July 5, 2019, Jason Cardiff was terminated as a consultant to Pharmastrip. As a result, Jason Cardiff no longer has any connection to TPI or Pharmastrip.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of July, 2019 at Aliso Viejo, California.

Jacques Poujade

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | August 5, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 1 of 5 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Appellant(s) | Attorneys Present for Appellee(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER REQUESTING SUPPLEMENTAL BRIEFING ON FINAL CLAIMS PROCESS AND RESOLUTION OF THIS CASE**

On July 20, 2021, the Court ordered Plaintiff the Federal Trade Commission ("FTC"), Defendants Jason and Eunjung Cardiff, and any interested non-parties to file reports describing (1) whether any remaining Receivership Property may be released without a formal post-judgment claims process; (2) the timeline and procedures for the claims process, disbursing Receivership Property, and closing this case, including when the Receiver would file its final fee application and accounting; (3) the proposed timing of the Receiver's recommendation for how to disburse remaining Receivership Property and close this case in the most equitable and economical manner; (4) the timing for the motions for default judgment and entry of final judgment; and (5) any other matters the FTC and/or the Receiver thinks are necessary to raise at this juncture. July 20, 2021 Ord. at 8 [Doc. # 636].

The FTC's report describes a possible post-judgment claims process and asserts that the Court has discretion to permit consumers injured by Defendants' violations of the Restore Online Shoppers' Confidence Act ("ROSCA") to participate and file claims. FTC Rep. at 8 [Doc. # 638]. The FTC states that "the Receiver can identify potentially affected consumers from Defendants' records and email them a claim form at their last known email address." *Id.* But the FTC fails to specify which "Defendants' records" the Receiver will use. The Court has already ruled that, as a discovery sanction under Federal Rule of Civil Procedure 37, the FTC cannot base its damages calculation on the late-disclosed customer relationship management ("CRM") database from Defendant Redwood Scientific's third-party CRM vendor. June 29, 2021 Ord. at 8-9 [Doc. # 627]. Thus, the FTC cannot end-run the Court's discovery sanction via an open-ended claims process for customers identified through that CRM database. If the FTC can identify no adequately disclosed evidence with which to identify affected customers and calculate the sum of their claims for ROSCA violations, then it has no evidentiary basis to obtain a monetary judgment and remedy for consumers. In that case, the Court is inclined to require the Receiver to file its final accounting and request for fees, after which it will rule on the fee request and terminate the Receivership without a formal claims process. Upon the closure of this case, any third-party creditors of the Cardiffs or the Entity Defendants can seek remedies from them directly, without the supervision of the Receiver. *See* Inter/Media Time Buying Corp.'s Rep. at 2 [Doc. # 639-2] (noting that it has already received an enforceable judgment).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | August 5, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 2 of 5 |

But if the FTC can identify evidence relating to ROSCA damages that was properly disclosed pursuant to Federal Rule of Civil Procedure 26 and is definite enough for a monetary judgment to issue and for the Receiver or a third-party claims administrator to identify affected consumers and efficiently verify their claims, a claims process for consumers may be appropriate. For any orderly, economical claims process to proceed, however, the FTC must specify *exactly* what it envisions, including (1) how it will prove up a monetary judgment for the ROSCA violations; (2) how many consumers are estimated to be affected by Defendants' ROSCA violations and entitled to a portion of any monetary judgment, (3) what the total amount of estimated consumer recovery would be, (4) what evidence is needed for a consumer to submit a claim, (5) how long such a claims process would take, and (6) how much the process would cost. The FTC's current recommendation of a 60-day deadline for the Receiver to propose a plan for distribution for known claims and a 30-day window for objections fails to account for the timing of a consumer claims process, and its examples of claims vendors' administrative costs are unhelpful without any information about how much redress is available here. *See* FTC Rep. at 9, 11 n.3.

Furthermore, if consumer claims are available, the ownership of the approximately $1.2 million USD ($1.56 million CAD), plus interest ("Deposited Funds") claimed by True Pharmastrip, Inc. ("TPI") becomes even more salient. The Court will not revisit its ruling that the Deposited Funds constitute Receivership Property that can be retroactively applied to the Receiver's fees and costs. *See* July 20, 2021 Ord. at 7 [Doc. # 636]; *cf.* TPI Rep. at 4-10 [Doc. # 639-1]. Under the terms of the Temporary Restraining Order and Preliminary Injunction still in effect, the Deposited Funds constitute Receivership Property due to the extent of Jason Cardiff's control. July 20, 2021 Ord. at 4-6. In addition, the Court determines that as a matter of equity, the Receiver may be paid from those funds. *See Netsphere v. Baron*, 703 F.3d 296, 312 (5th Cir. 2012) (noting "no controlling rule on assessing costs for an improperly created receivership other than that equity is the standard," and permitting the receiver to be paid out of the receivership estate); *see also* May 24, 2021 Ord. at 2-3 [Doc. # 598] (discussing *Netsphere*). But the Court acknowledges that *ownership* of the funds is a separate question from whether the funds constitute Receivership Property. *See* July 20, 2021 Ord. at 6 (citing *S.E.C. v. Hickey*, 322 F.3d 1123, 1125 (9th Cir.), *opinion amended on denial of reh'g*, 335 F.3d 834 (9th Cir. 2003)). Equity does not permit the Deposited Funds to be used to satisfy consumer claims without a conclusive determination of the money's ownership. *See Hickey*, 322 F.3d at 1133. Thus, if the FTC seeks a consumer claims process, the FTC must also account for the time, expense, and labor to litigate an evidentiary hearing on the ownership of the Deposited Funds—or to stipulate to their ownership.

The Court notes its initial skepticism that a claims process as the FTC proposes could be either orderly or economical. The claims process made sense at the outset of this litigation when a monetary judgment was a likely remedy for the FTC Act violation. But the United States Supreme Court's decision in *AMG Capital Management v. FTC*, 141 S. Ct. 1341 (Apr. 22, 2021), upended those assumptions – if there is no monetary judgment, it is unclear what authority exists

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | August 5, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 3 of 5 |
|---|---|---|---|

for a consumer claims process, let alone a third-party creditor claims process. None of the parties in this action have cited any authority that gives this Court guidance on the viability of a "claims process" in the absence of a monetary judgment. As the Cardiffs and Intervenor VPL Medical, Inc. ("VPL") point out, this process could become very cumbersome and expensive, resulting in further diminution of the Receivership Estate for purely administrative fees and costs. *See* Cardiffs' and VPL's Rep. at 9 [Doc. # 639-3]. The claims process may also involve fact-finding, and it is unclear how the Receiver would resolve disputes of fact. The end result of any claims process therefore may not be the most equitable one, in light of all of the competing claims to dwindling funds. The Court therefore suggests, as a matter of equity, that the FTC should also pay the Receivership and third-party administrator fees relating to its proposal for consumer recovery, if there is to be one, on top of the other Receivership fees for which it is already responsible.

Ultimately, if there is no monetary judgment, no avenue for consumer claims, and no formal claims process, equity will drive the Receiver's calculation of its final fees and distribution of remaining Receivership Property, which it will submit to the Court in its final accounting and fees application. *See S.E.C. v. Cap. Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) ("[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.") (quoting *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)).

The Court currently envisions the following scenario if the FTC is unable to demonstrate that a monetary judgment and consumer claims process will be based upon evidence that has been timely disclosed during the discovery process. In recognition of the Cardiffs' wrongdoing and summary judgment entered against them on 16 counts under the FTC Act, ROSCA, and other statutes and rules, any funds that are owned by the Cardiffs should be applied first to account for Receivership fees. This includes whatever remains of Jason Cardiff's Biztank Group, LLC bank account's funds. Then with respect to third parties' frozen assets held as Receivership Property, as a matter of equity some of the Deposited Funds claimed by TPI should be allocated to Receivership fees related to litigation over the Deposited Funds, just as VPL's frozen funds were allocated to Receivership fees related to litigation over VPL. *See Netsphere*, 703 F.3d at 313. After resolution of the Receiver's fees, the remainder of the Deposited Funds will be released to TPI, and the remainder of VPL's frozen funds and any pro rata reimbursement for receivership fees will be returned to VPL.[1] If the FTC disputes TPI's ownership of any portion of the Deposited

---

[1] The Court has reviewed the evidentiary record with regard to the question of ownership of the Deposited Funds and makes the preliminary findings that TPI is a corporate entity with a duly constituted board of directors, the Deposited Funds were raised from third-party investors, and neither Jason Cardiff nor Eunjung Cardiff own the funds, though Jason previously did have access to and control over the funds. *See, e.g.*, Poujade Decl. at ¶¶ 20-22, Ex. 2-3 (August and September 2018 investments in TPI by Gundyco ITF XIB Private Capital LP ("XIB") and FSD Pharma) [Doc. ## 148-13, 147-14]; 7/31/19 Hr'g Tr. at 314:4-25 [Doc. # 188] (the FTC acknowledging XIB and FSD Pharma's investments deposited in TPI's bank account as the source of the $1.2 million at issue, before Cardiff and Poujade wired those funds to another account in October 2018); Evid. In Support of Jacques Poujade's Obj. [Doc. # 204] (declarations of TPI board members). Indeed, the Court concluded that the FTC did not provide clear and convincing

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | August 5, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 4 of 5 |
|---|---|---|---|

Funds, it can request an evidentiary hearing before the Court. Because third-party creditors may seek remedies directly against the Cardiffs, the Receiver need not account for the claims of Inter/Media, Auctus, Amy Cardiff, or any other third-party creditor as they will have other formal avenues of redress available to them.

In light of the foregoing, the Court **ORDERS** the parties to file supplemental briefs as follows:

1. On or before **August 13, 2021**, the FTC shall meet and confer with the Receiver and file a report describing exactly what evidence it will rely on to prove up a monetary judgment, contact consumers potentially affected by Defendants' ROSCA violations, and confirm the quantity of monetary damages available to affected consumers. If such evidence was not previously disclosed to Defendants during the discovery period, the FTC must say so.

   a. If a consumer claims process can proceed on previously disclosed evidence and a monetary judgment is available, the FTC shall report *exactly* what it envisions the consumer claims process to entail, including (1) how many consumers are estimated to be affected by Defendants' ROSCA violations, (2) what the total amount of estimated consumer recovery would be, (3) what evidence, if any, is needed for a consumer to submit a claim, (4) how long such a claims process would take, and (5) how much it is estimated to cost, in addition to any other information necessary for the Court to evaluate the viability of the proposed claims process. The FTC must include specific detail indicating that the claims process would be orderly, economical, and equitable, including examples of prior similar claims processes that had no monetary judgment, if any. The FTC must also factor in the necessity for an evidentiary hearing on the ownership of the Deposited Funds before such funds may be used to satisfy consumer claims.

   b. The FTC shall respond to the Court's suggestion that the FTC pay for all Receivership and third-party administrator fees related to the claims process in excess of that paid by the Cardiffs' funds and, if it declines to voluntarily pay for the process, how much in Receivership Property would be available for consumer redress after the estimated Receivership and third-party administrator fees are paid.

---

evidence that other funds in TPI accounts were subject to the Cardiffs' ownership or control, thereby also acknowledging that TPI as a whole is not an alter ego of the Cardiffs. 8/27/19 Hr'g Tr. at 7:1-13 [Doc. # 249]; Purge Contempt Order at 3 [Doc. # 238]. The Court also recognized TPI's serious effort to distance themselves from the Cardiffs and others in their legitimate business. 8/27/19 Hr'g Tr. at 31:25-33:5. There is therefore insufficient evidence in the current record that either Cardiff is an alter ego of TPI, such that ownership can be imputed to either of them.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | | Date | August 5, 2021 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 5 of 5 |
|---|---|---|---|---|

    c.  The FTC shall also respond to the Court's recommendation for equitable disbursal of Receivership Property via the Receiver's final accounting and fees application, rather than through a formal claims process.

2. On or before **August 20, 2021**, all other parties and interested non-parties shall file a joint status report, with their responses to the FTC's report and to the topics the Court raised above. The Court strongly urges the parties to meet and confer in light of this Order, take into account the practical realities of the issues identified above, and come to a negotiated resolution that does not involve the further expenditure of valuable time and resources of all interested parties.

3. The video status conference set for August 6, 2021 is **VACATED** and is **RESCHEDULED** for **August 27, 2021 at 2:00 p.m.**


**IT IS SO ORDERED.**

**EXHIBIT 10**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | August 26, 2021 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 1 of 2 |
|---|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Appellant(s) | Attorneys Present for Appellee(s) |
|---|---|
| None Present | None Present |

**Proceedings:  IN CHAMBERS—ORDER SETTING DATES FOR BRIEFING SCHEDULE
AND RESCHEDULING STATUS CONFERENCE**

The Court has reviewed and considered the responses to the Court's August 5, 2021 Order requesting supplemental briefing on a final claims process and resolution of this case.  [Doc. ## 640, 641, 645, 647.]  In light of the parties' responses, the Court finds that there will be no monetary judgment and a claims process will not be necessary.  The Court therefore **ORDERS** the following:

1. By **September 3, 2021**, the FTC shall submit a Proposed Judgment and shall propose a date by which the preliminary injunction and receivership will end.  Defendants may submit any objections or responses to the Proposed Judgment by **September 10, 2021**.

2. By **September 8, 2021**, the Receiver shall file a detailed final accounting of:

   a. The Receiver's outstanding fees and costs;

   b. The assets remaining in the Receivership Estate; and

   c. The Receiver's recommendations for disbursal of the remaining assets in the Receivership Estate, taking into account the Court's prior May 24, 2021 and August 5, 2021 Orders [Doc. ## 598, 640].

   The parties and interested non-parties shall file any objections or responses to the Receiver's accounting by **September 15, 2021**.

3. On **September 17, 2021 at 9:30 a.m.**, the Court will hold a status conference regarding the Receiver's accounting, any objections or responses thereto, and the Proposed Judgment.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>KT</u> |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | August 26, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 2 of 2 |
|---|---|---|---|

4. The August 27, 2021 status conference is **VACATED**.

**IT IS SO ORDERED.**

# EXHIBIT 11

Michael Gerard Fletcher (State Bar No. 070849)
  mfletcher@frandzel.com
Craig A. Welin (State Bar No. 138418)
  cwelin@frandzel.com
Hal D. Goldflam (State Bar No. 179689)
  hgoldflam@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Receiver ROBB EVANS
AND ASSOCIATES LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 5:18-cv-02104-DMG-PLA |
| Plaintiff, | **RECEIVER'S FINAL REPORT WITH ACCOMPANYING ACCOUNTING** |
| v. | |
| JASON CARDIFF, etc., et al., | Date: TBD |
| Defendants. | Time: TBD |
| | Place: Via Zoom |
| | Courtroom 8C, |
| | 350 West 1st St. |
| | Judge: Hon. Dolly M. Gee |

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**TO: THE HONORABLE DOLLY M. GEE, JUDGE OF THE UNITED STATES DISTRICT COURT.**

Attached is the Receiver's Final Report ("Report"). This Report is supported by the accompanying declarations of Anita Jen and Michael Gerard Fletcher, and the accountings and other supporting documents in the Exhibit Appendix, and all of the filings and records in this action. This Report also serves as the Receiver's application of payment of its fees and costs, as set forth in the Report.

**PLEASE TAKE FURTHER NOTICE** that a copy of this Report, supporting declarations and appendix of exhibits are posted on the Receiver's website at https://www.robbevans.com/find-a-case/redwood-scientific-technologies-inc-et-al/ where they may be reviewed in their entirety. This Report and the concurrently filed declarations and appendix exhibits are being served on all parties herein. While a copy of this Report is being served on all known creditors and interested parties (see attached Creditors Service List) along with copies of the Receiver's Summary Accounting with Allocations (Doc. # 654, filed 9/10/21) IRS Claim Update to the Receiver's Summary Accounting with Allocations (Doc # 657, filed 9/16/21) these third-parties may obtain copies of the supporting declarations and appendix of exhibits by accessing the Receiver's website or by sending a written request to: Robb Evans & Associates LLC, 11450 Sheldon Street, Sun Valley, California 91352-1121; Telephone (818) 768-8100; Facsimile: (818) 768-8802.

/ / /

/ / /

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Dated: September 20, 2021     Respectfully submitted,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
CRAIG A. WELIN
HAL D. GOLDFLAM


By:     /s/ Michael Gerard Fletcher
        MICHAEL GERARD FLETCHER
        Attorneys for Receiver ROBB EVANS &
        ASSOCIATES LLC

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**Robb Evans & Associates LLC**
**Receiver of**
**Redwood Scientific Technologies, Inc. et al.**
**and**
**VPL Medical, Inc.**

## RECEIVER'S REPORT AS TO THE SUMMARY ACCOUNTING, THE ORDERED ALLOCATIONS, AND THE RECEIVER'S RECOMMENDATIONS
### Dated as of September 20, 2021

The Receiver has reviewed the Court's August 26, 2021 Order [Doc. # 650] and presents this report ("Report") and the indicated accompanying exhibits in support of the Report in accordance with the Order. The Court extended the time for the Receiver to file this Report to September 20, 2021 [Doc. ## 653 and 658].

## The Updated Summary Accounting

Attached to the Exhibit Appendix as Exhibit 1 is the Receiver's summary accounting updated as of September 20, 2021, updated from the *Receiver's Summary Accounting with Allocations* previously provided to the parties [Doc. # 654] ("Receiver's Summary Accounting").[1] The Receiver has expanded the scope of this Receiver's Summary Accounting to cover all known issues and claims as of the date of this Report. The Receiver's Summary Accounting has been prepared in accordance with the Court's Order, and is in a format similar to the format used by the Receiver in reporting more limited accounting numbers to the Court in a Receiver's prior filing [*See* Doc. # 617].

The August 31, 2021, balance line in the Receiver's Summary Accounting shows the aggregate amounts held by the Receiver as of August 31, 2021, the Poujade money having been allocated in the line items above that line item to show which entity originally provided the indicated funds held in the receivership estate. This based on this Court's prior order [Doc. # 636], concerning the fees caused to the receivership estate due to the Poujade and Cardiff prior contempts ("Poujade Contempt Purge Adjustment Order"), and the purge amount ("Poujade Purge Amount") paid to the Receiver by True Pharmastrip, Inc. ("TPI") to keep Poujade out of jail.[2]

---

[1] This Report is supported by the accompanying declarations of Anita Jen and Michael Fletcher, and the related exhibits in the Exhibit Appendix.

[2] As discussed more fully later in the Report, the Receiver recommends to the Court, in part, that the Court deem the Poujade money reallocated as indicated, primarily to benefit the non-Cardiff creditors of Redwood.

In general, the receivership estate held the aggregate sum of $1,730,453.09 as of August 31, 2021, prior to further payments to the Receiver for the 4/22/21-8/31/1 Receiver's fees and costs, the Receiver's estimated costs to close down the estate,[3] and the payments to taxing entities. But the breakdowns of that aggregate balance as of August 31 are important for the Court's evaluation of funds in the receivership estate, the decisions facing the Court, and the Receiver's recommendations to the Court. Those breakdowns are as follows, as of August 31.

| Source of Funds Held by Receiver | Balances As of 8/31/21 of Amounts Held | Comments |
|---|---|---|
| Redwood | $232,662.68 | Following the Receiver's recommended reallocation of fees caused by the Poujade contempt, charging the Poujade Purge Amount for those fees, and crediting these reallocated funds to Redwood. |
| Cardiff | $47,889.73 | Cardiff's VPL salary hold back in the Receivership estate. These are Cardiff funds. |
| VPL | $70,783.04 | The remaining funds belonging to the Receivership estate following the 50/50 split of funds with VPL, as of 6/1/21, plus some minor additions. These are Cardiff funds, *i.e.*, mostly based on his half of the available money from VPL. |
| Biztank | $407,648.74 | The money received from Biztank, a LLC entity wholly owned by Jason Cardiff. These are essentially Cardiff funds, as he would be the |

---

[3] The Receiver's estimate to close out the estate assumes that all concerned accept the Court's final determinations in settling the Receiver's final report and accounting, and do not thereafter seek to involve the Receiver in any further litigation activities, including but not limited to motions to reconsider and/or appeals. Should the Receiver be drawn into any other activities, the estimates to close will need to be reevaluated and increased.

| Source of Funds Held by Receiver | Balances As of 8/31/21 of Amounts Held | Comments |
|---|---|---|
| | | only LLC member entitled to a distribution of these funds. |
| Poujade/TPI | $971,468.90 | The remaining Poujade Purge Amount following the reallocation of previous fees from Poujade/TPI, primarily to Redwood. |
| **Aggregate Balance (as of 8/31/21)** | $1,730,453.09 | Before payment of further Receivership fees and costs, the estimate to close, and the tax payments. |

### Paying the Post April 21, 2021, Receiver's Remaining Fees

The Receiver's Summary Accounting reflects the Receiver's fees, costs, and expenses from and after April 22, 2021, through and including August 31, 2021, the last full accounting period to date, in the aggregate amount of $226,945.60. Further, the Receiver's Summary Accounting also provides the Receiver's best estimate (at the present time)[4] for the fees and costs expected to be incurred by the Receiver to close out the receivership estate from and after August 31 in the estimated amount of $68,358.50 (collectively, the fees/costs after 4/21/21 and the estimate are the "Remaining Fees"). The Remaining Fees should be paid first. This Report, the Summary Accounting, and the backup supporting it including the declarations and exhibits, should be considered to be the Receiver's fee application requesting such payments.

The Court discussed the issue of who should be responsible for payment of the Remaining Fees in the status conference on September 17, 2021. The Court decided that all of the Remaining Fees should and would be paid from the funds in the receivership estate. [*See also* Doc. ## 598 and 640]. The August 31 balances for "VPL," for "Cardiff," and for "Biztank," all of which categories are essentially Jason Cardiff funds, have been charged pro rata for the Remaining Fees.[5]

---

[4] Few things in this matter have gone as expected, and the Receiver reserves the right to alter the estimate depending on future developments, and adjustments needed based on further Court decisions, and/or the actions of others. For instance, if anyone involves the Receiver in any appeals, the estimates to close out the estate will have to be reevaluated and increased.

[5] As argued by the FTC, and otherwise shown in the post 4/21 billing statements, most of the receivership estate Remaining Fees (from and after April 22, 2021) were in fact caused directly by the actions of, the complaints by, and filings of the Cardiff and VPL parties. Those indicated balance amounts are accordingly charged for the Remaining Fees pro rata.

**Tax Claim Issues**

The Receiver's Summary Accounting now reflects the IRS further amendment of its claim, lowering that lien and priority payment claim to the amount of $64,279.56 ("Amended IRS Claim"). There are sufficient funds in the receivership estate to pay the Amended IRS Claim in full, along with the other asserted tax claims against the receivership estate. The Amended IRS Claim therefore no longer raises a host of issues that have to be addressed. The Receiver's Summary Accounting reflects payments to be made by the receivership estate to various taxing agencies in a wind down of the estate, which total in the aggregate $129,477.21. These payments are, in the Receiver's view, the responsibility of the receivership estate, following discussions held by the Receiver with the various taxing entities involved. The Receiver has allocated payment of these tax claims to the Cardiff funds indicated as of August 31, 2021, after payment of the Remaining Fees.

**Disposition of the Surplus Funds**

Following payment of the Remaining Fees and the Tax Claims, as reflected in the Summary Accounting, there would remain the following balances, allocated as indicated. The remaining issues discussed below concern the disposition of these remaining, surplus funds in the receivership estate after payment of the Remaining Fees and the Tax Claims (the "Surplus Funds"). The discussion of the Surplus Funds includes a discussion about and the options for the Court to consider concerning how to resolve competing claims to such Surplus Funds.

In summary, as discussed more fully below, the Receiver will recommend to the Court that, of all of the options that may exist for disposing of the Surplus Funds, the most efficient judicially option, and the one that is likely most equitable, would be for the Court to authorize the Receiver to interpled the Surplus Funds in the Los Angeles County Superior Court, naming as defendants the various claimants discussed below, thereby allowing a state court to sort out who is entitled to what portion of the Surplus Funds, which would no longer need to be administered in this receivership estate.

| Source of Surplus Funds Held by Receiver | Surplus Funds Amounts | Comments |
|---|---|---|
| Redwood | $174,289.96 | |
| Cardiff | $16,632.17 | |
| VPL | $24,583.05 | |
| Biztank | $141,577.00 | |
| Poujade/TPI | $948,589.60 | |
| Total Surplus Funds | $1,305,671.78 | |

## Disposition of the Poujade/TPI Contempt Charges Reallocated to Redwood

The Court asked the Receiver to break out the fees caused to the receivership estate by the contemptuous behavior of Poujade which were the subject of a purge payment to the Receiver by True Pharmastrip ("TPI") [Doc. # 636]. The Receiver and its legal counsel have gone back through all of the billings and invoices to date in this matter, identifying and breaking out the time and incurred by the receivership estate as a result of Poujade's contemptuous behavior, as shown in the line item reallocations in the Receiver's Summary Accounting, reporting period by reporting period.

That wrongful behavior by Poujade began the very first day that the Receiver, then a temporary receiver, went to the Redwood offices and interviewed Jason Cardiff. The ramifications of that contemptuous behavior continues to this day.

The Receiver's Summary Accounting reallocates those Poujade caused fees during each reporting period, debiting the Poujade funds and showing how the Court could, in its discretion, credit the receivership entity that otherwise paid for those charges. So, for example, all of the Poujade-related charges in the first through third reporting period (October 10, 2018, to September 30, 2019) were allocated from Poujade back to the Redwood entities, from whose funds those charges were otherwise paid.[6]

This approach realizes a balance of $174,289.96 in funds for Redwood being available in the receivership estate under the Receiver's Summary Accounting, after payment of the Remaining Fees and the Tax Claims. Rather than handing that money to Redwood, and forcing Redwood creditors to chase money that is likely to be sequestered, spent, or otherwise dissipated, Inter/Media, Redwood, Cardiff, VPL, and any other claimant against Redwood would be able to assert such secured or unsecured claims in a state court interpleader action while that court holds the money.

---

[6] There is an interpretation of the Court's *Chamber's Order re Jacque Poujade, etc.*, dated July 20, 2021, para. 1 on page 8 [Doc. # 636] that identified Poujade-caused expenses ought to be reallocated only if they were paid from VPL funds, and not from funds claimed by Cardiff or other defendants. Receiver's counsel initially did not interpret the order that way. And, such Order is based on equity, and there is a paltry amount of Poujade-caused expenses that were paid from VPL funds ($1,003.90), as shown on the Receiver's Summary Accounting. On the other hand, a pre-receivership creditor of Redwood, Inter/Media, claims sizeable amounts are owed to it under a final state court judgment and settlement, and that it holds a lien on Redwood personal property assets in the receivership estate, which could include the funds in the sum of $235,846.76 if such funds would be reallocated from Poujade to Redwood, once the Receiver's Remaining Fees are paid. The Receiver's Summary Accounting shows a possible accounting for those funds, in the Court's discretion, based on the facts and equities in this case to allow Inter/Media to assert its secured claim as to Redwood assets.

## Disposition of the VPL, Cardiff, and Biztank Surplus Funds

The column in the Receiver's Summary Accounting for "VPL" reflects the remaining balance of Surplus Funds ($70,783.04) to be held by and for the receivership estate after splitting the remaining VPL funds as of June 1, 2021, and transferring to VPL its portion as of that date. These funds essentially are Jason Cardiff's personal share of the previously split remaining VPL funds. The Receiver recommends to the Court that the Court treat these funds as Cardiff personal assets. The column in the Receiver's Summary Accounting for "JC" refers to Jason Cardiff and is self-explanatory. These are Jason Cardiff's funds from the hold back on his VPL salary ($47,889.73). The column in the Receiver's Accounting for "Biztank" reflects the remaining balance of funds ($407,648.74) held by the receivership estate from money collected from Biztank, as of August 31, 2021. These funds essentially belong to Jason Cardiff, as the sole member of Biztank, which is a limited liability company. Following allocation of the Remaining Fees and Tax Claims, the remaining Surplus Funds for these items are $24,583.05 for VPL; $16,632.17 for Cardiff; and $141,577.00 for Biztank.

The Receiver recommends to the Court that the Court treat these funds as Cardiff personal assets.

Such Cardiff Surplus Funds would seemingly otherwise be returned to VPL, the Cardiffs, and Biztank upon settlement of the Receiver's accounting, but as with the Redwood money, that would lead to judicial inefficiencies and potential inequitable results requiring Cardiff creditors, such as Inter/Media, to go chasing money in other judicial forums. The Receiver recommends that the Court authorize the Receiver to interplead such funds in the state court naming the claimants thereto as parties to the interpleader.

## Disposition of The Net Poujade/TPI Funds and the Debenture Claims

Recently, various claimants approached the Receiver directly asserting that TPI and Poujade, and their agents, had defrauded them into making substantial investments in TPI. The *signed* debenture instruments reviewed by the Receiver to date total USD $3.250 million ("Debenture Claims"). The Receiver has also been given an *unsigned* debenture in a large amount, and an *unsigned* Securities Purchase Agreement in Canadian dollars, which the Receiver has told the claimants will not be considered as they are unexecuted. The holders of the Debenture Claims are now represented by legal counsel who filed applications in this action and were admitted by the Court to appear in this matter *pro hac vice*.

The Debenture Claims all seem to date in and around June 2019, while the Cardiff and Poujade contempt matter was proceeding, and they do not seem to involve any acts or communications by the Receiver or the receivership estate to the holders of the Debenture Claims. Therefore, the Debenture Claims would not be a claim against the receivership estate, and the Receiver does not believe that any payments would be due to the holders of the Debenture Claims from the receivership estate.

Rather, the holders of the Debenture Claims seem to be angling to receive the Surplus Funds in the Receivership estate, if any, otherwise claimed by Poujade/TPI. The Receiver's Summary Accounting does not provide for any payments to the holders of the Debenture Claims, but the Receiver's recommendations below address the equities of allowing the holders of the Debenture Claims to press their claims in this matter as to any Surplus Funds otherwise available to Poujade/TPI.

Issues similar to the above disposition issues exist concerning the Debenture Claims against Poujade/TPI. The Debenture Holders claim the Poujade/TPI money remaining after the reallocations of such funds to Redwood. The Receiver recommends that the Court authorize the Receiver to interplead those funds in the state court for determinations there.

### Open Issues:  The Mortgage Holder Claim

While the Receiver was drafting this Report, the holder of the senior mortgage on the Cardiff Upland residence approached the Receiver indicating that it held a claim in the receivership estate. From what the Receiver has reviewed to date, the claim of the mortgage holder would seem to involve only its remaining unpaid balance secured by the senior deed of trust encumbering the Cardiff residence. The Receiver does not believe that any payments would be due to the holder of the mortgage from the receivership estate, which claim seemingly could be fully resolved by releasing the mortgage holder from the preliminary injunction allowing it to foreclose on the Cardiff residence. The Receiver's Summary Accounting does not provide for any payments to the mortgage holder, but the Receiver's recommendations below address the preliminary injunction in the context of the mortgage holder and the Cardiff residence.

### Open Issues: VPL Claim for More Funds

VPL itself continues to assert that the Court should go back into prior reporting periods and fee awards and reallocate to VPL approximately $235,000 previously paid from VPL funds for approved Receivership fees and costs.  Any such payment would have to come from the indicated Surplus Funds in the Summary Accounting columns shown for Redwood, Biztank, Cardiff, and VPL.  The Receiver sees no reason to do that, and would recommend against it. VPL has asserted such claims numerous previous times in the course of this matter, and the Court has ruled against VPL each time it has presented those arguments. Nothing material has occurred to change any of those prior evaluations which should, in the Receiver's view, cause a change in such prior rulings.[7]

---

[7] Under prior rulings, any such reallocation would result in the receivership estate keeping half of the funds so reallocated.

**Open Issues: The VPL Tax Return**

The amounts paid to VPL, and possibly still to be paid under the arguments that VPL continues to press in this matter, keep changing, which requires further adjustments by the Receiver to be able to finalize and file a VPL 2020 tax return. Other changes in payment amounts to VPL will further change any such tax return. The Receiver's Summary Accounting includes in the "costs" line item estimate for the Receiver to close the estate an amount to finalize and file such VPL tax return, once final decisions are made by the Court concerning whether any additional money will be provided to VPL, as it is requesting, from the receivership estate. The Receiver recommends to the Court that a decision be made that VPL is not entitled to receive any further funds from the receivership estate.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# PROOF OF SERVICE (1)

### FTC v. Jason Cardiff
### Case No. 5:18-cv-02104

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of Frandzel Robins Bloom & Csato, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 1000 Wilshire Boulevard, Nineteenth Floor, Los Angeles, CA 90017-2427.

On **September 20. 2021**, I served true copy(ies) of the **RECEIVER'S FINAL REPORT WITH ACCOMPANYING ACCOUNTING** the original(s) of which is(are) affixed hereto. to the party(ies) on the attached service list.

### SEE ATTACHED SERVICE LIST

☒     **BY CM/ECF NOTICE OF ELECTRONIC FILING**: I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on **September 20, 2021**, at Los Angeles County, California.


/s/ Sandra Young King
Sandra Young King
sking@frandzel.com

**SERVICE LIST**
**FTC v. Jason Cardiff**
**Case No. 5:18-cv-2104**

**Electronic Mail Notice List**

- **Elizabeth J Averill**
  eaverill@ftc.gov

- **Peter Bisno**
  pbisno@bisnolaw.com

- **Michael Anthony Brown**
  tbrown@spertuslaw.com

- **Stephen R Cochell**
  srcochell@gmail.com

- **Christopher David Crowell**
  ccrowell@hrhlaw.com

- **Michael Gerard Fletcher**
  mfletcher@frandzel.com,sking@frandzel.com

- **Hal D Goldflam**
  hgoldflam@frandzel.com,dmoore@frandzel.com

- **Allan Howard Grant**
  allan@grants-law.com

- **Dolly Kae Hansen**
  dolly@spertuslaw.com

- **Lindsey M Hay**
  lhay@spertuslaw.com

- **Inter/Media Time Buying Corporation**
  ccrowell@hrhlaw.com

- **Michael W Kinney**
  mkinney@lblglaw.com

- **Shira D Modell**
  smodell@ftc.gov

- **Stacy Rene Procter**
  sprocter@ftc.gov

- **James A Prunty**
  jprunty@ftc.gov

- **Edwin Rodriguez**
  erodriguez@ftc.gov

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

- **Elizabeth Jones Sanger**
  esanger@ftc.gov,csands@ftc.gov

- **James W Spertus**
  jspertus@spertuslaw.com,sluecf@spertuslaw.com

- **Jesse James Thaler**
  jessejthaler@gmail.com

- **Gerrick M Warrington**
  gwarrington@frandzel.com,sking@frandzel.com

- **Craig A Welin**
  cwelin@frandzel.com,bwilson@frandzel.com

- **James D White**
  jdw@jamesdwhitelaw.com

- **Williams, Jett**
  iwilliams@henkelawfirm.com

- **Henke. Charlie**
  chenke@henkelawfirm.com

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# PROOF OF SERVICE (2)

### FTC v. Jason Cardiff
### Case No. 5:18–cv–2104

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of Frandzel Robins Bloom & Csato, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 1000 Wilshire Boulevard, Nineteenth Floor, Los Angeles, CA 90017-2427.

On **September 20, 2021**, I served true copy(ies) of the **RECEIVER'S FINAL REPORT WITH ACCOMPANYING ACCOUNTING,** the original(s) of which is(are) affixed hereto. to the party(ies) on the attached service list.

### SEE ATTACHED SERVICE LIST

☒     **BY E-MAIL:** I caused said document(s) to be transmitted by electronic mail. The name(s) and e-mail addresses of the person(s) served are set forth in the service list. The document was transmitted by electronic transmission and without error.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on **September 20, 2021**, at Los Angeles, California.

/s/ Sandra Young King
Sandra Young King
*sking@frandzel.com*

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1

## CREDITORS SERVICE LIST

2 **VIA E-MAIL**

3 CMS c/o Renata Bukham, Esq.
renatabukhmanesq.com

4

5 Corporation Service Company
UCCSPREP@CSCINFO.COM

6 Extreme Reach
srobinson@extremereach.com

7

8 Mitchell Tepper
mitchelltepper@icloud.com

9 San Bernardino County Assessor
PersonalProperty@ARC.SBCounty.gov

10

11 Bergen Wholesalers c/o Cathy Fleming
cfleming@fleminguvoldt.com

12 Wave Crest Management c/o Jonathan W. Heaton,
Esq jon@heatonfontano.com

13

14 Leonard S. Brown
leonard.s.brown@irs.gov

15 Amelia Puertas-Samara amelia.puertas-
samara@edd.ca.gov

16

17 Jared Bissell
Jared.Bissell@troutman.com

18

19

20

21

22

23

24

25

26

27

28

2

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# PROOF OF SERVICE (3)

### FTC v. Jason Cardiff
### Case No. 5:18-cv-2104

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of Frandzel Robins Bloom & Csato, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 1000 Wilshire Boulevard, Nineteenth Floor, Los Angeles, CA 90017-2427.

On **September 20, 2021**, I served true copy(ies) of the **NOTICE OF APPLICATION AND APPLICATION OF RECEIVER'S FINAL REPORT WITH ACCOMPANYING ACCOUNTING ,** the original(s) of which is(are) affixed hereto. to the party(ies) on the attached service list.

### SEE ATTACHED SERVICE LIST

☒ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package and addressed them to the persons on the attached service list. They were deposited with the United States Postal Service, with the postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on **September 20, 2021**, at Los Angeles, California.

_____/s/ Sandra Young King_____
Sandra Young King
*sking@frandzel.com*

3

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# CREDITORS SERVICE LIST

## VIA U.S. MAIL

Ace Funding Source LLC
366 North Broadway
Jericho, NY  11753

Allen, Maxwell & Silver, Inc.
(collection agent for Facebook)
P.O. 540
Fair Lan, NJ  07410

American Express
P.O. Box 981535
El Paso, TX  79998-1535

App Group International LLC
85 Broadway Street, 17th Floor
New York, NY  10004

California Secretary of State
1500 11th St.
Sacramento, CA  95814

Corporate Filings LLC
30 N Gould St., Suite 7001
Sheridan, WY  82801

Corporation Service Company
PO Box 2576
Springfield, IL  62708

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL  62703-4261

County of San Bernardino - Central
Collections
268 West Hospitality Lane, Second
Floor
San Bernardino, CA  92415-0465

DAISY IT Supplies, Sales & Service
8575 Red Oak Ave
Rancho Cucamonga, CA  91730-4823

Florida Dept. of Agriculture and
Consumer Services
The Rhodes Building
2005 Alalachee Parkway
Tallahassee, Florida  32399-6500

Franchise Tax Board
P.O. Box 942857
Sacramento, CA  94257-0021

Franchise Tax Board
Special Procedures Sections; Att.: Tuan
Nguyen
P.O. Box 2952, Mail Stop A-345
Sacramento, CA  95812-2952

Franchise Tax Board - State of
California
P.O. Box 942867
Sacramento, CA  94267-0011

Frontier
P.O. Box 740407
Cincinnati, OH  45274-0407

Inter/Media Time Buying Corporation
Peter Bisno, Esq.
BISNO MULVANEY, LLP
15760 Ventura Boulevard, Suite 1200
Encino, CA  91436

Internal Revenue Service
Mail Stop 5022
300 N. Los Angeles Street
Los Angeles, CA  90012

Internal Revenue Service
Samson Cheng
9350 Flair Drive
El Monte, CA  91731

Internal Revenue Service
Ogden, UT  84201-0038

Intrinsic LLC c/o First Western Credit
P.O. Box 391
El Mirage, AZ  91711

4

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

| | |
|---|---|
| Lien Solutions<br>P.O. Box 29071<br>Glendale, CA  91209-9071 | Mailing House<br>1050 East Valencia Drive<br>Fullerton, CA  92831 |
| Nevada Department of Taxation<br>Grant Sawyer Office Building<br>555 E. Washington Ave., Ste 1300<br>Las Vegas, NV  89101 | Nevada Registered Agent LLC<br>401 Ryland St., Suite 200A<br>Reno, NV  89502 |
| Nevada Secretary of State<br>101 North Carson St., Suite 3<br>Carson City, NV  89701 | Paper Recycling & Shredding<br>Specialists, Inc.<br>P.O. Box 3074<br>San Dimas, CA  91773 |
| ReadyRefresh by Nestle<br>P.O. Box 856158<br>Louisville, KY  40285-6158 | Riverside County DCSS - Main Office<br>2041 Iowa Ave.<br>Riverside, CA  92507-2414 |
| State of CA - Employment<br>Development Department<br>P.O. Box 826880<br>MIC 4<br>Sacramento, CA  94280-0001 | State of CA - Employment<br>Development Department<br>P.O. Box 989151<br>W. Sacramento, CA  95798-9151 |
| Telecheck Services, Inc.<br>P.O. Box 60028<br>City of Industry, CA  91716-0028 | Time Warner Cable<br>P.O. Box 60074<br>City of Industry, CA  91716-0074 |
| T-Mobile<br>P.O. Box 790047<br>St. Louis, MO  63179-0047 | USPS c/o Collections Acquisition<br>Company, Inc.<br>2 Easton Oval, Suite 310<br>Columbus, OH  43219-6011 |
| Brink's U.S.<br>P.O. Box 619031<br>Dallas, TX 75261-9031 | California Board of Equalization<br>PO Box 942879<br>Sacramento, CA 94279 |
| California Board of Equalization<br>450 N St.<br>Sacramento, CA 95814 | California Department of Tax and Fee<br>Administration<br>PO Box 942879<br>Sacramento, CA 94279 |
| California Franchise Tax Board-<br>Special Procedures-BE Bankruptcy<br>Gary Johnson<br>MSA-345; P.O. Box 2952<br>Sacramento, CA 95812-2952 | Capital Merchant Services, LLC<br>110 W 34th St<br>New York, NY 10001 |
| CMS c/o Renata Bukham, Esq.<br>17 State St Ste 140<br>New York, NY 10004-1501 | Employment Development Department<br>State of California<br>Att. : Arianna M. Trujillo<br>PO Box 826880<br>Sacramento, CA 94248-0001 |

5

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1

Employment Development Department
State of California
2 Bankruptcy Unit
MIC 92E
3 PO Box 826880
Sacramento 94280-0001

4

Law Office of Carl P. Ranno
5 2733 East Vista Drive
Phoenix, AZ 85032

6

Preferred Pools
7 P.O. Box 1794
Upland, CA 91785

8

Zapp Packaging
9 c/o Roger J. Buffington
Buffington Law firm, P.C
10 8840 Warner Ave., Suite 300
Fountain Valley, CA 92708

11

Vision Security Systems
12 23800 Sunnymeand Blvd., Suite G
Moreno Valley, CA 92553

13

Jaedan Accounting & Tax Services
14 8743 Woodward Ct.
Rancho Cucamonga CA 91730

15

16

JP Morgan Chase Bank, NA
17 PO Box 183164
Columbus, OH 43218-3164

18

Wave Crest Management
19 c/o Jonathan W. Heaton, Esq.
Heaton | Fontano
20 7285 Dean Martin Drive, Suite 180
Las Vegas, Nevada 89118

21

Angeles, CA 90012
22 Amelia Puertas-Samara
Senior Tax Compliance
23 Representative Collection Division
Bankruptcy Group, MIC 92E
24 Tax Branch, State of California
Employment Development
25 Department PO Box 826880 MIC 92S
Sacramento, CA 94280-0001

26

27

28

Internal Revenue Service-Insolvency
Unit
P.O. Box 7346
Philadelphia, PA 19101-7346

Lighthouse
250 Montgomery Street, Suite 300
San Francisco, CA 94104

San Bernardino County Tax Collector
268 West Hospitality Lane, 1st Floor
San Bernardino, CA 92415-0360

Spectrum
c/o McCarthy Burgess & Wolff
26000 Cannon Road
Cleveland, Ohio 44146

American Compressor Company
10144 Freeman Ave
PO Box 2217
Santa Fe Springs CA 90670

Citizens Business Bank
PO Box 3938
Ontario CA 91761

Stripe Inc
Mike Khoury
Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800
San Francisco CA 94111

Leonard S. Brown
Bankruptcy Specialist
Internal Revenue Service
Insolvency Group 7
300 North Los Angeles St, #5022 Los

# EXHIBIT 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 1 of 10 |
|---|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Appellant(s) | Attorneys Present for Appellee(s) |
|---|---|
| None Present | None Present |

**Proceedings:  IN CHAMBERS—ORDER RE WINDUP OF RECEIVERSHIP ESTATE**

The Court has considered the filings of the parties and interested third parties regarding the wind up of the receivership in this matter.  These filings are:

- The Proposed Judgment filed by the Federal Trade Commission ("FTC") on September 3, 2021 [Doc. # 651];
- Defendants' response to the Proposed Judgment [Doc. # 655];
- The Receiver's Final Report and Summary Accounting ("Final Report") [Doc. # 659];
- The FTC's Response to the Receiver's Final Report ("FTC Response") [Doc. # 660];
- True Pharmastrip, Inc.'s ("TPI") Response to the Receiver's Final Report ("TPI Response") [Doc. # 661];
- Inter/Media's Response to the Receiver's Final Report ("Inter/Media Response") [Doc. # 666];
- The Cardiffs' and VPL's Response to the Receiver's Final Report ("Cardiffs'/VPL's Response") [Doc. # 667];
- The FTC's October 4, 2021 Reply re the Receiver's Final Report ("FTC's Reply") [Doc. # 668];
- The Receiver's October 4, 2021 Reply re the Receiver's Final Report ("Receiver's Reply") [Doc. # 669];
- Inter/Media's October 4, 2021 Supplemental Response re the Receiver's Final Report ("Inter/Media's Supplemental Response") [Doc. # 670];[1]
- VPL's October 7, 2021 Status Report regarding its tax return [Doc. # 672];
- TPI's October 12, 2021 Reply re the Receiver's and Inter/Media's Replies ("TPI's Reply") [Doc. # 674];

---

[1] The Court's August 26, 2021 Order requesting briefing on the Receiver's Final Report did not specifically authorize a Reply by Inter/Media.  Because Inter/Media filed its Supplemental Response in accordance with the Court's briefing schedule, however, and in the interest of resolving the issues in this case, the Court will accept and consider the Supplemental Response.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 2 of 10 |

- Defendants' October 17, 2021 Status Report regarding the passing of Brick Kane [Doc. # 678]; and
- Defendants' October 29, 2021 Notice of Supplemental Authority [Doc. # 680].

The Court held a videoconference hearing on this matter on November 3, 2021.  Having duly considered the parties' briefs and arguments, the Court issues the following Order.

**1.      Proposed Judgment**

The FTC submitted a Proposed Judgment and a Proposed Default Judgment in accordance with the Court's Order.  Defendants have stated that, subject to prior objections made, they do not object to the form of the Proposed Judgments.  The Court therefore intends to adopt the FTC's Proposed Judgments.

**2.      Interpleader**

On August 26, 2021, the Court determined that because there would be no monetary judgment in this matter, there would be no claims process in this Court.  [Doc. # 650.]  The Court sought the Receiver's recommendation for disbursal of the remaining assets in the Receivership estate, taking into account the Court's prior orders.  At the September 17, 2021 status conference, and in its Final Report, the Receiver recommended an interpleader action in state court to determine the proper distribution of the funds remaining in the Receivership estate, including the TPI Deposited Funds (discussed below).

The FTC and Inter/Media generally support this proposal.  [*See* Doc. ## 661, 666.] Defendants, VPL, and TPI oppose it.  [*See* Doc. ## 661, 667.]

**A.      Propriety of Interpleader**

VPL and TPI object to the use of an interpleader action to resolve competing claims to the money remaining in the Receivership estate, arguing that it is improper as a procedural vehicle.

Under California law, "[a]ny . . . entity against whom double or multiple claims are made, or may be made, by two or more persons which are such that they may give rise to double or multiple liability, may bring an action against the claimants to compel them to interplead and litigate their several claims."  Cal. Civ. Code § 386(b).  Although the statutory language refers to a party "against whom double or multiple claims are made, or may be made," California courts have made clear that "the 'true test of suitability for interpleader is the stakeholder's disavowal of interest in the property sought to be interpleaded, coupled with the perceived ability of the court to resolve the entire controversy as to entitlement to that property without the need for the

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 3 of 10 |

stakeholder to be a party to the suit.'" *Hood v. Gonzales*, 43 Cal. App. 5th 57, 80 (2019) (quoting *Pacific Loan Mgmt. Corp. v. Superior Court*, 196 Cal. App. 3d 1485, 1489-90 (1987)).

VPL and TPI both cite to *Westamerica Bank v. City of Berkeley* for the idea that the plaintiff in an interpleader must allege facts "showing a reasonable probability of double vexation." 201 Cal. App. 4th 598, 608 (2011). VPL and TPI argue that because the Receiver would not be subject to liability for distributing the Receivership estate in accordance with an order from this Court, the Receiver is not a proper plaintiff in an interpleader action under California law.

The Court agrees that the Receiver would not be subject to liability for distributing the funds in accordance with a court order. *Westamerica* does not support VPL and TPI's suggestion, however, that an interpleader plaintiff actually must be subject to liability.

In *Westamerica*, the California Court of Appeal affirmed the trial court's dismissal of an interpleader complaint filed by Westamerica Bank, which served as the escrow agent for retention funds deposited by a builder engaged by the City of Berkeley to construct a public library. 201 Cal. App. 4th at 600. The retention funds consisted of securities that, although deposited by the builder, could be distributed to the City in the event of default by the builder. *Id.* After a dispute between the City and the builder, the City demanded the funds, and the builder threatened to sue the bank if the funds were released. *Id.* at 600-01. The bank filed an action in interpleader, naming the City and the builder as defendants. *Id.* at 601.

The Court of Appeal affirmed the trial court's grant of a demurrer on the basis that, although the contractor threatened to sue the bank if the bank did not release the funds to the contractor, there was no "reasonable probability" that the bank would be subject to double liability if it released the funds to one party or the other. 201 Cal. App. 4th at 601. The court closely analyzed the statutory scheme governing the escrow agreement, which created a mechanism for cities to obtain security deposits to guard against breach by contractors without preventing the contractors from earning interest on their earnings. *Id.* at 608-612. Based on the language and legislative history of the statute, the court concluded that there was no real dispute as to who was entitled to disbursal of the funds held in escrow—the City was clearly entitled to immediate distribution upon demand. *Id.* at 612. The court held narrowly that "the equitable remedy of interpleader is not available on the facts alleged when taken together with the terms of the escrow agreement." *Id.* at 613.

VPL and TPI hang their hats on the court's discussion of the escrow agreement's "hold harmless" provision, which provided that the bank could not be sued if it complied with the statutory directive to provide the funds to the City upon demand. *See* 201 Cal. App. 4th at 609. But the court's analysis does not support the proposition that an interpleader plaintiff must face the possibility of legal liability. Rather, the court emphasized the "hold harmless" provision because the provision gave the bank clear guidance that it would only be subject to liability if the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 4 of 10 |
|---|---|---|---|

bank refused to release the funds to the City. *Id.* at 609; *accord Placer Foreclosure, Inc. v. Aflalo*, 23 Cal. App. 5th 1109, 1115 (2018) (affirming dismissal of interpleader in light of clear statutory direction regarding how to disburse funds).

A subsequent case distinguishing *Westamerica* has made clear that a threat of suit is not an element of interpleader. *Hood*, 43 Cal. App. 5th at 76 ("At the core of the interpleader procedure is the notion that a 'claimant' is not a defendant from whom affirmative relief is sought." (citations omitted)). The cases cited by the parties opposing interpleader stand for the proposition that there must be a real contest regarding which interpleader defendant owns the property in question. That is the case here.

## B.     Propriety of Interpleading the Deposited Funds

The largest source of funds remaining in the Receivership estate is the approximately $1.2 million USD deposited by TPI (the "Deposited Funds"). At the hearing on this matter, TPI argued that because there are no other claimants in this action who claim ownership of the Deposited Funds, the Deposited Funds should not be included in the interpleader action. TPI is correct that none of the parties in this action contest the ownership of the Deposited Funds. TPI is also correct that the Court previously made preliminary findings regarding TPI's ownership of the Deposited Funds *vis à vis* the parties in this case, and found "insufficient evidence in the current record that either Cardiff is an alter ego of TPI, such that ownership can be imputed to either of them." *See* August 5, 2021 Order at 3 n.1 [Doc. # 640].

The Court made these preliminary findings, however, in the context of considering how this Court would distribute the property remaining in the Receivership estate without overseeing a final claims process. August 5, 2021 Order at 3 (describing the Court's initial proposal for distribution of the remaining Receivership property if no consumer claims process was possible). Moreover, while neither of the parties to this case currently contests TPI's ownership of the Deposited Funds, the FTC noted in the hearing that this is because the FTC considers the issue moot *as to the FTC*. This Court has not made any dispositive findings regarding the ownership of the Deposited Funds. In addition, it is clear that multiple claimants who are not parties to this litigation assert claims to the Deposited Funds. After the Court issued its August 5, 2021 Order, counsel for a number of non-parties interested in the issue of TPI's ownership of the Deposited Funds have filed notices of appearance and applications to appear *pro hac vice* in this case. [Doc. ## 642, 643, 646.] The Receiver reports being approached by the same parties, who wish to assert claims against TPI regarding the Deposited Funds. Final Report at 9-10.

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 5 of 10 |
|---|---|---|---|

The Receiver has identified a long list of claimants to funds held in the Receivership estate, including the Deposited Funds. An interpleader action[2] that allows all potential claimants an opportunity to assert their claims is the most equitable way to wind up the Receivership. The Court will adopt the Receiver's proposal to interplead the funds remaining in the Receivership estate in state court.

**3.      Reallocation of Receivership Funds**

The Receiver proposes reallocating some of the funds remaining in the Receivership estate to do equity as between the parties and non-parties. The Receiver's specific proposals are discussed below.

**A.      Use of the TPI Deposited Funds to Pay for Poujade/TPI-Related Costs**

On July 20, 2021, the Court issued an Order regarding Jacques Poujade and TPI's motion for release of the Deposited Funds. [Doc. # 636.] As the Court discussed in that Order, the Court has previously found that the Deposited Funds are Receivership Property. *See id.* at 4. The Court also noted that it has "consistently informed Poujade and TPI that they would litigate the issue of ownership of the Deposited Funds at a post-judgment claims proceeding." *Id.* at 5-6. In that Order, the Court instructed the Receiver to "account for the portion of its past fees associated with litigation over the Deposited Funds as paid from the Deposited Funds." *Id.* at 8.

In its Final Report, the Receiver states that it has accounted for the portion of its past fees associated with litigation over the Deposited Funds as paid from the Deposited Funds. That complies with the Court's July 20, 2021 Order.

TPI argues that this reallocation is inequitable. *See* TPI Response at 6-8. This is essentially a request for the Court to reconsider its prior orders, which the Court declines to do because TPI has not demonstrated that reconsideration is warranted under the applicable standard. *See* C.D. Cal. L. R. 7-18 (limiting grounds for reconsideration to "(a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the

---

[2] TPI asserts that it "may" not be able to defend itself in a California court because it is not qualified to do business in California. Although a foreign corporation that transacts intrastate business in California without obtaining a certificate of qualification may not "maintain" an action in a California court, *see* Cal. Corp. Code § 2203, TPI does not indicate that it is such a corporation. Even if it is, this restriction does not extend to the defense of an action. *See Conseco Mktg., LLC v. IFA & Ins. Servs., Inc.,* 221 Cal. App. 4th 831, 840 (2013) ("A foreign corporation transacting intrastate business which has failed to qualify with the Secretary of State may nevertheless defend an action brought against it in state court and may also commence an action in state court; it may not, however, maintain an action commenced prior to qualification, except upon the satisfaction of certain conditions.") (citing *United Medical Management Ltd. v. Gatto,* 49 Cal. App. 4th 1732, 1739 (1996)). TPI has not explained why it cannot defend its interests in a California court interpleader action.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 6 of 10 |
|---|---|---|---|

emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered.")  Two other issues raised by TPI, however, are discussed below.

### i.      Propriety of Receivership Fees Charged to Deposited Funds

TPI argues that the Receiver has charged the Deposited Funds for costs that cannot reasonably be attributed to litigation over the ownership of the Deposited Funds.  In particular, TPI notes that nearly half the fees the Receiver attributes to TPI were incurred after Jacques Poujade's contempt motion was resolved.  TPI also accuses the Receiver of charging TPI for nearly all its activities during this period, even though not all its activities were related to the litigation over the Deposited Funds.  TPI Response at 8-9.

TPI's argument is factually incorrect.  An order was entered in the Poujade contempt motion on August 27, 2019, but the issue was not resolved with that order.  Poujade continued to litigate the issue long afterward, including objecting to the FTC's proposed order regarding the Deposited Funds [*see* Doc. # 226 and associated filings], moving to intervene in this litigation [*see* Doc. # 231 and associated filings], an *ex parte* application seeking modification or a stay of the order [*see* Doc. # 243 and associated filings], an appeal to the Ninth Circuit, briefing on another contempt motion in 2020 [*see* Doc. # 342 and associated filings], and briefing this year on Poujade and TPI's motion for return of the Deposited Funds [*see* Doc. # 576 and associated filings].

TPI does not object to any specific billing entry by the Receiver.  Absent any specific objections by TPI, the Court will accept the Receiver's calculation of which litigation costs should be allocated to TPI.

### ii.      Reallocation to Redwood

In its Final Report, the Receiver proposes a slight deviation from the Court's July 20, 2021 Order.  The Receiver notes that the Court ordered the Receivership fees related to the litigation over the Deposited Funds reallocated to VPL, but asserts that VPL actually paid only a small portion of those fees—only $1,003.90—and instead proposes reallocating those funds to Redwood, the entity which actually paid most of those costs.  The Receiver proposes that this approach is more equitable.  *See* Final Report at 8.

TPI objects to the reallocation of funds to Redwood on the basis that the Court's August 5, 2021 Order provided that Cardiff funds should be applied first to cover Receivership costs.  *See* TPI Response at 4-5 [Doc. # 661]; *see also* August 5, 2021 Order at 3 [Doc. # 640].

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 7 of 10 |
|---|---|---|---|

VPL argues that reallocation of funds to Redwood would be inequitable, since VPL has paid an outsize share of the Receivership costs over the course of the Receivership. VPL argues that the funds should instead be reallocated to VPL.

The Court agrees with the Receiver that reallocating these funds to the parties who initially paid them is the most equitable outcome. The Court previously made clear that TPI funds should be used to pay for some of the Receivership's costs incurred in litigating the ownership of the Deposited Funds. *See* July 20, 2021 Order at 8. While the Court was initially of the impression that most of the Receivership costs incurred in litigating the TPI/Poujade contempt issues were paid from VPL funds, that was factually incorrect. The Receiver has pointed out that most of those costs were paid from Redwood funds. The Receiver has reallocated those funds to the entities which paid those costs, restoring the *status quo ante*.[3] The Court therefore adopts the Receiver's recommendation to reallocate these funds from the Deposited Funds to Redwood.[4]

VPL argues that, if the Court allows reallocation of a portion of the Deposited Funds to reimburse Redwood for Receivership fees, it should also allow for reimbursement of VPL for Receivership fees. VPL makes several arguments regarding who should reimburse those fees, including the FTC and TPI. VPL also submits a declaration from an accountant that purports to trace all the remaining funds in the Receivership estate to VPL. VPL finally argues that the FTC should reimburse VPL for all Receivership costs because the Receivership was invalid from its inception.

The Court disagrees. First, what remains of VPL funds are *the Cardiffs'* share of the VPL funds. Therefore, any claim that Bedi has to those funds must be asserted against the Cardiffs. Second, the Court has previously found that the Receivership was lawful under pre-existing binding Ninth Circuit authority, and VPL's thinly-veiled request for the Court to reconsider its prior orders is unavailing. *See, e.g.*, July 20, 2021 Order at 7.[5] Here, the Court has ordered that

---

[3] The Receiver also notes that reallocating those funds to Redwood allows Inter/Media, a non-party whose claims have been long delayed by this litigation, to assert its claim to those funds. The Court emphasizes that the claims of Inter/Media and other potential creditors will be resolved through the interpleader action, not in this Court. The Court also notes its skepticism regarding Inter/Media's apparent position that it has a claim to all of the Deposited Funds, and not just the amounts reallocated to Redwood by the Receiver's accounting. The Court agrees with Inter/Media, however, that the reallocation should operate *nunc pro tunc* to restore Redwood's position at the time of the initiation of contempt proceedings.

[4] There are three Redwood defendants in this action: Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), and Redwood Scientific Technologies, Inc. (Delaware). To the extent possible, the Receiver should reallocate funds to the Redwood entity that actually paid the fees in question. If that is not possible, the Receiver should reallocate the funds *pro rata* according to the assets of each entity at the time the fees were paid.

[5] Moreover, although the Court previously suggested that the FTC should be responsible for some of the Receivership's costs, that suggestion was in the context of a post-judgment consumer claims process. *See* July 20,

---

CIVIL MINUTES—GENERAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 8 of 10 |
|---|---|---|---|

TPI should pay for the Receivership costs that it and Jacques Poujade caused, and that the entity which actually paid for those costs should be reimbursed. Because VPL was not the entity that actually paid for those costs, there is no justification for reimbursing VPL from these funds.

## 4. Other Issues

### A. Tax Issues

The Receiver asserts that tax claims against the Cardiffs are the responsibility of the Receivership estate. *See* Final Report at 7. The Receiver has allocated a $64,279.56 tax claim *pro rata* to three balances the Receiver attributes to the Cardiffs: the VPL, Cardiff, and Biztank balances. *Id.* Inter/Media appears to argue that these claims should be included in the interpleader.

In establishing the Receivership, this Court ordered the Receiver to cooperate with state and federal law enforcement agencies and to prevent the inequitable distribution of assets. *See* Preliminary Injunction at 23-24 [Doc. # 46]. It would not be equitable to allow pre-Receivership claims by governmental entities—with whom the Receiver is bound to cooperate—to be included in the interpleader action. The Court therefore will accept the Receiver's recommendation to charge these claims *pro rata* to the three balances the Receiver attributes to the Cardiffs.

The Receiver notes that it still must prepare and file VPL's 2020 tax return. *See* Final Report at 11. In its status report, VPL explains that it has already prepared and filed its 2020 tax return. *See* October 7, 2021 Status Report [Doc. # 672]. The Court therefore discharges the Receiver's obligation to prepare VPL's 2020 tax return.

### B. TPI Machines

The Receiver suggests in its Reply that machines owned by TPI and currently subject to monitoring by the Receiver should be held in trust for future claimants against TPI. Receiver's Reply at 5-6.

Although the Court previously ordered that the Receiver would have jurisdiction over the machines [*see* Doc. # 238 at 3-4], the machines were not transferred to the Receivership estate to purge Jacques Poujade's contempt. The Court previously found that the FTC had not established that the Cardiffs owned or controlled any of TPI's asserts "either directly or indirectly," except the Deposited Funds. The Receiver also does not identify a mechanism by which these machines could be held in trust after the dissolution of the Receivership. The Court therefore finds that there

---

2021 Order at 7. Because there will be no consumer claims process, the Court will not order the FTC to pay the costs of the Receivership.

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 9 of 10 |
|---|---|---|---|

is no basis to hold these machines in trust after the Receivership is dissolved and they should be returned to TPI's full possession and control.

**5.     Receiver's Seventh Fee Application and Final Fee Request**

After reallocating funds as discussed above, the Receiver calculated its fees incurred from April 22, 2021 through August 31, 2021 (the "Seventh Fee Application"). The total amount is $226,945.60. The Receiver proposes charging the amount *pro rata* to three balances the Receiver attributes to the Cardiffs: the VPL, Cardiff, and Biztank balances. Final Report at 6.

The Receiver seeks $36,991.80 in fees and $4,469.00 in costs for the Receiver, and $184,028.00 in fees and $1,456.80 in costs for the Receiver's counsel, Frandzel Robins Bloom and Csato, L.C. ("FRBC"). The Court previously approved the Receiver's fees through and including April 21, 2021. [Doc. ## 223, 224, 307, 514, 555, 598.]

The Seventh Fee Application includes 11.3 hours of work by the Receiver relating to researching Defendants' Limelight CRM database, performed at the FTC's request. These hours are attributed to Brick Kane (0.3 hours), Anita Jen (0.1 hours), Flora Jen (10.1 hours), and Tiffany Chung (0.8 hours). Because the Court excluded evidence regarding the Limelight CRM database as a Federal Rule of Civil Procedure 37 discovery sanction [Doc. # 627], the Court finds that it would be unfair to charge the Receivership estate for research relating to this evidence and will deduct these hours from the Receiver's bill. The Court therefore deducts $3,423.15 from the Receiver's fee application.

Moreover, as in prior fee applications, the Court has identified instances of block billing by the Receiver (Anita Jen and Carl DeCius) and FRBC (Craig Welin and Hal Goldflam). Because block billing renders more difficult determinations regarding the reasonableness of the Receiver's fees, the Court will impose a percentage cut, as it has in the past. [*See* Doc. ## 555, 598.] The Court will impose a 5% across the board cut as to the Receiver's and FRBC's fees. The Receiver shall pay itself $31,890.22 in fees and $4,469.00 in costs, and shall pay FRBC $174,826.60 in fees and $1,456.80 in costs. The Court adopts the Receiver's recommendation regarding the source of the fees: the Receiver shall charge its fees to the three balances attributed to the Cardiffs.

The Receiver also estimates that it will incur $68,358.50 in fees from August 31, 2021 until the Receivership estate is wound up. Final Report at 6. The Receiver seeks an order authorizing payment of that amount without a further order from this Court. *See* Final Report, Jen Decl., at ¶ 8 [Doc. # 659-1].

The Court declines to grant the Receiver's final fee request at this juncture. Instead, the Receiver shall post $68,358.50 with the Clerk of Court, to be held in trust for payment of the Receiver's post-judgment final bill. The Receiver shall file its final fee application within 10 days

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 10 of 10 |
|---|---|---|---|

of completing the wind up of the Receivership. The parties and interested non-parties may file any responses within seven days. The Court will then rule on the Receiver's final fee request. If any amount remains after the Court rules on the Receiver's final fee application, the money will be added to the amount in interpleader.

**6.      Conclusion**

In light of the foregoing,

1.   The Court adopts the Receiver's recommendations, except that:
     a.   The machines belonging to TPI shall be returned to TPI's possession and control; and
     b.   The Receiver is discharged of its obligation to prepare and file VPL's 2020 tax return.
2.   The Court approves the Receiver's Seventh Fee Request in the amounts of $31,890.22 in fees and $4,469.00 in costs for the Receiver and $174,826.60 in fees and $1,456.80 in costs for FRBC;
3.   The Receiver shall file an interpleader action and dissolve the Receivership, subject to the reallocation of funds described in the Receiver's Final Report and the modifications specified in the above Order;
4.   At the time the Receiver files the interpleader action, the Receiver shall submit to this Court a Proposed Order discharging the Receiver;
5.   The Receiver shall post $68,358.50 with the Clerk of Court, to be held in trust for payment of the Receiver's post-judgment final bill. The Receiver shall file its final fee application within 10 days of completing the wind up of the Receivership. The parties and interested non-parties may file any responses within seven days. The Court will then rule on the Receiver's final fee request. If any amount remains after the Court rules on the Receiver's final fee application, the money will be added to the amount in interpleader;
6.   The Court will enter its Order terminating the asset freeze and Receivership and discharging the Receiver; and
7.   The Court will enter the Final Judgment against Jason Cardiff and Eunjung Cardiff, and the Default Judgment as to the Corporate Defendants.

**IT IS SO ORDERED.**

# EXHIBIT 13

JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**Federal Trade Commission**,

    Plaintiff,

    v.

**Jason Cardiff**, et al.,

    Defendants.

No. ED CV 18-2104-DMG (PLAx)


FINAL JUDGMENT INCLUDING
PERMANENT INJUNCTION AS
TO DEFENDANTS JASON
CARDIFF AND EUNJUNG
CARDIFF

    On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining

order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership. [Doc. # 1.]

This Court entered a temporary restraining order ("TRO") on October 10, 2018. [Doc. # 29.] On October 24, 2018, the Court extended the TRO as to Defendants Jason Cardiff and Eunjung Cardiff ("the Cardiffs"). [Doc. # 48.] On November 8, 2018, the Court entered a Preliminary Injunction as to Defendants Jason Cardiff and Eunjung Cardiff. [Doc. # 59.]

On August 6, 2020, the Commission moved for summary judgment as to Defendants Jason Cardiff and Eunjung Cardiff on all counts of the Complaint. [Doc. # 423.] On October 9, 2020, the Court granted summary judgment against the Cardiffs on all sixteen counts in the Commission's Complaint. [Doc. # 511.] The Commission filed a proposed Final Judgment on September 3, 2021. [Doc. # 651.]

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

1.     This Court has jurisdiction over this matter and over the Cardiffs and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

2.     At all relevant times, the Cardiffs' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3.     The Complaint charged that Defendants, including Jason Cardiff and Eunjung Cardiff, participated in deceptive and unfair acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of

ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a),

Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. §

1005.10(b), and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule

("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in the marketing of Defendants' oral film

strips and the Rengalife multilevel marketing program. The Complaint sought

both permanent injunctive relief and equitable monetary relief for the challenged

acts or practices.

      4.    The Complaint stated a claim upon which relief can be granted against

the Cardiffs.

      5.    The Cardiffs violated Sections 5(a) and 12 of the Federal Trade

Commission Act, 15 U.S.C. §§ 45(a) and 52, by making:

      a.    False or unsubstantiated efficacy clams and false proof claims
for their oral film strips TBX-FREE, Eupepsia Thin, and
Prolongz;

      b.    False money-back guarantee claims for those oral film strips;

      c.    False claims that Eupepsia Thin oral film strips were made in
the United States, and that testimonialists appearing in
advertising for Eupepsia Thin had used the product to lose
weight; and

      d.    False claims that consumers would not be enrolled in an
autoship program and that their credit or debit card would be
charged only for a one-time purchase of oral film strips.

      6.    The Cardiffs violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

by:

      a.    Failing to disclose, or disclose adequately, that consumers who
provided their billing information for a product order would be
enrolled automatically in a continuity plan for future

autoshipments of oral film strips that would be charged to their credit or debit cards; and

b. Making false and unsubstantiated claims that people who became Rengalife members were likely to earn substantial income.

7. The Cardiffs violated Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), 45(n), by causing charges to be submitted for payment to consumers' credit and debit cards without the express informed consent of those consumers.

8. The Cardiffs violated Section 4 of ROSCA, 15 U.S.C. § 8403, by charging consumers for TBX-FREE oral film strips sold over the Internet through a negative option feature as defined in the TSR, 16 C.F.R. §3102(w) without: (a) clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (b) obtaining the consumer's express informed consent before making the charge; and (c) providing a simple mechanism to stop recurring charges.

9. The Cardiffs violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), by debiting consumers' bank accounts without first obtaining written authorizations signed or similarly authorized by those consumers for preauthorized electronic fund transfers from their accounts, or providing those consumers a copy of a written authorization signed or similarly authenticated by them.

10. The Cardiffs violated the TSR by initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages intended to induce the purchase of oral film strips.

11. The Cardiffs operated the Corporate Defendants as a common enterprise, and the Corporate Defendants were "all involved in the sale of the Products [with] money, products, and employees flow[ing] freely between them." Summary Judgment Order at 20-21 [Doc. # 511]. The Cardiffs were the

4

"beneficiaries and masterminds" of the common enterprise, and "had knowledge of the misrepresentations in advertising or were recklessly indifferent to the falsity of the misrepresentations." *Id.*

12. At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in Findings 5 to 11, above, and both of them are therefore liable for injunctive relief.

13. At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff knew of or were recklessly indifferent to the acts and practices set forth in Findings 5 to 11, above.

14. The danger of future violations by Jason Cardiff and Eunjung Cardiff justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

15. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief for the Defendants' law violations. Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

16. This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

17. Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon Jason Cardiff and Eunjung Cardiff, their successors and assigns, and their officers, agents, employees and attorneys, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

18. Entry of this Order is in the public interest, and there being no just reason for delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

5

**THEREFORE, IT IS ORDERED** as follows:

**DEFINITIONS**

For the purpose of this Order, the following definitions shall apply:

A. **"Acquirer"** or **"Acquiring Bank"** means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B. **"Billing Information"** means any data that enables any person to access a consumer's account, such as a credit card, debit card, checking, savings, share or similar account, utility bill, or mortgage loan account.

C. **"Business Venture"** means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or means to offer, sell, or distribute Goods or Services. The definition of Business Venture includes multilevel marketing programs.

D. **"Charge(s),"** **"Charged,"** or **"Charging"** means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

E. **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

    1. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television

6

advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F. **"Covered Product"** means any Dietary Supplement, Food, Drug, or Device.

7

G.     **"Credit Card Laundering"** means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H.     **"Credit Card Sales Draft"** means any record or evidence of a credit card transaction.

I.     **"Corporate Defendant(s)"** means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.      **"Defendant(s)"** means all of the named Defendants, individually, collectively, or in any combination.

K.     **"Device"** means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other

8

animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

L.  **"Dietary Supplement"** means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M.  **"Drug"** means:  (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N.  **"Essentially Equivalent Product"** means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of

additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O.    "**Financial Institution**" means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P.    "**Food**" means:  (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q.    "**Good(s) or Service(s)**" includes merchandise, products, plans, or programs.

R.    "**Investment Opportunity**" means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S.    "**Made in the United States**" means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T.    "**Merchant**" means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U.    "**Merchant Account**" means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V.    "**Negative Option Feature**" means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or

failure to take affirmative action to reject a Good or Service, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

W.     **"Payment Processing"** means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

X.     **"Person"** means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

Y.     **"Preauthorized Electronic Fund Transfer"** means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

Z.     **"Receiver"** means Robb Evans & Associates, LLC.

## ORDER

### I.     BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined

11

from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

## II. BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

## III. BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, facilitating, or advising, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

## IV. BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any dissolvable oral film strip to end-user consumers.

## V. PROHIBITED REPRESENTATIONS: HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling,

12

advertising, promotion, offering for sale, sale, or distribution of any Covered

Product are permanently restrained and enjoined from making, or assisting others

in making, expressly or by implication, including through the use of a product

name, endorsement, depiction, or illustration, any representation that such product:

A.   Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

B.   Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

C.   Suppresses or helps suppress appetite;

D.   Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

E.   Helps users avoid gaining back any weight they lost;

F.   Increases ejaculation control or the duration of sex;

G.   Treats or prevents premature ejaculation;

H.   Cures, mitigates, or treats any disease; or

I.   Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such

representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent

and reliable scientific evidence substantiating that the representation is true.  For

purposes of this Section, competent and reliable scientific evidence must consist of

human clinical testing of the product, or of an Essentially Equivalent Product, that

is sufficient in quality and quantity based on standards generally accepted by

experts in the relevant disease, condition, or function to which the representation

relates, when considered in light of the entire body of relevant and reliable

scientific evidence, to substantiate that the representation is true.  Such testing

must be:  (1) randomized, double-blind, and placebo-controlled; and (2) conducted

by researchers qualified by training and experience to conduct such testing. In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VI. PROHIBITED REPRESENTATIONS: OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations: Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

14

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true. In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII.   PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Jason Cardiff or Eunjung Cardiff rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A.      All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B.      All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

C.     Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not complete the test; source documents for such data; any data dictionaries; and any case report forms;

D.     All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E.     All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a reliably reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by: (1) Jason Cardiff or Eunjung Cardiff; (2) their officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with Jason Cardiff or Eunjung Cardiff; (4) any person or entity affiliated with or acting on behalf of Jason Cardiff or Eunjung Cardiff; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For purposes of this Section, "reliably reported test" means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

For any test conducted, controlled, or sponsored, in whole or in part, by or on behalf of, Jason Cardiff or Eunjung Cardiff, they must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants.  These procedures must

16

be documented in writing and must contain administrative, technical, and physical safeguards appropriate to the size and complexity of the entity sponsoring the test, the nature and scope of that entity's activities, and the sensitivity of the personal information collected from or about the participants.

## VIII. PROHIBITED REPRESENTATIONS: TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

    A.    That the product is clinically proven to:

        1.    Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

        2.    Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

        3.    Suppress or help suppress appetite;

        4.    Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

        5.    Help users avoid gaining back any weight they lost;

        6.    Increase ejaculation control or the duration of sex;

        7.    Treat or prevent premature ejaculation; or

        8.    Be comparable or superior to other treatments for quitting smoking.

    B.    That the performance or benefits of the product are scientifically or

17

clinically proven or otherwise established; or

C.    The existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research.

## IX.   FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A.    For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h,  ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with  Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B.    For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## X.   PROHIBITED MISREPRESENTATIONS:  ENDORSEMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others

in making, any misrepresentation, expressly or by implication, (1) about the status

of any endorser or person providing a review of the Good or Service, including a

misrepresentation that the endorser or reviewer is an independent or ordinary user

of the Good or Service, or (2) that any person or organization has endorsed any

Good or Service.

## XI.    PROHIBITED MISREPRESENTATIONS:  U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their

officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether

acting directly or indirectly, in connection with the manufacturing, labeling,

advertising, promotion, offering for sale, sale, or distribution of any Good or

Service, or any other product, are permanently restrained and enjoined from

making, or assisting others in making, any representation, expressly or by

implication, that it is Made in the United States unless:

A.    The final assembly or processing of the product occurs in the United

States, all significant processing that goes into the product occurs in the United

States, and all or virtually all ingredients or components of the product are made

and sourced in the United States; or

B.    A Clear and Conspicuous qualification appears immediately adjacent

to the representation that accurately conveys the extent to which the product

contains foreign parts, ingredients or components, and/or processing; or

C.    For a claim that a product is assembled in the United States, the

product is last substantially transformed in the United States, the product's

principal assembly takes place in the United States, and United States assembly

operations are substantial.

## XII.    PROHIBITED REPRESENTATIONS:  EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their

officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

A.     Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

      1.     That participants will or are likely to achieve substantial sales or earn substantial income or profit;

      2.     The amount of sales, income, or profit that participants have actually earned;

      3.     The amount of time or effort required to earn an amount of compensation or to advance; or

      4.     The total costs or any material restrictions, limitations, or conditions;

B.     Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time it is made, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII.  PROHIBITED MISREPRESENTATIONS:  OTHER MATERIAL FACTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

A.   The success rate or rate of customer satisfaction;

B.   The total costs;

C.   Any refund policy;

D.   Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

E.   Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

F.   Any cost to the consumer to purchase, receive, use, or return the Good or Service;

G.   That the consumer will not be Charged for any Good or Service;

H.   That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

I.   The timing or manner of any Charge or bill;

J.   That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K.     The purpose(s) for which the consumer's Billing Information will be used;

L.     The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M.     That a transaction has been authorized by the consumer; or

N.     Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV.  PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy to make refunds or allow returns or cancellations.

## XV.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.     Credit Card Laundering;

B.     Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C.     Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material

22

information related to a Merchant Account including, but not limited to, the
identity of any owner, manager, director, or officer of the applicant for or holder of
a Merchant Account, and any connection between an owner, manager, director, or
officer of the applicant for or holder of a Merchant Account and any third person
who has been or is placed in a Merchant Account monitoring program, had a
Merchant Account terminated by a payment processor or a Financial Institution, or
has been fined or otherwise disciplined in connection with a Merchant Account by
a payment processor or a Financial Institution; and

D.     Engaging in any tactics to avoid fraud-and-risk-monitoring programs
established by any Financial Institution, Acquiring Bank, or the operators of any
payment system, including, but not limited to, tactics such as balancing or
distributing sales transactions among multiple Merchant Accounts or merchant
billing descriptors; splitting a single sales transaction into multiple smaller
transactions; or using a shell company to apply for a Merchant Account.

## XVI.  PROHIBITION AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their
officers, agents, employees, and attorneys, and all other persons in active concert
or participation with any of them, who receive actual notice of this Order, whether
acting directly or indirectly, in connection with the advertising, promotion, offering
for sale, or sale of any Good or Service, are permanently restrained and enjoined
from Charging, causing to be Charged, assisting others in Charging, or attempting
to Charge any consumer, without obtaining the consumer's express informed
consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their
officers, agents, employees, and attorneys, and all other persons in active concert
or participation with any of them, who receive actual notice of this Order, whether

23

acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

     A.   Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

     B.   Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII.   CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that:

     A.   Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

          1.   Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Corporate Defendants obtained prior to entry of this Order in connection with the advertising, promotion, offering for sale, or sale of Defendants' oral film strips or Rengalife; and

          2.   Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

B.     Upon termination of the receivership, the Receiver shall not return any customer information to the Defendants.

## XIX.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff obtain acknowledgments of receipt of this Order:

A.     Jason Cardiff and Eunjung Cardiff, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, must deliver a copy of this Order  to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which Jason Cardiff or Eunjung Cardiff delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.  COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff make timely submissions to the Commission:

A.      One year after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance report, sworn under penalty of perjury.  Each of them must:

1.      Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.      Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.      Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.      Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

5.      Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.      Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Jason Cardiff and Eunjung Cardiff must describe if they know or should know due to their own involvement);

7.      Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.      Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.      For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

26

1.      Name, including aliases or fictitious name, or residence address;

2.      Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.      Any designated point of contact; or

4.      The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.      Jason Cardiff and Eunjung Cardiff must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin:  FTC v. Jason Cardiff, et al., X190001.

## XXI. RECORDKEEPING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Jason Cardiff and Eunjung Cardiff, for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A. Accounting records showing the revenues from all Goods or Services sold;

B. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Jason Cardiff and Eunjung Cardiff's compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, Jason Cardiff and Eunjung Cardiff each must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of

28

Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.     For matters concerning this Order, the Commission is authorized to communicate directly with Jason Cardiff and Eunjung Cardiff.  Jason Cardiff and Eunjung Cardiff must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.     The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.     Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Jason Cardiff and Eunjung Cardiff, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII.   EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

A.     Upon entry of this Order, the provisions of the Preliminary Injunction [Doc. # 59], including the asset freeze and receivership, shall expire, except to the extent provided in the Court's February 28, 2022 Order regarding discharge of the Receiver [Doc. # 702].  Upon the Receiver's completion of the tasks described in paragraphs 5 through 11 of that Order, and the Court's approval of the Receiver's final report, the Receiver will be discharged for all purposes.

## XXIV.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this 1st day of March, 2022.**

**DOLLY M. GEE**
**UNITED STATES DISTRICT JUDGE**